**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **GLENN TYLER CHRISTIE, et al.,** | ) |
| | ) |
| | ) |
| **Plaintiffs,** | ) |
| **v.** | ) |
| | ) **Civil Action No. 1:19-cv-01289-BAH** |
| | ) |
| **THE ISLAMIC REPUBLIC OF IRAN, et al.,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

**MEMORANDUM IN SUPPORT OF MOTION FOR**
**DEFAULT JUDGMENT AS TO LIABILITY AND DAMAGES**
**AND ENTRY OF FINAL JUDGMENT**

Plaintiffs respectfully submit this Memorandum in support of their Motion for Default Judgment as to Liability and Damages, and entry of Final Judgment against all Defendants. Plaintiffs incorporate by reference their motion to Take Judicial Notice of Evidence in Prior Related Cases and for Entry of Default as to Liability pending before this Court.  (ECF No. 29.)

In support of Plaintiffs' Motion, Plaintiffs submit individual declarations and accompanying exhibits, describing the serious physical and emotional injuries suffered by the Plaintiffs as a result of the terrorist attack on Khobar Towers.

**I.     BACKGROUND**

This case arises out of the June 25, 1996, terrorist attack on the United States Air Force housing complex, Khobar Towers, in Dhahran, Saudi Arabia ("the Attack").  The Attack was one of the deadliest attacks on United States Forces abroad, killing 19 U.S. Airmen and wounding nearly 500 others.  A tanker truck, loaded with 20,000 pounds of explosive, was detonated by terrorists next to Khobar Towers Building 131.  The blast blew off much of the eight-story building and left a crater 50 feet wide and 16 feet deep and shattered windows more

1

than a half a mile away. The blast killed 19 Air Force service members and injured many others.

At the time of the Attack, the Khobar Towers complex was housing United States Air Force and other service members who were assigned to Dhahran Air Base in Dhahran, Saudi Arabia, as part of Operation Southern Watch, to enforce a no-fly zone over southern Iraq.

Plaintiffs are fourteen (14) injured service members of the armed forces who survived the blast and twenty-one (21) of their immediate family members, who suffered physical and/or mental and/or emotional injuries as a result of the terrorist attack on Khobar Towers.

Injured service member Plaintiffs employed by the United States Air Force who suffered serious physical and psychological injuries as a result of the Attack include Glenn Tyler Christie, Clayton Omar Zook, Joseph Martin Jackson, Christopher Pius Nagel, Bryant Keith White, Ricky Lee Morse, Scott Elliott Rikard, William Christian Nevins, Timothy Michael Schomaker, Steven Neal Wilson, Nathan Frederick Baloy, Jackie Douglas Swogger, Chad Allen McCullough, and LeSandro Edwin Santiago ("Injured Service Member Plaintiffs").

Immediate family member Plaintiffs of the service member victims who suffered severe emotional distress as a result of the Attack on their loved ones include Janet Louise Christie, Sandra Olivia Bouse, Janet Lynn Douglass, Gregory Anthony Russell, Crystal Lynn Love, Sheila Lynn Jackson, William Richard Jackson, Melissa Dawn Jackson, RaeAnn Beth Nagel, Bernardine Clementine Nagel, Terese Marie Hunnel, Gerard Paul Nagel, Michael John Nagel, Mary Margaret Wilmes, Robert Charles Nagel, Patrick James Nagel, Carolyn Ann Nagel, Georgiana White, Kristina Lacava-Nevins, Kimberly Michelle Wilson, and Jackie Douglas Swogger ("Immediate Family Member Plaintiffs").

The Defendants are the Islamic Republic of Iran ("Iran"), a foreign sovereign state, and its political subdivisions, the Iranian Ministry of Intelligence and Security ("MOIS") and the Iranian

Islamic Revolutionary Guard Corps ("IRGC") (collectively "The Iranian Defendants").  These Defendants have previously been held liable for providing material support and resources to the terrorists who carried out the bombing on the Khobar Towers complex.  *E.g.*, *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1 (D.D.C. 2018); *Schooley v. Islamic Republic of Iran*, No. 17-1376; 2019 U.S. Dist. LEXIS 108011 (D.D.C. June 27, 2019)(BAH); *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (D.D.C. 2006); *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006); *Rimkus v. Islamic Republic of Iran*, 750 F. Supp.2d 163 (D.D.C. 2010).

## II.    PROCEDURAL HISTORY

The Plaintiffs filed a Complaint on May 3, 2019, against the Defendants Iran, MOIS, and IRGC, pursuant to the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, which allows victims of terrorism to file suit against foreign sovereign state-sponsors of terrorism.  (ECF No. 1.)  On May 28, 2019, the Plaintiffs filed their Amended Complaint against all Defendants.  (ECF No. 9.)[1]  After attempting service on the Defendants pursuant to 28 U.S.C. § 1608(a)(3), (as service under 1608(a)(1) and (2) were not available) (ECF Nos. 17 and 18), the Plaintiffs properly served all Defendants pursuant to 1608(a)(4) via diplomatic channels.  (ECF Nos. 19-21.)  On January 6, 2020, service was completed on all Defendants.  (ECF Nos. 22-25.)  On January 7, 2020, the Plaintiffs filed a Motion for Entry of Default pursuant to Rule 55(a).  (ECF No. 26.)

On January 23, 2020, the Clerk entered a Default as to all Defendants (ECF No. 30), thereby satisfying the Court's requirement for personal jurisdiction before entering judgment against an absent defendant. See *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005).

---

[1] On May 31, 2019, the Plaintiffs resubmitted the Amended Complaint with a redlined version. (ECF Nos. 12, and 12-1.)

On January 23, 2020, the Plaintiffs filed a Motion to Take Judicial Notice of Prior Related Cases under Fed. R. Evid. 201 and Entry of Default Judgment on Liability under Rule 55(b).  (ECF No. 29.)  In their Motion, the Plaintiffs requested that the Court take judicial notice of prior findings of fact and supporting evidence imposing liability under Section 1605A (and its predecessor, Section 1605(a)(7)) on Iran, IRGC and MOIS,  for providing material support and resources to the terrorists who carried out the attack on the Khobar Towers complex on June 25, 1996.  (ECF No. 29.)  The Plaintiffs also sought approval from the Court to file documentary evidence as to the Plaintiffs' damages under seal along with a redacted version for the public docket.  (ECF No. 29.)

On January 24, 2020, the court granted the Plaintiffs' Request to Submit Documentary Evidence Under Seal and directed the Plaintiffs to file a version of their declarations and exhibits on the public docket redacting personally identifiable information, and any medical and other sensitive personal information. *See* Minute Order of January 24, 2020.

On January 24, 2020, the Plaintiffs filed a motion for expedited consideration of the Plaintiffs' Rule 55(b) Motion to Take Judicial Notice of Prior Related Cases and Entry of a Default Judgment on Liability.  (ECF No. 31.)

On January 28, 2020, the Plaintiffs filed a notice of voluntary withdrawal of their claims for punitive damages without prejudice in consideration of the decision of the United States Court of Appeals for the District of Columbia in *Owens v. Rep. of Sudan*, 864 F.3d 751, 812 (D.C. Cir. 2017).  (ECF No. 34.)  In that notice, the Plaintiffs filed for voluntary withdrawal of their claims for economic damages without prejudice as well.

## III.   PLAINTIFFS ARE ENTITLED TO A FINAL JUDGMENT ON LIABILITY AGAINST ALL DEFENDANTS

### A.  Legal Standard For Liability

The Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–1611 ("FSIA"), provides the

sole basis for obtaining jurisdiction over a foreign state in the United States. *Argentine Republic v. Amerada Hess Shipping Corp*., 488 U.S. 428, 434 (1989).

Pursuant to the FSIA and Federal Rule of Civil Procedure 55(b)(2), the court may enter a default judgment upon application by a party seeking that relief where (1) the court has subject matter jurisdiction over the claims; (2) personal jurisdiction is properly exercised over defendant; and (3) plaintiff has presented satisfactory evidence to establish its claim against defendant. *Thuneibat v. Syrian Arab Republic*, 167 F.Supp.3d 22, 33 (D.D.C. 2016).

### 1.  Subject Matter Jurisdiction

Under FSIA, subject matter jurisdiction exists where the defendant's conduct falls within one of the specific statutory exceptions to immunity.  See *Owens v. Republic of Sudan,* 882 F. Supp. 2d 128, 143 (D.D.C. 2012) and 28 U.S.C. §§ 1330(a) and 1604.

Chief Judge Lamberth has explained that the defendant's conduct falls within the "state sponsor of terrorism" exception to immunity where the following elements are satisfied:

> (1) money damages are sought (2) against that state for (3) personal injury or death that (4) was "caused by" (5) an act of torture, extrajudicial killing . . . or the provision of material support of resources for such an act if such act or provision of material support or resources is engaged in by an official, employee or agent of such foreign state while acting within the scope of his or her office, employment or agency.  Furthermore, the FSIA provides that courts "shall hear a claim" under § 1605A of the FSIA if (1) the foreign state was designated as a state sponsor of terrorism at the time the act occurred; (2) the claimant was a United States national, a member of the armed forces, or otherwise, an employee or contractor of the Government of the United States, acting within the scope of her employment and (3) the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim, provided that the act occurred in the foreign state against which the claim is brought.

*Harrison v. Rep. of Sudan*, 882 F. Supp. 2d 23, 28 (D.D.C. 2012) (quoting 28 U.S.C. § 1605A(a)(1) and (a)(2)).

Here, the elements have been met and the Court has subject matter jurisdiction.  The court should hear this claim for the foregoing reasons.  First, it is well established that Iran is now, and has continuously been since 1984, a state sponsor of terrorism.  Iran was designated by the

Secretary of State, George P. Shultz, on January 23, 1984, in accordance with the Export Administration Act of 1979, as a "country which has repeatedly provided support for acts of international terrorism." 49 Fed. Reg. 2836-02 (Jan. 23, 1984) (statement of Secretary of State George P. Schultz). This designation meets Section 1605A's definition of a "state sponsor of terrorism." 28 U.S.C. § 1605A(h)(6). Iran continues to be designated as a state sponsor of terrorism to this day. *State Sponsors of Terrorism*, U.S. Dep't of State, https://www.state.gov/state-sponsors-of-terrorism/ (last visited Jan. 2, 2020).

Similarly, "[B]oth MOIS and [IRGC]" must be treated as the foreign state for purposes of § 1608(a))." *Azadeh v. Gov't of the Islamic Republic of Iran*, No. 16-1467, 2018 WL 4232913, at 39 n.6 (D.D.C. Sept. 5, 2018). The MOIS and IRGC are both "so closely bound up with the structure of the state that they must in all cases be considered as the 'foreign state' itself, rather than a separate 'agency or instrumentality' of the state." *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153 (D.C. Cir. 1994).

 Second, the Plaintiffs have brought a civil action against Iran, and its political subdivisions, for money damages for their material support of the Khobar Towers Attack, an act of terrorism, for which the Iranian Defendants are not immune. In fact, the same defendants have already been found to have provided material support for the Attack. *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1 (D.D.C. 2018); *Schooley v. Islamic Republic of Iran*, No. 17-1376 (D.D.C. June 27, 2019)(BAH); *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (D.D.C. 2006); *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006); *Rimkus v. Islamic Republic of Iran*, 750 F. Supp.2d 163 (D.D.C. 2010).

Moreover, "[T]he defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity." *Harrison,* 882 F. Supp. 2d at 50.

Here, where the Iranian Defendants have defaulted, they have forfeited any affirmative defenses including the statute of limitations defense, which has been determined to be not jurisdictional. *Owens*, 864 F.3d at 804; *see also Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1115 (D.C. Cir. 2019) (holding that a district court may not *sua sponte* raise a forfeited statute of limitations defense under 28 U.S.C. § 1605A(b)).

Third, all Plaintiffs are U.S. service members and their immediate family members who are all United States' nationals as required by § 1605A(a)(2)(A)(ii)[2].

Fourth, the Khobar Towers bombing carried out by Saudi Hezbollah, which killed 19 American service members and caused the "personal injur[ies]" suffered by the Plaintiffs, was manifestly an extrajudicial killing for which the Defendants provided material support, and for which the Defendants can be subject to the jurisdiction of this Court.  See *Owens*, 864 F.3d at 778 ("[T]he plain meaning of § 1605A(a) grants . . . jurisdiction over claims against designated state sponsors of terrorism that materially support extrajudicial killings committed by nonstate actors.").

Finally, Plaintiffs were not required to extend an offer to arbitrate under § 1605A(a)(2)(A)(iii) because the FSIA's arbitration requirement only applies when the alleged terrorist act occurred in the foreign state against which the claim is brought, which is not the case here. *Harrison,* 882 F. Supp. 2d at 50.

Therefore, the Iranian Defendants' conduct falls within the "state sponsor of terrorism" exception set forth in 28 U.S.C. § 1605A and accordingly, the Court has subject matter jurisdiction over this matter.

### 2.  Personal Jurisdiction

A court may exercise personal jurisdiction over a defendant if the state is properly served

---

[2] All the Plaintiffs have provided sworn declarations and exhibits in support of their citizenship, in the attached Memorandum in Support of their Motion for Damages.

in accordance with the FSIA requirements stated in 28 U.S.C. § 1608(a). *See* 28 U.S.C. § 1330(b); *Stern v. Islamic Republic of* Iran, 271 F.Supp.2d 286, 298 (D.D.C. 2003) (Lamberth, J.).

As noted above, service, in this case, was properly affected on Iran, IRGC, and MOIS pursuant to the procedures set forth in 28 U.S.C. § 1608(a)(4).  (ECF Nos. 22-25.)  Accordingly, Defendants were properly served in accordance with 28 U.S.C. § 1608(a) and this Court has personal jurisdiction over them.

### 3.   Evidence Satisfactory to the Court

To obtain a default judgment against a foreign sovereign, the FSIA requires that Plaintiffs demonstrate the right to relief "by evidence satisfactory to the court."  *Owens v. Rep. of Sudan*, 864 F.3d at 785(quoting 28 U.S.C. § 1608(e)).  This standard may be satisfied through uncontroverted factual allegations supported by documentary and affidavit evidence.  *Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52, 59 (D.D.C. 2010).  Further, the "court may accept as true plaintiffs' uncontroverted evidence." *Campuzano v. Islamic Republic of Iran*, 281 F.Supp.2d 258, 268 (D.D.C. 2003).  Additionally, a court may take judicial notice of related proceedings and records in cases before the same court.  *Rimkus*, 750 F. Supp. 2d at 171.

Here, the Plaintiffs submit that prior related cases overwhelmingly established that the Iranian Defendants are liable for their conduct that caused the Attack, and ask that this Court take judicial notice of those proceedings.

### B.   <u>The Court Should Take Judicial Notice Of Related Prior Cases Finding Liability Against Iranian Defendants</u>

Rule 201 of the Federal Rules of Evidence permits this Court to take judicial notice of facts previously adjudicated in the records and proceedings from prior related cases.  Specifically, this Rule authorizes a court to adjudicate facts that are not subject to reasonable dispute because they

can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned.  Fed. R. Evid. 201 (a), (b), and (c).

Additionally, it is settled law that "the court may take judicial notice of other cases including the same subject matter or questions of a related nature between the same parties*." Veg-Mix Inc. v. US Dept of Agriculture*, 832 F. 2d 601 (D.C. Cir. 1987).  Moreover, this Court has found that "judicial notice is warranted where the validity of judicial record is generally 'not subject to reasonable dispute . . . " *Rimkus*, 750 F. Supp. 2d at 172.

This Court has taken judicial notice of the prior related proceedings when adjudicating the Khobar Towers litigation in *Heiser.* There, the court considered the evidence presented in *Blais,* finding that the court may review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence.  *Heiser*, 466 F. Supp. 2d at 264.  As a result, the court rendered a default judgment against the same Iranian Defendants that are in this action.  *Id.*

Further, this Court has held that "the FSIA does not require this Court to re-litigate issues that have already been settled in previous decisions."  *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010).

Specifically, the courts in *Blais, Heiser,* and *Rimkus* found that "the Khobar Towers bombing was planned, funded, and sponsored by senior leadership in the government of the Islamic Republic of Iran; the IRGC had the responsibility of working with Saudi Hezbollah to execute the plan, and the MOIS participated in the planning and funding of the attack."  *Heiser*, 466 F. Supp. 2d at 265; see also *Blais*, 459 F. Supp. 2d at 48, and *Rimkus*, 575 F. Supp. 2d at 195.

In these cases, liability for the Attack was firmly established by expert testimony and evidentiary evidence.  The FBI Director at the time of the Attack, Louis Freeh, and the FBI agent

in charge of the five-year investigation into the Attack, Dale Watson, along with Middle East expert, Dr. Patrick Clawson, presented conclusive evidence that the government of Iran, MOIS, and IRGC were responsible for the Khobar Towers bombing, and that Saudi Hezbollah carried out the Attack under their direction.  *Heiser*, Ex. 9 at 67–68.[3]

The facts of the Attack were also clearly proven in the record and proceedings of those cases.  Khobar Towers was a residential complex in Dhahran, Saudi Arabia, which housed the coalition forces assigned to Operation Southern Watch, charged with monitoring compliance with U.N. Security Council resolutions after the end of the Gulf War.  *Blais*, Tr. 41.  At approximately ten minutes before 10 pm on June 25, 1996, a large gasoline tanker truck pulled up alongside the perimeter wall of the Khobar Towers complex.  The driver jumped out, ran into a waiting car that had pulled up near the truck, and sped off.  *Blais,* Tr. 9-10.  Although security guards on top of Building 131 started to give warnings about the unusual vehicle location, the truck exploded with great force within about 15 minutes.  The investigation determined that the force of the explosion was the equivalent of 20,000 pounds of TNT and that it was the largest non-nuclear explosion ever up to that time. *Blais*, Tr. 10.  The explosion sheared off the face of Building 131, which housed members of the U.S Air Force 4404th Wing (Provisional), and damaged every other building in the complex.  19 United States Air Force personnel were killed in the explosion, and hundreds of others were injured.  *Blais*, Tr. 11; Ex. 2.

The Court has similarly taken judicial notice of the findings in *Blais, Heiser,* and *Rimku*s against Iran, the MOIS, and IRGC in its more recent rulings in *Akins* and *Schooley.*

Therefore, judicial notice of those proceedings is warranted here, where prior findings of fact and supporting evidence has established the Iranian Defendants' liability under § 1605A (and

---

[3] References to the transcripts of the hearings held in Blais and Heiser will be abbreviated throughout as "Tr." References to exhibits admitted into evidence in those hearings will be abbreviated "Ex."

its predecessor § 1605(a)(7)) for providing material support and resources that caused the Attack

on the Khobar Towers housing complex on June 25, 1996, and resulted in Plaintiffs' injuries.

## IV.    ALL PLAINTIFFS HAVE SUFFERED PHYSICAL AND PSYCHOLOGICAL INJURIES COVERED BY SECTION 1605A ENTITLING THEM TO DAMAGES AGAINST ALL DEFENDANTS

### A.   Standards Of Proof

While the "FSIA leaves it to the court to determine precisely how much and what kinds of

evidence the plaintiff must provide,  requiring only that it be 'satisfactory to the court,'" courts

must be mindful that Congress enacted  Section 1605A, FSIA's terrorism exception, and Section

1608(e) with the "aim[] to prevent state   sponsors of terrorism—entities particularly unlikely to

submit to this country's laws—from  escaping liability for their sins."  *Han Kim v. Democratic*

*People's Republic of Korea*, 774 F.3d 1044, 1047–48 (D.C. Cir. 2014) (quoting 28 U.S.C. §

1608(e)).

In an FSIA default  proceeding, uncontroverted  factual allegations that are supported by

admissible evidence are taken as true.  *Roth v. Islamic  Republic of Iran*, 78 F. Supp. 3d 379, 386

(D.D.C. 2015) ("Courts may rely on uncontroverted factual allegations that are supported by

affidavits." (citing *Rimkus*, 750 F. Supp. 2d at 171)); *Gates v. Syrian Arab Republic*, 580 F. Supp.

2d 53, 63 (D.D.C. 2008), *aff'd*, 646 F.3d 1 (D.C. Cir. 2011) (quoting *Estate of Botvin v. Islamic*

*Republic of Iran*, 510 F. Supp. 2d 101, 103  (D.D.C. 2007)); *accord* FED. R. CIV. P. 56(e)(2)

(authorizing court to "consider the fact  undisputed for purposes of the motion" when an adverse

party "fails to properly address another party's assertion of fact").  The D.C. Circuit "review[s]

the District Court's FSIA damages awards for abuse  of discretion," and its "review of findings

underlying a default judgment in an FSIA case of this sort is 'lenient.'"  *Fraenkel v. Islamic*

*Republic of Iran, Ministry of Foreign Affairs, et al.*, 892 F.3d 348, 356 (D.C. Cir. 2018) (quoting

*Owens*, 864 F.3d at 785).

Plaintiffs have each submitted, as exhibits to this memorandum, sworn declarations in support of their request for damages.  This Court has held that sworn declarations such as those submitted by Plaintiffs herewith are sufficient to satisfy the requirement of the FSIA, 28 U.S.C. § 1608(e), that a claimant must establish his claim or right to relief by evidence satisfactory to the court.  *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 17 (D.D.C. 2016); *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012) and *Weinstein v. Islamic Republic of Iran,* 184 F. Supp. 2d 13, 19 (D.D.C. 2002). In fact, in prior Khobar Towers cases, *Akins* and *Schooley,* this Court allowed such presentment.  It has also been held that section 1608(e) "does not require the court to demand more or different evidence than it would ordinarily receive; indeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required." *Owens*, 864 F.3d at 785.

## B. <u>Plaintiffs Right Of Action For Damages Under Section 1605A(c)</u>

In the U.S. Code Section 1605A(c), Congress created a comprehensive statutory scheme that provides a federal private right of action for terrorism-related injuries:

(c)PRIVATE RIGHT OF ACTION.—A foreign state that is or was a state sponsor of terrorism as described in subsection (a)(2)(A)(i), and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, shall be liable to—

(1) a national of the United States,

(2) a member of the armed forces,

(3) an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or

(4) the legal representative of a person described in paragraph (1), (2), or (3), for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States

may maintain jurisdiction under this section for money damages. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

28 U.S.C. § 1605A(c).

Under Section 1605A(c), a foreign state that meets subsection (a)(2)(A)(i)'s requirements of "state sponsors of terrorism" is liable "for personal injury or death" caused by the foreign state or its agents. 28 U.S.C. § 1605A(c).  In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages.  *Id.*  Iran is a foreign state within the meaning of 28 U.S.C. § 1391(f) and 1603(a).  The Islamic Republic of Iran has been designated a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979, (50 U.S.C. § 2405(j)) continuously since January 19, 1984.  *State Sponsors of Terrorism*, U.S. Dep't of State, https://www.state.gov/state-sponsors-of-terrorism/ (last visited Jan. 2, 2020).

Although Section 1605A(c) provides a private right of action, it does not itself specify the substantive law to be applied.  The court, however, "may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)." *Fraenkel*, 892 F.3d at 353.

In prior cases, this Court has applied "general principles of tort law," looking to authoritative sources such as the Restatement (Second) of Torts. *See, e.g.*, *Heiser,* 659 F. Supp. 2d at 24; *Roth,* 78 F. Supp. 3d at 399 (citing *Oveissi v. Islamic Republic of Iran,* 879 F. Supp. 2d 44, 54 (D.D.C. 2012)); *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 335 (D.D.C. 2014). These cases have repeatedly and correctly held that, under any possible interpretation of these general principles, a state sponsor of terrorism which is shown to have provided material resources and support to a terrorist organization for an attack that causes an "extra-judicial killing" and/or

"personal injury" is responsible for intentional infliction of emotional distress and the pain and suffering as well as loss of consortium and solatium of the immediate family.

Moreover, this Court has previously held that Iran was liable to the service members who were present at the Khobar Towers attack for the torts of assault, battery, and intentional infliction of distress.  *E.g.*, *Akins*, 332 F. Supp. 3d at 1; *Schooley,* 2019 U.S. Dist. LEXIS 108011.  The Court also held Iran liable to the immediate family members of those present, for intentional infliction of emotional distress, with rights to solatium damages. *Id.*

Plaintiffs are comprised of two groups of claimants, U.S. service members who are United States' nationals, and were serving in the  United States Air Force and were present at the time of the bombing and suffered physical and psychological injuries as a result of the Attack, and immediate family members of those service members, who are United States' nationals, and who suffered severe emotional distress and loss of solatium as a result of the attacks on their loved ones. Under 1605A(c) both of these groups of Plaintiffs are entitled to bring claims for damages against the Iranian Defendants.

**C.**  **Plaintiffs Claims**

All thirty-five (35) Plaintiffs have brought claims for compensatory damages under 28 U.S.C. § 1605A(c) for intentional infliction of emotional distress. Compl. Count III and IV.  In addition, the fourteen (14) Injured Service Member Plaintiffs who were present at the bombing site bring compensatory damages claims for assault and battery.  Compl. Count II.  The twenty-one (21) Immediate Family Member Plaintiffs bring a claim for loss of solatium.  Compl. Count V.  This Court has found claims for solatium to be nearly indistinguishable from claims for intentional infliction of emotional distress. *Flanagan v Islamic Republic of Iran,* 87 F. Supp. 3d.

93, 115 (D.D.C. 2015).  The sworn declarations from each individual Plaintiff attached hereto, attest to their individual injuries.

### 1.  Assault and Battery

The Iranian Defendants are liable for assault on each of the fourteen service members who were present at Khobar Towers on June 25, 1996, if, when the Defendants provided material support and resources for the Attack, they acted "intending to cause a harmful or offensive contact with . . . or an imminent apprehension of such a contact" with those attacked, and those attacked were "thereby put in such imminent apprehension." Restatement (Second) of Torts § 21(1) (Am. Law Inst. 1977);  *Murphy*, 740 F. Supp. 2d at 73 (since "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm," where plaintiffs asserted "that they did, in fact, fear such harm because of the attack," Iran may be held liable for assault); *see also Valore*, 700 F. Supp. 2d at 76 (Determining that just as terrorist acts are designed to harm others physically, they are also designed to inflict psychological terror by instilling fear of future harm into the victims).

This Court has previously recognized in *Schooley*, the term 'terrorism' literally means "the systematic use of terror especially as a means of coercion."  *Schooley*, 2019 U.S. Dist. LEXIS 108011, at *289.  (Quoting Terrorism, Merriam-Webster Dictionary online, https://www.merriam-webster.com/dictionary/terrorism (last visited Apr. 5, 2019).

Similarly, under general principals of law, the Iranian Defendants are liable for battery to the fourteen Injured Service Member Plaintiffs, if, when they provided material support and resources for the Attack, they acted "intending to cause a harmful or offensive contact . . . or an imminent apprehension of such a contact" with those attacked, and "a harmful contact with [those attacked] directly or indirectly results." Restatement (Second) Of Torts § 13.  "Harmful contact"

has occurred where "any physical impairment of the condition of another's body, or physical pain or illness" results. *Id*. § 15.

Here, the elements of assault and battery have been established.  As this Court has found in prior related cases (e.g. *Heiser*, *Blaise*, *Rimkus, Akins*, *Schooley, supra*), the Iranian Defendants, in providing Saudi Hezbollah with the materials, training, and money necessary to detonate a significant explosion near an Air Force residence, acted with an intent to harm the Plaintiffs and inflict emotional and physical injuries on the service members and their families.

Further, the Injured Service Member Plaintiffs, who were present at the site of the Attack, have through their sworn declarations and exhibits, which are attached, demonstrated the physical and psychological impact the bombing had on them, corroborating their claims of assault and battery.

Several of the Injured Service Member Plaintiffs did not seek treatment for the physical injuries at the time of the Attack or minimized their injuries so as not to detract from treating the more seriously wounded and assisting in the search and rescue efforts.  However, even the ones who suffered minor cuts and abrasions by the blast wave from the bomb were impacted either by being thrown around or knocked about.  Many had serious cuts and shrapnel wounds from the shattered glass and flying debris that became embedded in their bodies, but for which some sought and received minimal medical treatment. Others had permanent damage to their backs, shoulders, necks, arms, and legs and suffered from head trauma because of the impact of being propelled against a wall or other objects falling on top of them. Many have suffered loss or decreased hearing as a result and suffer from permanent and debilitating ringing in their ears and have been diagnosed with tinnitus

16

Similarly, several of the Injured Service Member Plaintiffs suffered substantial psychological injuries but did not seek treatment or put off diagnosis for many years due to the stigma attached to being labeled with mental health issues or for other personal reasons. These grounds do not minimize their claims for injuries for assault, battery or any other claim for pain and suffering.

Accordingly, the Iranian Defendants are liable for assault and battery to the Injured Service Member Plaintiffs.

### 2. Intentional Infliction of Emotional Distress

Under general principals of law, the Iranian Defendants are liable for intentional infliction of emotional distress if they, "by extreme and outrageous conduct[,] intentionally or recklessly cause[d] severe emotional distress to" the Plaintiffs. Restatement (Second) Of Torts § 46(1); see also *Roth*, 78 F. Supp. 3d at 400 (*quoting Estate of Heiser v. Islamic Republic of Iran,* 659 F. Supp. 2d 20, 26 (D.D.C. 2009) ("*Heiser II*").

Where the claimants were not the direct recipient of the "extreme and outrageous conduct," the Restatement permits recovery if (1) they are members of a victim's immediate family; and (2) they are present at the time, or "the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present." *Heiser II*, 659 F. Supp. 2d at 26–27 (quoting Dan B. Dobbs, The Law Of Torts § 307, at 834 (2000)); *see also* Restatement (Second) Of Torts § 46, cmt. l (leaving "open the possibility of situations in which presence at the time may not be required"). The "physical presence" requirement has been almost universally waived for solatium claims arising under the FSIA's terrorism provisions. This is because "[c]ourt's have uniformly held that a terrorist attack- by its nature- is directed not only at the

victims but also at the victims' families." *Salazar v Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 n. 12 (D.D.C. 2005): *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d. 27, 35 (D.D.C. 2001).

The Iranian Defendants engaged in conduct that was extreme and outrageous, by providing material support and resources to a known terrorist organization. *See, e.g.*, *Valore*, 700 F. Supp. 2d at 77.  ("Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress.") (*quoting Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009)).

The Injured Service Member Plaintiffs, who were present at Khobar Towers at the time of the Attack, suffered the repercussions of the extreme and outrageous conduct. Their declarations demonstrate that the Khobar Towers attack caused extreme emotional distress, and all fourteen of these Plaintiffs have been formally diagnosed with PTSD.

Further, the Iranian Defendants' conduct was sufficiently outrageous and intended to inflict severe emotional harm upon the family members who were not present at the Attack.  *See Heiser II*, 659 F. Supp. 2d at 27; *see also Roth*, 78 F. Supp. 3d at 401; *Worley*, 75 F. Supp. 3d at 336–37; *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 231 (D.D.C. 2012).  As attested to in the Declarations of the Family Member Plaintiffs, each suffered extreme emotional distress upon learning, through a news report, or from a neighbor, other family members, or military personnel, of the bombing and not knowing whether their loved one was alive or dead.

Consequently, the Iranian Defendants are liable to all Plaintiffs for intentional infliction of emotional distress caused by their extreme and outrageous conduct in materially supporting the Khobar Towers attack.

V.   **LEGAL STANDARDS FOR DAMAGES AND FRAMEWORK FOR AWARDING DAMAGES**

To recover damages against defendants in an FSIA action, "the plaintiff must prove that the consequences of the defendants' conduct were reasonably certain (i.e., more likely than not) to occur, and must prove the amount of the damages by a reasonable estimate." *Salazar*, 370 F. Supp. 2d at 115-16 (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C.Cir.2003) (internal quotations omitted)).   In determining the "reasonable estimate," courts may look to expert testimony and prior awards for comparable injury.  *Reed*, 845 F. Supp. 2d at 214; *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008).

The evidence presented in *Blais*, *Heiser, and Rimkus*, of which the Plaintiffs have requested this Court take Judicial Notice (ECF No. 29), has established with reasonable certainty that the Plaintiffs' injuries were the intended consequences of the Iranian Defendants' material support of the Attack. Consequently, the Iranian Defendants' conduct was likely to result in injury and death and to the service members residing in the Khobar Towers and their families.

Here, the Plaintiffs seek to recover pain and suffering, and solatium damages to compensate for their losses. Plaintiffs have voluntarily withdrawn without prejudice their demand for punitive damages and economic loss in order to make it possible for this Court to expedite consideration of Plaintiffs' Motion on Damages, and enter a Final Judgment prior to the USVSST Fund's February 19, 2020, deadline.

A.   **Pain And Suffering Awards For Surviving Service Members**

Each of the injured service member Plaintiffs has sought pain and suffering awards associated with their claims for assault, battery, and intentional infliction of emotional distress. The claimants have provided uncontroverted evidence of physical and emotional injuries in the form of declarations, medical records, medals and awards, Department of Veterans Affairs ("VA")

disability ratings, affidavits of friends and family, and other supporting personal documents such as news clippings and photographs.

"[W]hen assessing damages for surviving victims of terrorist hostilities[,]" the "baseline assumption" is that "persons suffering injuries in terrorist attacks are entitled to $5 million in damages." *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 12 (D.D.C. 2012). This baseline may be adjusted upward "in the presence of 'severe instances of physical and psychological pain.'" *Id.* at 35–36 (quoting *Valore*, 700 F. Supp. 2d at 84). This Court has previously used the VA disability rating as an objective metric for determining the relative degree of injury suffered by each service member plaintiff. *See Schooley,* 2019 U.S. Dist. LEXIS 108011 at 302. The VA disability rating constitutes a specialized agency's official determination regarding the extent of disabling injury sustained by service members "in connection with military service." *Id.* This approach treats mental and physical injuries as equally capable of causing disability, and therefore equally deserving of compensatory damages, and is preferable to discounting a damage award merely because a service member suffered 'only' mental, but not physical, injuries. *See Id.*; *Cf., e.g., Valore,* 700 F. Supp. 2d at 85.

In *Schooley*, this Court applied the following framework for awarding damages to those service member plaintiffs rated by the VA:

- Rated 70–100% disabled by the VA, received an upward departure, for a total of $7,000,000 each.

- Rated 40–60% disabled by the VA received an upward departure, for a total award of $6,000,000 each;

- Rating up to 30% disabled by the VA, whether due to mental or physical injuries, or a combination of both, received a baseline award of $5,000,000 each;

- No rating,  however, corroboration of mental or physical injuries, or a combination of both, received a baseline award of $5,000,000 each;

*Schooley,* 2019 U.S. Dist. LEXIS 108011 at *303.

Additionally, other courts have made an upward adjustment to $7–12 million as it has found appropriate "in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries. . . partially lost hearing." *Valore,* 700 F. Supp. 2d at 84.

In awarding pain and suffering damages, the Court must take pains to ensure that individuals with similar injuries receive similar awards. *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 54 (D.D.C. 2007)).

In the present case, the Injured Service Member Plaintiffs seek this Court to utilize the framework it established for the calculation of damages in *Schooley,* beginning with the baseline assumption that persons suffering injuries in terrorist attacks are entitled to $5 million in compensatory damages and adjusting upward or downward to reflect the severity of the injuries based upon the VA disability rating.  *See Schooley,* 2019 U.S. Dist. LEXIS 108011 at 301-303. As apparent through the declarations of the Injured Service Member Plaintiffs, all of the Plaintiffs have suffered substantial and permanent injuries including being diagnosed with PTSD, which has impacted their lives until today.

## B.  Solatium Damages

Plaintiffs who are immediate family members of injured Airmen are entitled to solatium damages. Solatium damages compensate for the mental anguish, bereavement, and grief that those with a close personal relationship to an injured or killed family member experience as the result of that person's injury or death, as well as the harm caused by the loss of that person's society and

comfort. *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 88 (D.D.C. 2011).  A close family member has been generally (but not always) recognized "as one's spouse, parents, siblings, and children." *Heiser II*, 659 F. Supp. 2d at 28.

In determining the appropriate amount of compensatory damages, the Court may look to prior decisions awarding damages for pain and suffering, and to those awarding damages for solatium.  *Acosta,* 574 F. Supp. 2d at 29.

In the present case, all Immediate Family Member Plaintiffs have established through sworn declarations and corroborating exhibits that they are entitled to recover damages for their claims for solatium and intentional infliction of emotional distress. They are either immediate family members of the injured claimant or the functional equivalent thereof and have suffered emotional distress as a result of their injured family member's loss of society and companionship after the Khobar Towers bombing.

The Courts have treated damages recoverable on claims of intentional infliction of emotional distress resulting from harms suffered by family member plaintiffs as identical with claims for solatium damages. *See, e.g. Valore*, 700 F. Supp. 2d at 85 ("Under the FSIA, a solatium claim is indistinguishable from an [intentional infliction of emotional distress] claim.").  Solatium refers to compensation for the "mental anguish, bereavement[,] and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent['s] society and comfort." *Id*.

Although FSIA cases arise under a federal cause of action, 28 U.S.C. § 1605A(c), the common law of intentional infliction of emotional distress governs questions of who is entitled to recover damages. As such, courts have looked at "state decisional law, legal treatises, or the Restatements in order to find and apply what are generally considered to be the well-established

standards of state common law." *Heiser II,* 659 F. Supp. 2d at 24. This is necessarily so because of the "interest in promoting uniformity of determinations with respect to [state sponsored terrorist acts]" and the fact that "generally accepted legal standards of the states provide the only steady foundation for the rules of decision." *Id.* at 24–25 (citations and quotation marks omitted).  A nearly universal source that most courts have considered to be a "proxy for state common law" is Restatement (Second) of Torts § 46. *Bettis v.Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003).

### 1.   Immediate Family Member

In determining the amount of compensatory damages awards to family members of a surviving victim, courts have held that these awards are determined by the "nature of the relationship" between the family member and victim, and "the severity of the pain suffered by the family member." *Haim v. Islamic Republic of Iran,* 425 F. Supp. 2d 56, 75 (D.D.C. 2006).  This Court has established a baseline damages framework for family members of surviving service members who received the baseline of $5 million in compensatory damages are as follows:

- Spouse $4,000,000;

- Parents $2,500,000 each;

- Children $2,500,00 each; and

- Siblings $1,250,000 each.

*Heiser II,* 659 F. Supp. 2d 20, 24*; Blais*, 459 F.Supp.2d at 59; *Oveissi*, 768 F. Supp. 2d at 26; *Valore*, 700 F.Supp.2d at 85.

Here, the Immediate Family Member Plaintiffs seek this Court to utilize the damages framework established in *Heiser,* and accordingly, enter such baseline awards.

## 2.    Functional Equivalent of Immediate Family Member

The second prong of the Restatement's requirements for a plaintiff to be eligible to recover solatium damages is that they are "an immediate family member" of the person at whom the conduct was directed.   Restatement (Second) of Torts § 46 (1965). Courts have traditionally defined "immediate family" to include parents, children, siblings, and spouses.  *Jenco,* 154 F. Supp. 2d at 36.

In the instant case, one Plaintiff was not legally related to the Injured Plaintiffs at the time of the Khobar Towers bombing but is the functional equivalent of an "immediate family member" of the injured service member Plaintiff.   Kristina Nevins was not formally married to William Nevins at the time of the Attack.   However, she was living with him at that time and was his fiancé. They had been together for four years prior to the Attack and married shortly thereafter. (See, Kristina Lecava Nevins Declaration and Exhibits, ¶ 6, Ex. B.)

In similar circumstances, this Court has awarded compensation to close "partners" who were not formally married. *E.g. Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 270 D.D.C. 2002) (Awarding damages for intentional infliction of emotional distress to a woman who lived with the victim and had a bond that was the "functional equivalent of marriage"). Other FSIA terrorism cases have applied the "functional equivalent" language.   In *Heiser II,* the court emphasized the importance of cohabitation, noting that "in those rare cases in which the parties at issue had lived in the victim's immediate household and had been in other important respects like a spouse, parent, sibling, or child to the victim, circumstances may require a slight stretching of the immediate-family requirement."  *Heiser II,* 659 F. Supp. 2d at 29.

Therefore, the lack of a formal legal relationship at the time of the injury is not necessarily a bar to recovery for solatium damages. Rather, in such instances, the Court's inquiry turns on

whether these family members were "members of the victim's household" such that they were "viewed as the functional equivalents of family members[.] " *Valore*, 700 F. Supp. 2d at 78-80.

Although it has not been adopted by this Court, the Restatement (Third) of Torts section on negligent infliction of emotional distress provides guidance with its use of the broader term "close family member," instead of "immediate family member" and calls for a "functional approach" in determining who qualifies for recovery. Restat. 3d of the Law, Torts: Liability for Physical and Emotional Harm, § 48 (3rd 2010) (citing Principles of the Law of Family, Dissolution: Analysis and Recommendations § 2.03(1)(c) and Comment *c*).

This section of the Restatement (Third) provides that "[a]n actor who negligently causes sudden serious bodily injury to a third person is subject to liability for serious emotional harm caused thereby to a person who: (a) perceives the event contemporaneously, and (b) is a close family member of the person suffering the bodily injury." *Id.* at § 48.

In describing a "close family member," the Restatement (Third) states, "[s]ometimes people live functionally in a nuclear family without formal legal family ties. When defining what constitutes a close family relationship, courts should take into account changing practices and social norms and employ a functional approach to determine what constitutes a family." *Id.* at § 48 Comment H.

Here, Plaintiffs Williams Nevins and Kristina Nevins have submitted evidence of their functional equivalent to a married couple at the time of the Attack, including sworn declarations and a witness statement, sufficient to prove that they demonstrated the seriousness of their commitment to each other prior to the Attack by getting engaged and purchasing a home and living together. (See, Kristina Lecava Nevins Declaration and Exhibits, ¶ 6, Ex. C).  Accordingly,

Plaintiff Kristina Nevins seeks this Court to utilize the damages framework established in *Heiser,* and accordingly enter such a baseline award for a spouse.

**C.  Pre And Post-Judgment Interest**

Post-judgment interest may be awarded against a foreign sovereign when the FSIA provides jurisdiction. *See, e.g.*, *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 324 (D.D.C. 2005); *Lanny J. Davis & Assocs. LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152.

By federal statute, "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court[,]" and that "[s]uch interest shall be calculated from the date of the entry of judgment . . ." 28 U.S.C. § 1961(a). See *Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria*, 850 F. Supp. 2d 277, 287 (D.D.C. 2012); *Lanny J. Davis & Assocs. LLC,* 962 F. Supp. 2d at 165.  Plaintiffs, therefore, request an award of post-judgment interest at the statutory rate.

The decision to "award prejudgment interest, as well as how to compute that interest, rests within the discretion of the court, subject to equitable considerations." *Baker*, 775 F. Supp. 2d at 86.  "The purpose of such awards is to compensate the plaintiff for any delay in payment resulting from the litigation." *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997). Accordingly, "[p]rejudgment interest is an element of complete compensation." *Oveissi,* 879 F. Supp. 2d at 59 (D.D.C. 2012) ("*Oveissi II*") (quoting *West Virginia v. United States*, 479 U.S. 305, 311–12 (1987)).

Courts in this circuit have awarded prejudgment interest in cases where plaintiffs were delayed in recovering compensation for their injuries, specifically, where such "injuries were the result of targeted attacks perpetrated by foreign defendants," *Pugh v. Socialist People's Libyan Arab Jamahiriya,* 530 F. Supp. 2d 216, 263 (D.D.C. 2008), and have concluded that prejudgment interest is appropriate in FSIA cases because "[d]enying prejudgment interest on these damages

would allow defendants to profit from the use of the money [in the time between the attacks and the litigation]." *Estate of Doe v. Islamic Republic of Iran*, 943 F. Supp. 2d 180, 184 n.1 (D.D.C. 2013); *see also Baker*, 775 F. Supp. 2d at 86; *Belkin*, 667 F. Supp. 2d at 24.   Therefore, there is precedent for an award of prejudgment interest. See, *Owens v. Republic of Sudan*, 71 F. Supp. 3d 252 at 261 (D.D.C. 2014); *Doe*, 943 F. Supp. 2d at 184.   "Because of the nature of the plaintiff's loss and the considerable delay that is necessary to secure a judgment," courts have concluded that prejudgment interest is appropriate in FSIA cases.  *Id.* at 214-215.

Accordingly, prejudgment interest is appropriate in this case. An award for damages arising from an FSIA claim is a payment that treats the injury as a harm that arises at the moment of the tort. "Awards for pain and suffering and solatium are calculated without reference to the time elapsed since the attacks." *Khaliq v. Republic of Sudan*, 33 F. Supp. 3d 29, 35 (D.D.C. 2014), *aff'd sub nom. Owens*, 864 F.3d 751.  A damages award under FSIA, is, therefore, best viewed as fixed at the time of the loss.  As a result, the Plaintiffs were theoretically entitled to the full amount of their solatium awards in 1996, and thus prejudgment interest is appropriate to account for the time that they have not had access to that full amount.  Plaintiffs, therefore, request an award of post-judgment interest at the statutory rate.

## VI.    INDIVIDUAL PLAINTIFFS' REQUESTS FOR DAMAGES

### 1.     Glenn Tyler Christie and One Immediate Family Member

Injured Service Member Plaintiff Glenn Tyler Christie was severely and permanently injured both physically and psychologically from the Attack on Khobar Towers. Glenn Tyler Christie Declaration and Exhibits, ("Christie Decl.").  The explosion shattered the glass windows in front of Glenn and he was thrown across the room and knocked unconscious.  Christie Decl. ¶ 7.  When he awoke he was sandwiched between a washing machine and refrigerator with shredded

glass everywhere.  *Id*. ¶¶ 7and 8.  He had deep lacerations to his face, head, and arms, and a severed artery in his right arm that was bleeding so profusely that his blood squirted across a wall as he exited the room.  *Id*. ¶ 8.  Glenn was transported to the clinic where he waited for treatment, all the while terrified at the thought of being attacked again and being helpless.  *Id*. ¶ 9.  The glass shrapnel imbedded in Glenn's skin was so profuse that despite having a great deal of it removed during his initial treatment, he continued to remove shards of glass from his head and arms for many years after the blast.  *Id*. ¶ 9.  After his initial treatment at the clinic, Glenn was transported to a local civilian hospital for further extensive treatment for the severed artery in his right arm.  *Id*. ¶ 11. To this day, he continues to suffer from pain and discomfort in his arm that is so intense at times that when lifting something heavy the pain causes him to drop what he is trying to lift.  *Id*. ¶ 13.

Glenn also incurred a traumatic brain injury, which causes chronic and debilitating headaches as well as permanent and constant ringing and buzzing in his ears diagnosed as tinnitus. *Id*. ¶ 12.  Directly following the Attack and ongoing, he developed post-traumatic stress disorder, which includes symptoms of night terrors, sleep deprivation, survivor's guilt, depression, persistent anxiety, panic attacks, and bursts of anger.  For PTSD and sleep deprivation, Glenn requires medication.  *Id*. ¶ 13.  For his courage and injuries from the Attack, he was awarded a Purple Heart and a Certificate of Appreciation.  *Id*. ¶ 21.  Glenn has been rated 70% disabled from the VA. *Id*. ¶ 18.

For the reasons set forth herein and in Plaintiff's accompanying sworn Declaration, Plaintiff Glenn Tyler is seeking a compensatory damages award in the amount of $7,000,000.

Immediate family member Plaintiff Janet Louise Christie experienced extreme emotional distress and loss of solatium regarding her son, Plaintiff Glenn Tyler.  For the reasons set forth

herein and in Plaintiff's accompanying sworn Declaration, Plaintiff Janet Louise Christie is seeking a solatium damages award in the amount of $2,500,000.

2.    **Clayton Omar Zook And Four Immediate Family Members**

Injured Service Member Plaintiff Clayton Omar Zook was severely and permanently injured, both physically and psychologically, from the Attack.  Clayton Omar Zook Declaration and Exhibits, ("Zook Decl.").  When the explosion occurred, it shook the entire building and glass shattered throughout the room hitting Clayton.  Zook Decl. ¶ 9.  Clayton was violently thrown off a couch and he braced his fall with his left arm extended he sustained a superior labral tear to his left shoulder.  *Id.*  Disregarding his own injury and pain, he spent the remainder of that night and next day transporting the bodies of his injured and fallen fellow Airmen to triage.  *Id*. ¶ 10.  As a result of the Attack, he sustained multiple permanent physical injuries including TMJ and gastroesophageal reflux disease with irritable bowel syndrome.  *Id*. ¶¶ 13 and 14.  Once Clayton returned to the States, he underwent SLAP repair surgery and continues to experience pain in his shoulder to this day.  *Id.* ¶ 15.  He suffers from permanent and debilitating ringing in his ears, which began following the bombing and was diagnosed as tinnitus.  *Id.* ¶ 15.

Psychologically, he returned a "different person." *Id.* ¶ 17. Before he deployed, he was a happy newlywed with a bright future.  *Id.* ¶ 17.  After the Attack, he became angry, controlling, and withdrawn from his family.  *Id.* ¶ 17.  He began drinking and acquired a food addiction.  *Id.* ¶ 19.  He was diagnosed with chronic PTSD and chronic adjustment disorder with mixed anxiety and depression.  *Id*.  For his courageous efforts following the Attack, Clayton received an Outstanding Unit Award with Valor.  *Id*. ¶ 11.  He has been rated 90% disabled by the Department of Veterans Affairs. *Id.* ¶ 14.

For the reasons set forth herein and in Plaintiff's accompanying sworn Declaration, Plaintiff Clayton Zook is seeking a compensatory damages award in the amount of $7,000,000.

Immediate family member Plaintiffs Sandra Bouse, Janet Douglass, Gregory Russell, and Crystal Love experienced extreme emotional distress and loss of solatium regarding family member Clayton Zook. For the reasons set forth herein and in Plaintiffs' accompanying sworn Declarations, Plaintiff Sandra Bouse, Clayton Zook's spouse at the time of the attack, is seeking a solatium damages award in the amount of $4,000,000; Plaintiff Janet Lynn Douglass, Clayton Zook's mother, is seeking a solatium damages award in the amount of $2,500,000; Gregory Plaintiff Anthony Russell, Clayton Zook's brother, is seeking a solatium damages award in the amount of $1,250,000; and Crystal Lynn Love, Clayton Zook's sister, is seeking a solatium damages award in the amount of $1,250,000.

**3.      Joseph Martin Jackson and Three Immediate Family Members**

Injured Service Member Plaintiff Joseph Martin Jackson was severely and permanently injured, both physically and psychologically, from the Attack. Joseph Martin Jackson Declaration and Exhibits, ("Jackson Decl."). When the Attack happened, Joseph was propelled across his room and thrown into a wall. Jackson Decl. ¶ 7. He was hit by debris and glass, and parts of the ceiling fell on top of him, causing multiple lacerations. *Id.* He sustained bilateral torn rotator cuffs, requiring him to undergo five surgeries. *Id.* ¶ 11. He assisted in treating the injured and moving the bodies of the fallen. *Id.* ¶ 8. Today, he suffers from permanent ringing in his ear, diagnosed as tinnitus, and hearing deficiency. *Id.* ¶ 10. He suffers from chronic pain to his shoulders, cervical strain and was told that he will eventually need a complete replacement of both shoulders. *Id.* ¶ 11. He suffers from gastroesophageal reflux disease due to the side effects of the pain medication he was taking. *Id.*

Joseph has lasting psychological injuries and has been diagnosed with PTSD.  *Id*. ¶ 8.  Still today, he has severe emotional breakdowns, reimagining the "wounded Airmen . . . endless blood, and the sound of screaming over the chaos." *Id.*  He has become a "recluse," withdrawing from his family and friends.  *Id*. ¶¶ 14 and 15. He has serious and detrimental sleep issues.  *Id*. ¶ 12.  He has been rated 90% disabled by the Department of Veterans Affairs. *Id.* ¶ 13.

For the reasons set forth herein and in Plaintiff's accompanying sworn Declaration, Plaintiff Joseph Jackson is seeking a compensatory damages award in the amount of $7,000,000.

Immediate family member Plaintiffs Sheila Lynn Jackson, William Richard Jackson and Melissa Dawn Jackson experienced extreme emotional distress and loss of solatium regarding family member Joseph Jackson.  For the reasons set forth herein and in Plaintiffs' accompanying sworn Declarations, Plaintiff Sheila Lynn Jackson, Joseph Jackson's mother, is seeking a solatium damages award in the amount of $2,500,000; Plaintiff William Richard Jackson, Joseph Jackson's father, is seeking a solatium damages award in the amount of $2,500,000; Melissa Dawn Jackson, Joseph Jackson's sister, is seeking a solatium damages award in the amount of $1,250,000.

**4.      Christopher Pius Nagel and Nine Immediate Family Members**

Injured Service Member Plaintiff Christopher Pius Nagel was severely and permanently injured, both physically and psychologically, from the Attack. Christopher Pius Nagel Declaration and Exhibits, ("Nagel Decl.").  The explosion threw him across the room and knocked a wall of lockers on top of him.  Nagel Decl. ¶ 10. He sustained serious lacerations from shards of glass and debris.  *Id*.  Disregarding his own injuries and pain, Christopher spent the time after the Attack evacuating injured personnel to triage.  *Id*. ¶ 13.  The days following the Attack, he helped the FBI investigate the bombsite.  *Id*. ¶ 14.  For days, he was reminded of the tragedy while he walked over dried pools of blood where bodies had been dragged.  *Id*.  Physically, he suffers from permanent

ringing and buzzing in his ears, which has been formally diagnosed as tinnitus.  *Id.* ¶ 17. Emotionally, he suffers deeply. He has uncontrollable anger and anxiety. *Id.* ¶ 19.  He is extremely defensive and short-tempered. *Id.* ¶ 21.  His emotional instability has had a severe impact on his entire family. *Id.* ¶ 21. He suffers from extreme PTSD; unable to walk around large cities, hear vehicles backing up, or even drive on the highway. *Id.* ¶ 25.  For his courage and efforts, Christopher was awarded an Air Force Achievement Medal. *Id.* ¶ 25.  He has been rated 100% disabled by the Department of Veterans Affairs. *Id.* ¶ 24.

For the reasons set forth herein and in Plaintiff's accompanying sworn Declaration, Plaintiff Christopher Nagel is seeking a compensatory damages award in the amount of $7,000,000.

Immediate family member Plaintiffs RaeAnn Beth Nagel, Bernardine Clementine Nagel, Terese Marie Hunnel, Gerard Paul Nagel, Michael John Nagel, Mary Margaret Wilmes, Robert Charles Nagel, Patrick James Nagel, and Carolyn Ann Nagel experienced extreme emotional distress and loss of solatium regarding family member Christopher Nagel.  For the reasons set forth herein and in Plaintiffs' accompanying sworn Declarations, Plaintiff RaeAnn Beth Nagel, Christopher Nagel's daughter, is seeking a solatium damages award in the amount of $2,500,000; Plaintiff Bernardine Clementine Nagel, Christopher Nagel's mother, is seeking a solatium damages award in the amount of $2,500,000; Terese Marie Hunnel, Christopher Nagel's sister, is seeking a solatium damages award in the amount of $1,250,000; Gerard Paul Nagel, Christopher Nagel's brother, is seeking a solatium damages award in the amount of $1,250,000; Michael John Nagel, Christopher Nagel's brother, is seeking a solatium damages award in the amount of $1,250,000; Mary Margaret Wilmes, Christopher Nagel's sister, is seeking a solatium damages award in the amount of $1,250,000; Robert Charles Nagel, Christopher Nagel's brother, is seeking

a solatium damages award in the amount of $1,250,000; Patrick James Nagel, Christopher Nagel's brother, is seeking a solatium damages award in the amount of $1,250,000; and Carolyn Ann Nagel, Christopher Nagel's sister, is seeking a solatium damages award in the amount of $1,250,000.

### 5.    Bryant Keith White and One Immediate Family Member

Injured Service Member Plaintiff Bryant Keith White was severely injured by the Attack on Khobar Towers.  Bryant Keith White Declaration and Exhibits, ("White Decl.").  The strength of the explosion threw Bryant out of his bed, shattered windows in his room and blew solid double doors off their hinges.  White Decl. ¶ 7.  The doors slammed into Bryant's head and landed on top of him rendering him unconscious.  *Id.*  Following the explosion, Bryant experienced searing pain to his head, pain in his back, neck, and buttocks and ringing to his ears.  *Id.*  ¶ 8.  He sustained a deep laceration to his head, severe whiplash causing neck and back spasms, traumatic brain injury, as well as shrapnel and glass wounds to his back, buttocks, arms, and feet.  *Id.* ¶¶ 7 and 10.  The shrapnel injuries were so severe that they caused scarring to his scalp and glass fragments remain embedded in his head to this day.  *Id.* ¶ 10.  Rather than seek medical treatment immediately after the Attack, Bryant assisted in the rescue and triage efforts of wounded personnel, the whole time, fearing the possibility of another bombing or attack.  *Id.* ¶ 9.  Bryant went to a clinic later that night where the medical staff removed the glass from his feet, back and buttocks.  *Id.*  The doctors had to cut open his right foot with scissors and use a tweezer to remove some of the glass.  *Id*. ¶. The deep laceration to his head had to be glued together.  *Id.* ¶ 10.   Bryant was awarded a Purple Heart for his injuries and an Air Force Commendation Medal with Valor for his courage and efforts during the Attack.  *Id.* ¶ 12.

In addition to the physical injuries Bryant sustained, the trauma leads him to suffer from survivor's guilt and PTSD.  *Id.* ¶¶ 15, 16.  His permanent injuries from the attack include constant ringing in his ears diagnosed as tinnitus, headaches, anxiety, depressions, nightmares, night terrors, flashbacks and overactive reflexes.  *Id.* ¶ 17.  He has received a 70% disability rating from the VA. *Id.* ¶ 16.

For the reasons set forth herein and in Plaintiff's accompanying sworn Declaration, Plaintiff Bryant White is seeking a compensatory damages award in the amount of $7,000,000.

Family member Plaintiff Georgiana White experienced extreme emotional distress and loss of solatium regarding her husband, Plaintiff Bryant White.  For the reasons set forth herein and in Plaintiff's accompanying sworn Declaration, Plaintiff Georgiana White is seeking a solatium damages award in the amount of $4,000,000.

**6.      Ricky Lee Morse**

Injured Service Member Plaintiff Ricky Lee Morse was severely and permanently injured, both physically and psychologically, from the Attack.  Ricky Lee Morse Declaration and Exhibits, ("Morse Decl.").  Initially, he was trapped underneath an A/C unit, a footlocker, and a door.  Morse Decl. ¶ 6.  Once he escaped, the air was so clouded with smoke and dust he was "unable to breathe" and "thought [he] was going to die."  *Id.*  He was in agonizing pain from head trauma. *Id.*  The shards of glass and debris from the explosion caused severe lacerations throughout his body. *Id.* What he witnessed following the Attack was extreme; "one man with his leg detached and lying by his head." *Id.* ¶ 8.  He sustained a multitude of physical injuries, many of which he still suffers from today. He has "frequent intense headaches, severe tinnitus, and consistent irritating itching on [his] feet" from the glass wounds. *Id.* ¶ 13. His tinnitus is so severe it interferes with his hearing. *Id.*

He did not return from that deployment the same person. *Id*. ¶ 14. He "became short-tempered . . . would overreact . . . became more nervous and hyper-vigilant." *Id*. He has not been able to deal with his recurring symptoms in a healthy manner but instead turns to avoidance and isolation. *Id*. He suffers from PTSD, sleep deprivation and anxiety. *Id*. ¶ 15. He has "terrifying nightmares, at least once a month." Most tragically, his relationship with his wife and children has suffered. *Id*. For his actions and injuries from the attack, he was awarded a Purple Heart *Id*. ¶ 12. He has been rated 60% disabled by the Department of Veterans Affairs. *Id*. ¶ 16.

For the reasons set forth herein and in Plaintiff's accompanying sworn Declaration, Plaintiff Ricky Morse is seeking a compensatory damages award in the amount of $6,000,000.

**7.     Scott Elliot Rikard**

Injured, Service Member Plaintiff Scott Elliot Rikard was severely and permanently injured, both physically and psychologically**,** from the Attack.  Scott Elliot Rickard Declaration and Exhibits, ("Rikard Decl.").  He sustained bruising and abrasions to his body as well as the permanent injury of constant ringing in his ears, diagnosed as tinnitus. Rickard Decl. ¶¶ 7 and 11. Immediately following the explosion, despite his own injuries, he ran out of his dorm and began assisting in evacuating injured personnel. Rikard Decl.  ¶ 8.  He performed first aid and buddy care on several of his fellow Airmen and led teams in the search through the site.  *Id.* Physically, he suffers from permanent ringing in his ears, diagnosed as tinnitus.  *Id.* ¶ 10.

His courageous efforts after the Attack in helping colleagues who were badly injured, and witnessing the death of fellow Airmen, left him with an enormous amount of survivor's guilt.  *Id.* He suffers from PTSD, anger issues, anxiety, stress, frequent depression, and chronic sleep deprivation.  *Id.*  His sleep issues and nightmares are so severe he has been prescribed sleeping pills.  For his courageous actions following the attack, he was awarded the Armed Forces

35

Expeditionary Medal and the Air Force Achievement Medal Oak Leaf Cluster with Valor. *Id* ¶ 9. He has been rated 80% disabled by the Department of Veterans Affairs. *Id*. ¶ 10.

For the reasons set forth herein and in Plaintiff's accompanying sworn Declaration, Plaintiff Scott Rikard is seeking a compensatory damages award in the amount of $7,000,000.

**8.     William Christian Nevins and One Immediate Family Member**

Injured Service Member Plaintiff William Christian Nevins was severely and permanently injured both physically and psychologically from the Attack on Khobar Towers. William Christian Nevins Declaration and Exhibits, ("Nevins Decl."). William was in Building 131 on the 5th floor when the explosion occurred. Nevins Decl. ¶ 7. As a result of the blast, he was blown off his feet, slammed to the floor, covered with shards of glass from the shattered windows, and impaled in the knee by a large piece of glass. *Id.* ¶ 7. Despite feeling overwhelmed by the pain from his injuries and the chaos and destruction around him, William helped set up a triage area and assisted in treating and moving the casualties. *Id.* ¶¶7-9. He also transported bodies of some of the Airmen and helped identify bodies at the morgue, including one of his close friends. *Id.* ¶ 9.

As a result of the attack, William sustained a permanent scar on his knee, and he continues to suffer from permanent bilateral tinnitus causing fifty percent of what he hears to be constant ringing and buzzing. *Id.* ¶ 12. Immediately following the Attack, William experienced tremendous survivor's guilt due to the large number of close friends with whom he lived in Building 131 having died or been gravely injured. *Id.* ¶ 13. He was diagnosed with post-traumatic stress disorder and suffers from major depression, anxiety, sleep deprivation, which requires medication. *Id.* ¶¶ 14 and 15. The PTSD symptoms have negatively affected his employment causing him to be let go from good jobs. *Id.* ¶ 15. For his courage and actions after the Attack, he

was awarded a Certificate of Appreciation along with a personal letter from his Commander.  *Id.*
¶ 11.  William has been rated 60% disabled by the VA. *Id.* ¶ 12.

For the reasons set forth herein and in Plaintiff's accompanying sworn Declaration,
Plaintiff William Nevins is seeking a compensatory damages award in the amount of $6,000,000.

Immediate family member Plaintiff Kristina Lacava Nevins experienced extreme
emotional distress and loss of solatium regarding her then-fiancé and now husband, William
Nevins.  For the reasons set forth herein and in Plaintiff's accompanying sworn Declaration,
Plaintiff Kristina Lacava Nevins is seeking a solatium damages award in the amount of $4,000,000.

### 9.    Timothy Michael Schomaker

Injured Service Member Plaintiff Timothy Michael Schomaker was severely and
permanently injured both physically and psychologically from the Attack on Khobar Towers.
Timothy Michael Schomaker Declaration and Exhibits, ("Schomaker Decl.").  The explosion
rocked his building and caused Timothy to be slammed into the furniture in his room, resulting in
painful bruising to his body.  Schomaker Decl. ¶ 7.  Immediately following the explosion, he
experienced constant ringing in his ears, which persists to this day.  *Id.*  He also suffers from
permanent ringing in his ears diagnosed as tinnitus, hearing loss, PTSD, gastrointestinal issues,
anxiety, survivor's guilt, and depression resulting from the horrors he witnessed during the Attack
and the days following the Attack when he was tasked with cleaning the blood of his fellow Airmen
off walls, floors, and furniture.  *Id.* ¶¶ 7-9, 11-12.

He also was a member of the team that transported the caskets of deceased service members
back to the U.S.  *Id.* ¶ 8. During the two and a half months, Timothy remained in Saudi Arabia he
lived in constant fear of another attack.  *Id.* ¶ 9  The experience had such a profound effect on him
that he left active duty at the end of his first enlistment.  *Id.* ¶ 11

From his actions as a result of the Attack, Timothy received the Lieutenant General Leo Marquez Award, a Certificate of Appreciation, and an Expeditionary Medal Award. *Id.* ¶ 10. The VA has rated him 60% disabled. *Id.* ¶ 11.

For the reasons set forth herein and in Plaintiff's accompanying sworn Declaration, Plaintiff Timothy Schomaker is seeking a compensatory damages award in the amount of $6,000,000.

**10.     Steven Neal Wilson and One Immediate Family Member**

Injured Service Member Plaintiff Steven Neal Wilson was severely and permanently injured both physically and psychologically as a result of the Attack on Khobar Towers. Steven Neal Wilson Declaration and Exhibits, ("Wilson Decl."). The blast threw him 20 feet across the room through the sliding glass doors and slammed him against a wall. Wilson Decl. ¶ 9. He was knocked unconscious and suffered a traumatic brain injury. *Id.* ¶¶ 9 and 10. Shrapnel caused lacerations to his head and back, as well as completely severing the tendons in his left-hand connecting digits two and three.

Despite his injuries, he assisting in transporting casualties and provided first aid until his superior officer forced him to get treatment. *Id.* ¶11. He was then transported to Germany where he underwent surgical repair of his hand, which left a five-inch scar. *Id.* ¶ ¶12, 16. He required several months of occupational therapy to relearn how to use his injured two fingers and continues to suffer constant numbness, wrist tendinitis, and pain for which he takes daily painkillers. *Id.* ¶¶ 13 and 17. He also continues to suffer greatly from PTSD including symptoms of chronic sleep issues. *Id.* ¶19.    For his actions and injuries from the attack, he was awarded a Purple Heart and an Air Force Commendation Medal with Valor. *Id.* ¶14. The VA has rated him 80% disabled. *Id.* ¶22.

For the reasons set forth herein and in Plaintiff's accompanying sworn Declaration, Plaintiff Steven Wilson is seeking a compensatory damages award in the amount of $7,000,000.

**11.     Nathan Frederick Baloy**

Injured Service Member Plaintiff Nathan Frederick Baloy was severely and permanently injured both physically and psychologically as a result of the Attack on Khobar Towers.  Nathan Frederick Baloy Declarations and Exhibits ("Baloy Decl.").  At the time of the bombing, Nathan was in the building 129, which was located directly behind Building 131. Baloy Decl. ¶ 7.  The force of the explosion caused the sliding glass door in his room to fly off its frame impaling his right knee and knocking him unconscious. The impact resulted in severe bruising to his entire body and a deep laceration to his knee.  *Id.* ¶ 8.  The explosion also shattered the windows in his room, resulting in glass shards penetrating his left foot and causing lacerations throughout his body.  *Id.* He endured stitches above his right knee without Novocain or painkillers. *Id.*¶ 9. He suffered head trauma resulting in excruciating pain, headaches and hearing loss for several days following the attack.  *Id.*¶ 10.  He continues to suffer from ongoing ringing in his ears diagnosed as tinnitus.  *Id.*

Nathan was awarded a Purple Heart for injuries he sustained in the Attack.  *Id.*¶ 13.  He suffers from permanent psychological injury of PTSD, which includes symptoms of anxiety, depression, irrational fears, and sleep deprivation.  *Id.*¶11.  He has been rated by the VA as 70% disabled. *Id.*¶ 12.

For the reasons set forth herein and in Plaintiff's accompanying sworn Declaration, Plaintiff Nathan Baloy is seeking a compensatory damages award in the amount of $7,000,000.

12.     **Jackie Douglas Swogger and One Immediate Family Member**

Injured Service Member Plaintiff Jackie Douglas Swogger was severely and permanently injured both physically and psychologically as a result of the Attack on Khobar Towers.  Jackie Douglas Swogger Declaration and Exhibits ("Swogger Dcl.")  He was launched almost completely out of his window from the force of the explosion.  Swogger Dcl. ¶ 9.  From his beltline up, he was hanging out of the window, grasping for anything to pull himself back inside.  *Id.*  He felt immediate pain to his left shoulder, which he learned he had fractured.  *Id.* ¶ 10.  His ears were ringing from the blast and his head was pounding from trauma due.  *Id.*  His right knee was severely bruised, had to be drained of fluid and the injury caused permanent scarring.  *Id.*  He had lacerations and abrasions all over his body from the exploding glass and the impact of being thrown almost completely out the window.  *Id.*  Despite the serious pain he was experiencing, and instead of seeking medical treatment, he spent the rest of the night and the next day helping with the search and rescue efforts.  *Id.* ¶¶ 13 and 14.  During that time, he witnessed gruesome scenes that will forever be ingrained in his memory. *Id.* ¶ 14.  For his courageous actions after the Attack, he was awarded an Air Force Outstanding Unit Award with Valor.  *Id.* ¶ 15.  Although eligible**,** he did not receive a Purple Heart due to angry, bitter comments that he made about those responsible for the Attack, which were found inappropriate by his superiors. *Id.*

Jackie suffered both physical and emotional debilitating injuries from the Attack, for which he received a 100% disability rating with unemployability from the VA.  *Id.* ¶ 22.  He incurred permanent hearing loss and tinnitus requiring the use of hearing aids, and suffers from ongoing night terrors, severe insomnia, and sleep apnea.  *Id.* ¶¶ 23 and 24.

For the reasons set forth herein and in Plaintiff's accompanying sworn Declaration, Plaintiff Jackie Swogger is seeking a compensatory damages award in the amount of $7,000,000.

Immediate family member Plaintiff Jackie Swogger (father) experienced extreme emotional distress and loss of solatium regarding his son, Plaintiff Jackie Swogger.  For the reasons set forth herein and in Plaintiff's accompanying sworn Declaration, Plaintiff Jackie Swogger is seeking a solatium damages award in the amount of $2,500,000.

### 13.    Chad Allen McCullough

Injured Service Member Plaintiff Chad Allen McCullough was severely injured as a result of the Attack on Khobar Towers.   Chad Allen McCullough Declaration and Exhibits, ("McCullough Decl.").  The force of the explosion caused the window in front of him to shatter, wherein glass penetrated his left shoulder and the left side of his chest and flying debris caused cuts and bruises to his body.  McCullough Decl. ¶ 6.  He had a painful ringing in his ears from the blast. *Id.*  Although injured, he was able to make his way outside the building, where he removed the glass and debris and bandaged the wounds himself.  *Id.*  Chad then ran back to the blast site and spent many hours rendering self-aid/ buddy care to the wounded applying bandages to stop bleeding and transporting personnel to the mass casualty collection point. *Id.* ¶ 7. Over the next few days, Chad also assisted in searching through the rubble and the clean-up of the blast site, working tirelessly to remove the glass and hazardous debris from the surrounding area and cleaning off blood, pieces of flesh and clothing from floors and walls around the site. *Id.* ¶ 8.   He volunteered to be a pallbearer for the Wing Honor Guard to ceremoniously carry the caskets of his fallen comrades.  *Id.*   Chad also assisted the FBI with their investigation of the bombing by searching the rubble for fragments of the truck bomb.  *Id.*   For his efforts, he was awarded an Armed Forces Expeditionary Medal *Id.* ¶ 9.   His commendable action in the hours and days

following the bombing were also noted in his Enlisted Performance Report and his Letter of Evaluation. *Id.* ¶ 8.

In addition to the physical injuries Chad sustained, as a result of witnessing the horrors of the explosion and the aftermath, Chad suffered from survivor's guilt and PTSD.  He continues to suffer from PTSD, for which he was diagnosed, and the effects of the bombing to this day.  *Id.* ¶¶ 10-11.  His symptoms include nightmares, reliving the Attack, chronic sleep deprivation, depression, anxiety, and mood swings. *Id.* ¶ 11.  Other symptoms of his PTSD include panic attacks triggered by unexpected, loud noises, hypervigilance, avoidance of crowd and suspicious nature. *Id*. ¶11.  Chad suffers from tinnitus from the attack and has constant ringing in his ears to this day. *Id*.  ¶11.  As a result of these permanent injuries, Chad finds it difficult to communicate, trust others and tolerate any sort of stressful situation. *Id.* ¶12.  These behaviors have had a negative and lasting effect on his relationships with his spouse, parents, siblings, and friends as well as his military and civilian careers. *Id* ¶¶ 12-15.  The PTSD has continued to hinder his employment opportunities and consequently, Chad has suffered financially as well.  *Id*. ¶¶ 14-15.  Because of the manner in which the military dealt with evaluating and treating his psychological injuries following the Attack, he avoided seeking treatment or an evaluation by the VA for many years and as a result does not currently have a disability rating.  However, he has recently sought treatment again with the VA is in the process of obtaining a rating for his permanent psychological injuries. *Id.* ¶ 16.

For the reasons set forth herein and in Plaintiff's accompanying sworn Declaration, Plaintiff Chad McCullough is seeking a compensatory damages award in the amount of $5,000,000.

14.     **LeSandro Edwin Santiago**

Injured Service Member Plaintiff LeSandro Edwin Santiago was severely and permanently injured both physically and psychologically as a result of the Attack on Khobar Towers.  LeSandro Edwin Santiago Declaration and Exhibits, ("Santiago Decl..").  The blast propelled LeSandro six to ten feet across the room causing bruising to his body.  Santiago Decl. ¶ 6.  He was pummeled by flying debris from the collapse of a wall behind him resulting in deep lacerations throughout his body including a 1.5-inch laceration to his left wrist that is now a scar.  He also sustained permanent hearing loss and constant ringing in his ears from tinnitus.  The impact from the blast and debris also caused trauma to his left kidney resulting in renal sclerotic disease that requires medication to control hypertension and monitoring to prevent further kidney problems. *Id.* ¶¶ 6 and 14.

Following the attack, LeSandro assisted medical personnel treating wounded service members and for over 48 hours straight, worked at retrieving the remains of the fallen as a member of the Mortuary Affairs team. *Id.* ¶ 8  This gruesome task, which required LeSandro to be surrounded by death, body parts, and an endless amount of blood from his fellow injured and deceased Airman, resulted in LeSandro developing PTSD.  He continues to suffer from anxiety, sleep deprivation, and other PTSD symptoms to this day.  *Id.* ¶ 9.  For his courageous efforts following the attack, Lesandro was awarded an Air Force Commendation Medal with Valor.  *Id.* ¶ 8.  He has been rated 40% disabled by the VA.  *Id.* ¶ 16.

For the reasons set forth herein and in Plaintiff's accompanying sworn Declaration, Plaintiff LeSandro Santigo is seeking a compensatory damages award in the amount of $6,000,000.

| Plaintiff | Relationship | Rating | Requested Award |
|---|---|---|---|
| Glenn Christie | Injured | 70% | $7,000,000 |
| Janet Christie | Parent | N/A | $2,500,000 |
| Clayton Zook | Injured | 90% | $7,000,000 |
| Sandra Bouse | Spouse | N/A | $4,000,000 |
| Janet Douglass | Parent | N/A | $2,500,000 |
| Gregory Russell | Sibling | N/A | $1,250,000 |
| Crystal Love | Sibling | N/A | $1,250,000 |
| Joseph Jackson | Injured | 90% | $7,000,000 |
| Sheila Jackson | Parent | N/A | $2,500,000 |
| William Jackson | Parent | N/A | $2,500,000 |
| Melissa Jackson | Sibling | N/A | $1,250,000 |
| Christopher Nagel | Injured | 100% | $7,000,000 |
| RaeAnn Nagel | Child | N/A | $2,500,000 |
| Bernardine Nagel | Parent | N/A | $2,500,000 |
| Terese Hunnel | Sibling | N/A | $1,250,000 |
| Gerard Nagel | Sibling | N/A | $1,250,000 |
| Michael Nagel | Sibling | N/A | $1,250,000 |
| Mary Margaret Wilmes | Sibling | N/A | $1,250,000 |
| Robert Nagel | Sibling | N/A | $1,250,000 |
| Patrick Nagel | Sibling | N/A | $1,250,000 |
| Carolyn Nagel | Sibling | N/A | $1,250,000 |
| Bryant White | Injured | 100% | $7,000,000 |
| Georgiana White | Spouse | N/A | $4,000,000 |
| Ricky Morse | Injured | 60% | $6,000,000 |
| Scott Rikard | Injured | 80% | $7,000,000 |
| William Nevins | Injured | 60% | $6,000,000 |
| Kristina Nevins | Spouse | N/A | $4,000,000 |
| Timothy Schomaker | Injured | 60% | $6,000,000 |
| Steven Wilson | Injured | 80% | $7,000,000 |
| Kimberly Wilson | Spouse | N/A | $4,000,000 |
| Nathan Baloy | Injured | 70% | $7,000,000 |
| Jackie Swogger | Injured | 100% | $7,000,000 |
| Jackie Swogger | Parent | N/A | $2,500,000 |
| Chad McCullough | Injured | N/A | $5,000,000 |
| LeSandro Santiago | Injured | 40% | $6,000,000 |

## <u>CONCLUSION</u>

WHEREFORE, for the reasons stated herein, Plaintiffs respectfully request this Honorable Court grant their Motion for Default on Damages and Entry of a Final Judgment against All Defendants, and in favor of each Plaintiff in the standard baseline amounts entered in numerous similar cases, with such upward or downward departures from the baseline as the Court deems appropriate in each case.

Dated:    January 29, 2020                    Respectfully submitted,

/s/  Michael Miller          __
The Miller Firm LLC
Michael J. Miller, Esq.
D.C. Bar No. 397689
108 Railroad Avenue
Orange, VA 22960
Tel: (540)-672-4224
Fax: (540)-672-3055
MMiller@millerfirmllc.com
DDickens@millerfirmllc.com
EMaggio@millerfirmllc.com

And

/s/ Gavriel Mairone____
MM~LAW, LLC
Gavriel Mairone, Esq (Admitted *pro hac vice*)
Illinois Bar No. 618698

Adora Sauer, Esq (Admitted *pro hac vice*)
Illinois Bar No. 6256703
980 North Michigan Avenue, Suite 1400
Chicago, IL 60611
Tel: (312) 253-7444
Fax: (312) 275-8590
ctlaw@mm-law.com;
adora@mm-law.com

*Counsel for Plaintiffs*