## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| GLENN TYLER CHRISTIE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> ISLAMIC REPUBLIC OF IRAN, *et al*., <br><br> Defendants. | Civil Action No. 19-1289 (BAH) <br><br> Chief Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

This action arises out of the bombing on June 25, 1996 of the Khobar Towers apartment complex in Dhahran, Saudi Arabia, which housed United States military personnel, including the 14 service-member plaintiffs in this case.  *See* First Amended Compl. ("FAC") at 3, ECF No. 9. Also among the 35 plaintiffs are family members of these 14 service-member plaintiffs.  *See id.* ¶ 41.  Plaintiffs allege that defendants — the Islamic Republic of Iran ("Iran"), the Islamic Revolutionary Guard Corps ("IRGC"), and the Iranian Ministry of Information and Security ("MOIS") — are liable under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, for "provid[ing] material support and resources to its agent, Hizbollah . . . which facilitated and caused the terror attack on the Khobar Towers[]."  FAC ¶ 136.  Although plaintiffs have complied with the FSIA's requirements for service on defendants, defendants have failed to enter an appearance or otherwise defend against this action. *See* 28 U.S.C. § 1608(a)(4); Return of Service, ECF No. 23; Clerk's Entry of Default, ECF No. 30.  Plaintiffs now seek the entry of a default judgment against defendants as to liability and damages.  Pls.' Mot. to Take Judicial Notice of Evid. in Related Prior Cases and for Entry of Default J. as to Liability ("Pls.' Mot. I"), ECF No. 29; Pls.' Mot. for Default J. as to Liability and

Damages & Entry of Final J. ("Pls. Mot. II"), ECF No. 35.  For the reasons detailed below, default judgment as to liability and damages is granted.[1]

## I.      BACKGROUND

Several prior decisions of this Court have found the defendants liable for the Khobar Towers bombing:  *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 46–51 (D.D.C. 2006) (Lamberth, J.); *Estate of Heiser v. Islamic Republic of Iran* (*Heiser I*), 466 F. Supp. 2d 229, 248 (D.D.C. 2006) (Lamberth, J.); *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 167 (D.D.C. 2010) (Lamberth, J.); *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 10 (D.D.C. 2018) (Howell, C.J.); *Schooley v. Islamic Republic of Iran*, No. 17-cv-1376 (BAH), 2019 WL 2717888 (D.D.C. June 27, 2019) (Howell, C.J.); *Aceto v. Islamic Republic of Iran*, No. 19-cv-464 (BAH), 2020 WL 619925 (D.D.C. Feb. 7, 2020) (Howell, C.J.) (addressing only defendant Iran).  In *Blais* and *Heiser I*, the Court heard evidence and witness testimony.  *See Blais*, 459 F. Supp. 2d at 46 n.4; *Heiser I*, 466 F. Supp. 2d at 250.  In *Heiser I* alone, the offering of evidence took 17 days, which included examination of witnesses, including seven expert witnesses.  *See* 466 F. Supp. 2d at 250.[2]  *Rimkus*, *Akins*, and *Schooley* concluded that judicial notice of the findings of fact in *Blais* and *Heiser I* was appropriate, *see Rimkus*, 750 F. Supp. 2d at 167; *Akins*,

---

[1]      Plaintiffs also moved for expedited consideration of these motions, which were filed January 23 and January 29, 2020, seeking a ruling within three weeks so that plaintiffs could submit applications to the United States Victims of State Sponsored Terrorism Fund by a February 19, 2020 deadline.  *See* Pls.' Motion for Expedited Consideration at 1, ECF No. 31.  That motion, now moot, is denied.  Further, as discussed *infra* note 16, on June 3, 2020, plaintiffs filed a motion to reinstate their demand for punitive damages based on the Supreme Court's decision in *Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020).  *See* Pls.' Mot. and Mem. to Reinstate Pls.' Demand for Punitive Damages and For an Award of Punitive Damages Against Defs. ("Pls.' Mot. for Punitive Damages") at 3, ECF No. 43.

[2]      The expert witnesses in *Heiser I* were: (1) Louis Freeh, the former Director of the Federal Bureau of Investigation ("FBI"); (2) Dr. Patrick Clawson, a scholar of Middle Eastern politics who has frequently provided expert testimony regarding Iran's involvement in sponsoring terrorism; (3) Dr. Bruce Tefft, a founding member of the CIA's Counterterrorism Bureau and regular consultant on issues of terrorism; (4) Dale Watson, the former Deputy Counterterrorism Chief of the FBI, *see Heiser I*, 466 F. Supp. 2d at 260–65; (5) Dr. Thomas Parsons, a medical examiner, *see id.* at 268; (6) Dr. Dana Cable, a licensed psychologist and expert on grief process, *see id.* at 269–70; and (7) Dr. Herman Miller, an economic consultant, *see id.* at 273–74.

332 F. Supp. 3d at 9; *Schooley*, 2019 WL 2717888, at *2, and the plaintiffs here request that this Court "take judicial notice of the records and proceedings from prior related cases . . . wherein the same Iranian Defendants were held liable for providing material support and resources to support" the Khobar Towers bombing.  Pls.' Mem. Supp. Mot. to Take Judicial Notice of Evid. in Related Prior Cases and for Entry of Default J. as to Liability and Request to Submit Documentary Evidence Under Seal ("Pls.' Mem.") at 9, ECF No. 29.

Rule 201 of the Federal Rules of Evidence authorizes a court to "judicially notice" adjudicative facts that are "not subject to reasonable dispute because" they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  FED. R. EVID. 201(b).[3]  Rule 201 is used frequently to judicially notice factual evidence developed in other FSIA proceedings "involving the same conduct by the same defendants," *Akins*, 332 F. Supp. 3d at 11, "even when those proceedings have taken place in front of a different judge," *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 191 (D.D.C. 2017) (citing *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009)).  This avoids "the formality of having that evidence reproduced."  *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012) (quoting *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 7 (D.D.C. 2011)); *see also Oveissi v. Islamic Republic of Iran* (*Oveissi II*), 879 F. Supp. 2d 44, 50 (D.D.C. 2012) (finding courts permitted "in subsequent related cases to rely upon the evidence presented in earlier litigation"); *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 237 (D.D.C. 2012) (taking "judicial notice of the evidence presented in the earlier cases").  Taking judicial notice of

---

[3]   "[A]djudicative facts are simply the facts of the particular case."  *Nat'l Org. for Women, Wash., D.C. Chapter v. Social Sec. Admin.*, 736 F.2d 727, 737 n.95 (D.C. Cir. 1984) (Robinson, J., concurring) (quoting FED. R. EVID. 201, Advisory Committee Note).  The Rule does not govern judicial notice of "legislative facts," FED. R. EVID. 201(a), which are "those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body," *Nat'l Org. for Women*, 736 F.2d 727 at 737 n.95 (quoting FED. R. EVID. 201, Advisory Committee Note).

prior findings "does not conclusively establish the facts found in those cases" in the later FSIA

case. *Foley*, 249 F. Supp. 3d at 191. Rather, "based on judicial notice of the evidence presented

in the earlier cases[,] . . . courts may reach their own independent findings of fact." *Anderson v.*

*Islamic Republic of Iran*, 753 F. Supp. 2d 68, 75 (D.D.C. 2010); *see also Rimkus*, 750 F. Supp.

2d at 172. In fact, "courts in FSIA litigation have adopted a middle-ground approach that

permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation

— without necessitating the formality of having that evidence reproduced — to reach their own,

independent findings of fact in the cases before them." *Rimkus*, 750 F.Supp.2d at 172.[4]

This Court is persuaded that this approach is both "efficient and sufficiently protective of

the absent defendants' interests," *Akins*, 332 F. Supp. 3d at 11, and will therefore adopt it and

grant the plaintiffs' request to take judicial notice of the evidence presented in *Heiser I, Blais,*

*Rimkus, Akins,* and *Schooley*. *See id.* (stating that factual evidence developed in other cases

"involving the same conduct by the same defendants . . . admissible and may be relied upon in

this case."). The evidence regarding the Khobar Towers bombing is summarized below,

followed by an overview of the procedural history of this case.

### A. The Attack on Khobar Towers

The Khobar Towers residential complex in Dhahran, Saudi Arabia "housed the coalition

forces," including the U.S. military forces, "charged with monitoring compliance with [United

Nations] security council resolutions." *Blais*, 459 F. Supp. 2d at 47. About 10 minutes before

10:00 pm on June 25, 1996, "a large gasoline tanker truck pulled up" and parked "alongside the

---

[4]     The D.C. Circuit has endorsed the use of judicial notice to establish facts in FSIA terrorism cases. In *Han Kim v. Democratic People's Republic of Korea*, the D.C. Circuit held that the plaintiffs had "met their burden of producing evidence 'satisfactory to the court'" to establish subject matter jurisdiction under the FSIA, where the only evidence linking North Korea to the victim's disappearance was a South Korean court's conviction of a North Korean agent, of which the district court had taken judicial notice. 774 F.3d 1044, 1049 (D.C. Cir. 2014).

perimeter wall of the Khobar Towers complex." *Heiser I*, 466 F. Supp. 2d at 252; *see also* FAC ¶ 124. Security guards near the top of one of the towers, Building 131, "started to give warnings about the unusual vehicle location," but the truck exploded "within about 15 minutes." *Heiser I*, 466 F. Supp. 2d at 252; *see also* FAC ¶ 124. The blast "sheared off the face of Building 131," *Heiser I*, 466 F. Supp. 2d at 252, and "shattered windows more than half a mile away," FAC at 1. Subsequent "investigation determined that the force of the explosion was the equivalent of 20,000 pounds of TNT. The Defense Department said that it was the largest non-nuclear explosion ever up to that time." *Heiser I*, 466 F. Supp. 2d at 252; *see also* FAC ¶ 126.

### B.     The Defendants' Roles

Iran "has been designated a state sponsor of terrorism" by the U.S. Department of State "since January 19, 1984." *Blais*, 459 F. Supp. 2d at 47; *see also, e.g.*, *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 77 (D.D.C. 2018); U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/j/ct/list/c14151.htm. As *Blais* described it, "the IRGC is a non-traditional instrumentality of Iran," serving as "the military arm of a kind of shadow government answering directly to the Ayatollah and the mullahs who hold power in Iran." 459 F. Supp. 2d at 47.

Prior proceedings have found that Iran, along with the IRGC and MOIS, planned and supported the Khobar Towers bombing.[5] The attack was "approved" by both the Ayatollah Ali Khamenei, the Supreme Leader of Iran at the time, and the Minister of Intelligence and Security. *Heiser I*, 466 F. Supp. 2d at 252. The truck bomb used was "assembled" at a base in Lebanon's Bekaa Valley "jointly operated by the IRGC and by the terrorist organization known as Hezbollah;" the individuals who carried out the bombing called themselves "Saudi Hezbollah." *Id.*

---

[5]     Under the FSIA, Iran is "vicariously liable for the acts of its officials, employees, or agents." 28 U.S.C. § 1605A(c)(4).

These conclusions are based in part on the testimony of four key expert witnesses in *Blais* and *Heiser I*.  Louis Freeh, who was director of the FBI at the time of the bombing, and Dale Watson, then deputy counterterrorism chief of the FBI, testified in *Heiser I* based on their oversight of the FBI's "massive and thorough investigation of the attack, using over 250 agents." *Id.*; *see also id.* at 260–62.  "Based on that investigation, an Alexandria, Virginia, grand jury returned an indictment . . . against 13 identified members of the pro-Iran Saudi Hezbollah organization." *Id.* at 252.  During its investigation, the FBI interviewed six members of Saudi Hezbollah who "admitted to the FBI their complicity in the attack on Khobar Towers, and admitted that senior officials in the Iranian government provided them with funding, planning, training, sponsorship, and travel necessary to carry out the attack on Khobar Towers." *Id.* at 253. Both Freeh and Watson testified to their conclusions. *Id.* at 264.  Based on information gathered in their investigations, both testified that "Iran, MOIS, and IRGC were responsible for the Khobar Towers bombing carried out by Saudi Hezbollah." *Id.* at 264.

Finally, Dr. Patrick Clawson provided expert testimony in support of this conclusion in *Heiser I*: "the government of Iran, MOIS, and IRGC were responsible for the Khobar Towers bombing, and that Saudi Hezbollah carried out the attack under their direction." *Id.* at 253.  This conclusion was "based on his involvement on a Commission investigating the bombing, his top-secret security clearance, his discussions with Saudi officials, as well as his academic research on the subject." *Id.* at 253.  Dr. Bruce Tefft, a former member of the CIA's Counterterrorism Bureau, supported Clawson's "expert opinion," based on "publicly available sources that were not inconsistent with classified information known to him from his time at the CIA" that "the Islamic Republic of Iran and the Iranian Revolutionary Guards Corp were responsible for planning and supporting the attack on Khobar Towers." *Id.* at 253–54.

6

C.      The Instant Plaintiffs

Plaintiffs in this action are 14 service members who were injured as a result of the

Khobar Towers bombing and 21 of their family members.  *See* FAC at 3.[6]  The service-member

plaintiffs and the family-member plaintiffs are described below.

1.  *Glenn Tyler Christie and one family member*

On June 25, 1996, Glenn Tyler Christie was working as a Staff Sergeant Crew Chief with

an aircraft maintenance squadron of the U.S. Air Force, deployed to Saudi Arabia, and living in

Khobar Towers in Dhahran.  Decl. of Pl. Glenn Tyler Christie ("Christie Decl.") (Dec. 17, 2019)

¶ 6, ECF No. 37 (sealed), ECF No. 39 (public version).[7]  At the time of the bombing, Christie

was cleaning up in the kitchen in his quarters in Khobar Towers.  *Id.* ¶ 7.  Christie was

"approximately 100 yards from the blast" when the explosion "shattered the glass" in the

window he was facing, knocked him "unconscious," and "blew" him across the room.  *Id.*  When

Christie regained consciousness, he was on the opposite side of the room "sandwiched between a

washing machine and refrigerator that had also blown across the room."  *Id.*  Christie had "deep

lacerations" to his head and body, and blood was "squirting across a wall" from a severed artery

in his right arm as he exited the room.  *Id.* ¶ 8.  Christie's suitemates helped him out of the

building and wrapped his arm and head with pieces of t-shirts before Christie "passed out."  *Id.*

¶ 9.  After "what felt like an eternity," Christie was given treatment at a clinic "by the light of a

coke machine," and was then evacuated to a hospital for further "extensive treatment" for the

---

[6]      Although the complaint states that "[p]laintiffs are thirteen (14) injured members of the armed forces,"
there are, in fact, 14 service-member plaintiffs.  *See* FAC at 1–2.

[7]      Every plaintiff in this case has submitted a sealed declaration, with supporting documentation containing
sensitive personal information, and a redacted, public version.  The docket numbers for both the public and the
sealed versions are noted in the initial citation to each plaintiff's declaration.  Otherwise, sealed content referenced
in this Memorandum Opinion is unsealed as necessary to explain the reasoning.  *See In re WP Co. LLC*, 201 F.
Supp. 3d 109, 116 n.4 (D.D.C. 2016) (citing *United States v. Reeves*, 586 F.3d 20, 22 n.1 (D.C. Cir. 2009)); *United
States v. Parnell*, 524 F.3d 166, 167 n.1 (2d Cir. 2008) (per curiam)).

severed artery in his arm.  *Id.* ¶ 9–10.  For his "efforts and injuries" that day, Christie was awarded a Purple Heart.  Christie Decl., Ex. E, ECF No. 37.

As a result of the attack, Christie sustained a traumatic brain injury that causes "chronic and debilitating headaches," tinnitus, ongoing pain and discomfort in his arm, and post-traumatic stress disorder ("PTSD"), including night terrors, depression, persistent anxiety, and panic attacks.  *Id*. ¶ 12–14.  In 2002, Christie began receiving treatment for the PTSD, *see id*. ¶ 20, and the VA has rated him 70% disabled based on his PTSD and major depressive disorder from a traumatic brain injury.  *See id.* ¶ 18; *see also* Christie Decl., Ex. D, Letter from VA, dated Dec. 17, 2018 at 14, ECF No. 37.

One of Christie's family members is also a plaintiff in this lawsuit: his mother, Janet Louise Christie.  Janet Louise Christie found out about the attack while watching the news. Decl. of Pl. Janet Louise Christie ("Janet Louise Christie Decl.") (Dec. 18, 2019) ¶ 6, ECF No. 37 (sealed), ECF No. 39 (public version).  She became "hysterical" and was "extremely anxious" until she contacted her daughter-in-law, who told her Christie was alive.  *Id*. ¶ 6–7.  Janet did not communicate with Christie until he came home, "approximately a week after the attack," and she was "tremendously hurt" when he got off the plane and "wanted nothing to do with" his family. *Id.* ¶ 8–9.  Eventually, years later, Christie did tell her "what he experienced that day at Khobar." *Id*. ¶ 10.  Janet perceives that Christie is "an entirely different person" because of the attack, *id*. ¶ 12, and she has been "receiving treatment" for twenty years for anxiety related to what the attack "did to [her] son."  *Id*. ¶ 15.

### 2.  *Clayton Omar Zook and four family members*

On June 25, 1996, Clayton Omar Zook was a Senior Airman with the U.S. Air Force, stationed at Dhahran Air Base, and living in the Khobar Towers.  Decl. of Pl. Clayton Omar Zook ("Zook Decl.") (Dec. 16, 2019) ¶ 6–7, ECF No. 37 (sealed), ECF No. 39 (public version).

At the time of the bombing, Zook was lying on the couch in the day room in his quarters.  *Id.* ¶ 9.

The blast shook the building with such force that it knocked Zook off the couch.  *Id.*  The blast

shattered glass throughout the day room and hit Zook, who braced his fall from the couch with

his left arm extended, which resulted in a superior labral tear to his left shoulder.  *Id.*  Zook,

working with other Airmen, then began evacuating each floor of the building, starting at the

ninth floor.  *Id.* ¶ 10.  After he reached the bottom floor, Zook began "evacuating bodies to the

triage area."  *Id.* ¶ 11.  For his "efforts," Zook received an Outstanding Unit Award with Valor.

*Id.*; *see also* Zook Decl., Ex. D, ECF No. 37.  Zook remained in Saudi Arabia for another two

months after the attack, a time when he was "stressed, anxious, depressed," began to have

"frequent horrendous nightmares about the attack," and felt he was "not in control" of his life.

Zook Decl. ¶ 13.  As a result of the attack, Zook developed irritable bowel syndrome with

gastroesophageal reflux disease and tinnitus, as well as "chronic left shoulder pain."  *Id.* ¶ 14–15.

Zook receives treatment from the VA for PTSD, *id.* ¶ 19, and the VA has rated him 90%

disabled — 70% for PTSD, 20% for left shoulder impingement, and 10% for tinnitus.  *Id.* ¶ 14;

*see also* Zook Decl., Ex. E, Letter from VA, dated Mar. 13, 2019 at 49, ECF No. 37.

Four of Zook's family members are plaintiffs in this lawsuit: his ex-wife, Sandra Olivia

Bouse; his mother, Janet Lynn Douglass; his half-sister Crystal Lynn Love; and his half-brother

Gregory Anthony Russell.  Zook's ex-wife, Sandra Olivia Bouse, was an active duty member of

the Air Force and was stationed at Luke Air Force base in Phoenix, Arizona at the time of the

attack.  Decl. of Pl. Sandra Olivia Bouse ("Bouse Decl.") (Dec. 18, 2019) ¶ 6, ECF No. 37

(sealed), ECF No. 39 (public version).  Bouse's supervisor informed her that Khobar Towers had

been bombed, and she became "very upset."  *Id.* ¶ 7.  Bouse "frantically ran outside" to confirm

that the news was true, and "immediately called the base operator" to be connected to Khobar

Towers' base operator; she was able to speak briefly with Zook and "confirm that he was alive." *Id.* ¶ 8.  Bouse had to be released from work due to her "tremendous distress."  *Id.*  She perceives that the attack "altered [Zook's] personality dramatically," and on June 10, 1997, Bouse and Zook divorced.  *Id.* ¶ 15.  As a result of the attack and the divorce, Bouse developed "extreme anxiety," which affected her professionally, and she was "denied the ability to return to the Air Force Reserves" because of the treatment she received for anxiety.  *Id.* ¶ 19.

Zook's mother, Janet Lynn Douglass, was cooking dinner when she received a call from Zook, who was "sobbing on the phone."  Decl. of Pl. Janet Lynn Douglass ("Douglass Decl.") (Dec. 18, 2019) ¶ 7, ECF No. 37 (sealed), ECF No. 39 (public version).  When Douglass learned about the attack, she was "freaked out" and "devastated."  *Id.*  When Zook returned home, Douglass perceived that he was "not the same person," and they now speak even less than they did when Zook was on active duty.  *Id.* ¶ 8–9.  Douglass has felt "helpless" since the bombing because she does not know how to help her son.  *Id.* ¶ 10.

Zook's half-sister, Crystal Lynn Love, was watching the news at home when she learned about the attack.  Decl. of Pl. Crystal Lynn Love ("Love Decl.") (Dec. 18, 2019) ¶ 6, ECF No. 37 (sealed), ECF No. 39 (public version).  Love was "really scared" and, even when she heard from Zook three days later, she did not get "peace of mind" because she was "worried there would be another attack."  *Id.* ¶ 6–7.  Because of Zook's "paternal role" in Love's life, *see id.* ¶ 8, the attack "brought back memories" of Love's father's death.  *Id.* ¶ 10.  Love perceives that her brother is not "the same person" after the attack, and she has been in psychotherapy "partly" because of her concerns for Zook.  *Id* ¶ 10–11.

Zook's half-brother, Gregory Anthony Russell, first learned about the attack while watching the news.  Decl. of Pl. Gregory Anthony Russell ("Russell Decl.") (Dec. 16, 2019) ¶ 6,

ECF No. 37 (sealed), ECF No. 39 (public version).  He was fourteen years old on June 25, 1996. *Id.* ¶ 7.  Russell felt "hollow" because he thought he was losing "the only father figure" in his life and could not do "anything" except wait for a call.  *Id.* ¶ 7–8.  After three days, Russell "finally" heard from Zook.  *Id.* ¶ 8.  When Zook returned, he was "emotionally distant" and "turned into a stranger."  *Id.* ¶ 10.  Because Russell lost a "positive male role model" in Zook, he "began to act out" and was suspended "numerous times" and "kicked out of school."  *Id.* ¶ 12. Russell began to suffer from depression and anxiety after the attack and has been under the care of a psychiatrist since his teenage years.  *Id.*

### 3.   *Joseph Martin Jackson and three family members*

On June 25, 1996, Joseph Martin Jackson was a Senior Airman with the U.S. Air Force, stationed in Dhahran, Saudi Arabia, and living in the Khobar Towers.  Decl. of Pl. Joseph Martin Jackson ("Jackson Decl.") (Dec. 13, 2019) ¶ 6, ECF No. 37 (sealed), ECF No. 39 (public version).  At the time of the bombing, Jackson was in his bedroom getting out of bed; he was "thrown" across the room and into a wall "with force."  *Id.* ¶ 7.  Jackson was "dazed" and had multiple lacerations and bruises across his body from flying debris, glass, and "parts of the ceiling" that fell on top of him.  *Id.*  After an "unknown amount of time," Jackson got up and out of the building and "assisted with triage" and "moving the casualties," despite his own pain.  *Id.* ¶ 8.  Jackson was unable to call his parents until two days after the bombing.  *Id.* ¶ 9.  As a result of the attack, both of Jackson's rotator cuffs were torn and, though he has since had five surgeries to repair his shoulders, they "remain dislocated."  *Id.* ¶ 11.  Jackson suffers from symptoms of PTSD and has been rated 90% disabled by the VA, with 30% for PTSD, 10% for a right shoulder injury, 10% for a left shoulder injury, and 10% for tinnitus.  *Id.* ¶ 12-13; *see also* Jackson Decl., Ex. D, Letter from VA, dated Mar. 19, 2019 at 115, ECF No. 37.

Three of Jackson's family members are plaintiffs in this lawsuit: his mother, Sheila Lynn Jackson; his father, William Richard Jackson; and his sister, Melissa Dawn Timko.  When Jackson's mother, Sheila Lynn Jackson, heard about the attacks on the news, she "fell" to her knees and "cried hysterically."  Decl. of Pl. Sheila Lynn Jackson ("Sheila Lynn Jackson Decl.") (Dec. 19, 2019) ¶ 6–7, ECF No. 37 (sealed), ECF No. 39 (public version).  She called the telephone number she had for the base "non-stop," and was "devastated" until she received a call from Jackson thirty hours later.  *Id.* ¶ 8–9.  Years after the bombing, Jackson "expressed to" his mother "his fear of himself," and Sheila remains afraid of "what [Jackson] might do to himself," *id.* ¶ 12.  Jackson, whom she has not seen "since Christmas 2018," has "isolated himself from the family" since the bombing.  *Id.* ¶ 14.  Sheila continues to be "constantly worried" about him and takes medication for "depression and anxiety."  *Id.* ¶ 15.

Jackson's father, William Richard Jackson, was in his home when he heard about the attack on the television.  Decl. of Pl. William Richard Jackson ("William Richard Jackson Decl.") (Dec. 19, 2019) ¶ 6, ECF No. 37 (sealed), ECF No. 39 (public version).  He was "shocked," but did his "best" to "stay composed" for his wife until they received a call from Jackson "in the middle of the night."  *Id.* ¶ 6–7.  Jackson's father perceives that Jackson "became withdrawn" when he returned home, and Jackson's "behavior" has caused him a "tremendous amount of concern and anxiety."  *Id.* ¶ 10–11.  Jackson's father feels that the attack "took [his] son away" and that he has "suffered a great loss" as a result.  *Id.* ¶ 11.

Jackson's sister, Melissa Dawn Timko, was "at home" with her parents when she learned about the bombing from the news.  Decl. of Pl. Melissa Dawn Timko ("Timko Decl.") (Dec. 19, 2019) ¶ 6, ECF No. 37 (sealed), ECF No. 39 (public version).  Timko "threw up" and spent "hours crying and praying" until she heard from her mother "24–48 hours later" that Jackson was

alive. *Id.* ¶ 6–7.  Timko perceives that the attack has had a "profound negative effect" on her life and on Jackson's and is "very anxious" about what Jackson is "going through." *Id.* ¶ 13.

### 4.  *Christopher Pius Nagel and nine family members.*

On June 25, 1996, Christopher Pius Nagel was a Staff Sergeant with the U.S. Air Force, stationed in Dhahran, Saudi Arabia, and living in the Khobar Towers.  Decl. of Pl. Christopher Pius Nagel ("Nagel Decl.") (Dec. 13, 2019) ¶ 6, ECF No. 37 (sealed), ECF No. 39 (public version).  At the time of the bombing, Nagel was folding laundry in his room, standing in front of a window with his back to a wall of lockers.  *Id.* ¶ 9.  The explosion "threw" Nagel across the room "into the wall of lockers" and his head "struck the lockers," which then fell on top of him. *Id.* ¶ 10.  Nagel felt "searing pain" in his head and across his body and had "deep lacerations" from flying glass and debris.  *Id.*  Nagel is not sure how long he was under the lockers, and he was "afraid." *Id.* ¶ 11.  After a roommate helped free Nagel from the lockers, he searched the building "room by room" for injured people.  *Id.* ¶ 11–12.  Nagel helped "evacuate" these people to a "casualty collection point" and, in the days after the attack, assisted the FBI with their "investigation of the bombsite." *Id.* ¶ 13–14.  He was "finally" able to speak to his mother three days after the attack.  *Id.* ¶ 16.  For his "actions," Nagel received an Air Force Achievement Medal.  *Id.* ¶ 14; *see also* Nagel Decl., Ex. E, ECF No. 37.  During the 120 days that Nagel remained in Saudi Arabia after the bombing, he was "terrified" that another attack would occur and suffered from "anxiety and depression."  Nagel Decl. ¶ 15.  In the years after the attack, Nagel's "outbursts and anxiety" became "frequent and uncontrollable," so he sought counseling in 2012.  *Id.* ¶ 19.  Nagel was diagnosed with PTSD, and the VA rated him as 100% disabled with 70% for PTSD, 10% for a chronic right ankle condition, 10% for a chronic left ankle condition, and 10% for tinnitus.  *Id.* ¶ 24; *see also* Nagel Decl., Ex. H Letter from VA, dated Feb. 13, 2019 at 170, ECF No. 37.  Nagel perceives that the PTSD has "considerably" impacted

his relationships with his family but perceives that the counseling has "improved things."  Nagel Decl. ¶ 25–26.

Nine of Nagel's family members are plaintiffs in this lawsuit: his daughter, RaeAnn Beth Nagel; his mother, Bernardine Clementine Nagel; his brothers Michael John Nagel, Gerard Paul Nagel, Patrick James Nagel, and Robert Charles Nagel; and his sisters Terese Marie Hunnel, Carolyn Ann Nagel, and Mary Margaret Wilmes.  Nagel's daughter, RaeAnn Beth Nagel, was three years old at the time of the attack and did not see her father for "some time" after the attack.  Decl. of Pl. RaeAnn Beth Nagel ("RaeAnn Beth Nagel Decl.") (Dec. 19, 2019) ¶ 6, ECF No. 37 (sealed), ECF No. 39 (public version).  Because of his "emotional injuries" from the attack, Nagel was not able to "reconnect" with his daughter until "three years later," when RaeAnn was six years old.  *Id.* ¶ 7.  Nagel's daughter believes Nagel's experience "changed him" and caused "the loss of the father" she had known, leaving her "profoundly hurt and sad." *Id.* ¶ 8.  RaeAnn "suffered" as a result of the attack, becoming "very sad and depressed" about her relationship with Nagel.  *Id.* ¶ 10.

Nagel's mother, Bernardine Clementine Nagel, was watching the news when she first learned of the bombing and became "overwhelmed with anxiety and distress."  Decl. of Pl. Bernardine Clementine Nagel ("Bernardine Clementine Nagel Decl.") (Dec. 18, 2019) ¶ 6–7, ECF No. 37 (sealed), ECF No. 39 (public version).  Nagel's mother "finally" learned that Nagel was alive when he called her "a couple of days" after the attack.  *Id.* ¶ 8.  Nagel's mother perceives that Nagel has "become confrontational and argumentative," causing "a lot of tension" within the family and the cancelation of important family events.  *See id.* ¶ 14.  Bernardine has been "deeply saddened" and "worried" about Nagel since the bombing.  *Id.* ¶ 18.

When Nagel's brother, Michael John Nagel, first learned about the attack on the news, he was "very concerned and worried."  Decl. of Pl. Michael John Nagel ("Michael John Nagel Decl.") (Dec. 18, 2019) ¶ 6, ECF No. 37 (sealed), ECF No. 39 (public version).  Michael remained "very anxious and afraid" until his parents confirmed that Nagel was alive.  *Id*.  He perceives that after the attack, Nagel's personality changed, *see id.* ¶ 9, and Michael has "anxiety" around Nagel because he feels like a "hostage" to Nagel's "mood swings," *id*. ¶ 11.

Nagel's brother, Gerard Paul Nagel, first learned about the attack from his mother on the day of the bombing.  Decl. of Pl. Gerard Paul Nagel ("Gerard Paul Nagel Decl.") (Dec. 13, 2019) ¶ 6, ECF No. 37 (sealed), ECF No. 39 (public version).  Gerard did not know the "extent" of Nagel's injuries, so waiting to hear from Nagel was "agonizing."  *Id.* ¶ 6.  Once Gerard heard from Nagel "two or three days after the bombing," the conversation "created stress and anxiety."  *Id*. ¶ 7.  When Nagel returned, Gerard perceived that Nagel's "personality changed."  *Id.* ¶ 11.  He was "tremendously sad" that his "role model" had become "withdrawn, angry, verbally and mentally abusive."  *Id*.

When Nagel's brother, Patrick James Nagel, first learned about the attack from the news, he was "upset."  Decl. of Pl. Patrick Nagel ("Patrick Nagel Decl.") (Dec. 16, 2019) ¶ 6, ECF No. 37 (sealed), ECF No. 39 (public version).  It was a "tremendous relief" for Patrick when he "finally" learned that Nagel was alive.  *Id*. ¶ 8.  Patrick perceives that Nagel has become "more withdrawn" and "angry" since he returned, and Patrick is "anxious to help[] but depressed that [he] cannot."  *Id*. ¶ 10.  He is "highly concerned" about Nagel and has dealt with the "agony" of seeing the effects the bombing has had on Nagel.  *Id*. ¶ 18.

Nagel's brother, Robert Charles Nagel, first learned of the attack from the news and was "very upset and unable to sleep," in part because he felt "responsible" for encouraging Nagel to

15

enlist.  Decl. of Pl. Robert Charles Nagel ("Robert Charles Nagel Decl.") (Dec. 9, 2019) ¶ 6–7, ECF No. 37 (sealed), ECF No. 39 (public version).  He was "extremely distraught and withdrawn" while he waited for news about Nagel.  *Id.* ¶ 8.  After Nagel returned, Robert perceived that their relationship had changed and, following a confrontation, "did not have any contact" with Nagel for "a number of years."  *Id.* ¶ 14.  While it is "a struggle" for Robert to communicate with Nagel, *id.* ¶ 16, he perceives that their relationship has improved since Nagel "sought professional help," *id.* ¶ 18.

Nagel's sister, Terese Marie Hunnel, learned about the attack when her mother called her and was in "total disbelief" and felt "sick to [her] stomach" while she waited for news.  Decl. of Pl. Terese Marie Hunnel ("Hunnel Decl.") (Dec. 13, 2019) ¶ 6–7, ECF No. 37 (sealed), ECF No. 39 (public version).  Hunnel remained "extremely stressed and anxious" until she "finally" heard from her parents, "perhaps" two days after the attack, that Nagel was alive, after which she "cried with joy."  *Id.* ¶ 9.  After Nagel returned, Hunnel perceived that he was "different."  *Id.* ¶ 10.  Hunnel's children do not want to spend time with Nagel because of the "drama," which puts Hunnel in a "difficult" position.  *Id.* ¶ 11.  The attack has had a "profoundly negative effect" on Hunnel's life because of the strain it placed on her relationship with Nagel, which causes Hunnel to experience "anxiety and depression."  *Id.* ¶ 15.

Nagel's sister, Carolyn Ann Nagel, first learned of the attack from her sister.  Decl. of Pl. Carolyn Ann Nagel ("Carolyn Ann Nagel Decl.") (Dec. 18, 2019) ¶ 6, ECF No. 37 (sealed), ECF No. 39 (public version).  Carolyn Ann Nagel was "shocked, worried, [and] scared" during the two days before she learned that Nagel was alive.  *Id.* ¶ 6–7.  She perceives that Nagel's "experience at Khobar" affected his behavior and that their "relationship suffered" as a result.

*Id.* ¶ 13.  Nagel's sister is "hopeful" that she and Nagel can "return to the relationship" they "once had."  *Id.* ¶ 24.

Nagel's sister, Mary Margaret Wilmes, first learned of the attack from the news and felt anxious and worried until she found out that Nagel was alive.  Decl. of Pl. Mary Margaret Wilmes ("Wilmes Decl.") (Dec. 18, 2019) ¶ 6–7, ECF No. 37 (sealed), ECF No. 39 (public version).  Wilmes and Nagel had a "heated argument" when Nagel enlisted and "rarely spoke" after, so it was "difficult" for Wilmes when she learned of the attack because she worried she "would not get the chance to fix" her relationship with Nagel.  *Id.* ¶ 12.  Wilmes perceives that when Nagel returned he was like "another person."  *Id.* ¶ 10.

### 5.  *Bryant Keith White and one family member*

On June 25, 1996, Bryant Keith White was working as a Senior Airman in the U.S. Air Force, deployed to Dhahran, Saudi Arabia, and living in at Khobar Towers.  Decl. of Pl. Bryant Keith White ("White Decl.") (Dec. 17, 2019) ¶ 6, ECF No. 37 (sealed), ECF No. 39 (public version).  At the time of the bombing, White was lying on his bed in his room at Khobar Towers. *Id.* ¶ 7.  The explosion "threw" White out of bed, shattered the windows in his room, and blew the double doors off their hinges.  *Id.*  The doors "slammed" into White's head and landed on top of him, knocking him unconscious for "an unknown amount of time," and leaving him with a "deep laceration" on his head in addition to glass and shrapnel wounds across his body.  *Id.* After White regained consciousness, he walked barefoot, sustaining cuts to his feet from the glass, and began searching for others who had been wounded.  *Id.* ¶ 8.  Despite his injuries, White aided with the "rescue and triage effort throughout the night."  *Id.*  White then went to a clinic and received treatment for the glass in his feet.  *Id.* ¶ 9.  There, doctors "cut open" his right foot with "some scissors" to remove the glass.  *Id.*  The next day, White went to a different clinic where a doctor "glued together" the laceration on his head and gave him pain medication for

symptoms of whiplash.  *Id.* ¶ 10.  White received a Purple Heart for his "injuries."  *Id.* ¶ 12; *see also* White Decl., Ex. E, ECF No. 37.

As a result of the bombing, White continues to suffer from "acute and frequent headaches," which were diagnosed as a traumatic brain injury.  White Decl. ¶ 13.  White has also been diagnosed with PTSD, tinnitus and hearing loss, and "chronic pain and muscle spasms" in his back and neck.  *Id.*  Additionally, metal shrapnel "remains embedded" in White's head and he "continued to remove pieces of glass" from his scalp "for 10 years after the" bombing.  *Id.* White was rated 70% disabled by the VA for symptoms of PTSD, including "headaches, anxiety, depression," and nightmares, and was given an overall disability rating of 100%.  *Id.* ¶ 16, 22; *see also* White Decl., Ex. H, Letter from VA, dated May 1, 2018 at 296, ECF No. 37; White Decl., Ex. I, List of VA Rated Disabilities at 298, ECF No. 37.

One of White's family members is also a plaintiff in this lawsuit: his wife, Georgiana White.  Georgiana learned about the Khobar Towers attack when she called her neighbor, who informed her that the base "had been bombed."  Decl. of Pl. Georgiana White ("Georgiana White Decl.) (Dec. 15, 2019) ¶ 7, ECF No. 37 (sealed), ECF No. 39 (public version).  She started "crying uncontrollably."  *Id.*  Georgiana received a call "eight hours later" and was told "they were having trouble accounting for" White and "had not found him yet."  *Id.* ¶ 8.  She was unable to leave the house the next day because she was waiting for news of her husband.  *Id.* When she was informed that White was alive, Georgiana "did not go to work or school for a couple of days" because she "did not want to be away from the house in case" White called.  *Id.* ¶ 10.  She heard from White two days later, and he came home several weeks later.  *See id.* ¶ 11– 12.  Georgiana perceives that "as a result of" the bombing, she has "lost" her "life partner" because of the "physical and psychological limitations" White now has.  *Id.* ¶ 16.  She feels that

she has "become more of a caregiver" to White "than a spouse" and suffers from anxiety, depression, and migraines as a result.  *Id.* ¶ 20.

### 6.  *Ricky Lee Morse*

On June 25, 1996, Ricky Lee Morse was working as a Technical Sergeant in the U.S. Air Force, deployed to Dhahran, Saudi Arabia, and living at Khobar Towers.  Decl. of Pl. Ricky Lee Morse ("Morse Decl.") (Dec. 27, 2019) ¶ 5, ECF No. 37 (sealed), ECF No. 39 (public version). Morse was lying on his bed in Khobar Towers when the explosion knocked an air conditioning unit, door, and "footlocker" on top of him.  *Id.* ¶ 6.  Morse was "unable to breathe" for "a few seconds," and when he was able to breathe he started "coughing uncontrollably" and "thought [he] was going to die."  *Id.*  Despite his injuries, Morse exited the room, found his crew chief and "carried him downstairs," and "provided first aid" to several others.  *Id.* ¶ 7–8.  For his "injuries and actions," White was awarded a Purple Heart.  *Id.* ¶ 12; *see also* White Decl., Ex. F, ECF No. 37.  White was treated for his "painful and serious" injuries the day after the attack.  White Decl. ¶ 9.  Although doctors removed "some" of the glass and shrapnel from his body, White "continued to pull glass" from his feet for two years after the bombing.  *Id.*  White was unable to contact his family to let them know he was alive until "18–20 hours" after the bombing.  *Id.*  As a result of the attack, White has been diagnosed with PTSD, for which the VA rated him 50% disabled.  *Id.* ¶ 16; *see also* White Decl., Ex. I, Letter from VA, dated Oct. 1, 2019 at 340, ECF No. 37.  White feels that the bombing has "intensely diminished" his quality of life and he still "suffer[s] deeply" from the emotional effects of the bombing.  White Decl. ¶ 17.

### 7.  *Scott Elliot Rikard*

On June 25, 1996, Scott Elliot Rikard was working as a Staff Sergeant in the U.S Air Force, deployed to Dhahran, Saudi Arabia, and living at Khobar Towers.  Decl. of Pl. Scott Elliot Rikard ("Rikard Decl.") (Dec. 18, 2019) ¶ 5, ECF No. 37 (sealed), ECF No. 39 (public version).

Rikard was sitting on the couch in his dormitory in Khobar Towers when the bomb exploded, and he "sustained abrasions and bruises" to his right side. *Id.* ¶ 7. Rikard then exited the building and assisted in "evacuating injured personnel," after which he "led two fire teams to search and clear the area between the armory and the blast site." *Id.* ¶ 9. For his "actions" that day, Rikard was awarded the Armed Forces Expeditionary Medal and the Air Force Achievement Medal Oak Leaf Cluster with Valor. Rikard Decl., Ex. D, ECF No. 37. When Rikard first spoke to his family "the next morning," he "broke down crying." Rikard Decl. ¶ 10. After the bombing, Rikard began to experience symptoms of PTSD including "anxiety, stress, frequent depression, and chronic sleep issues," and the VA has rated him 80% disabled, attributing 30% to PTSD and 10% to tinnitus. *Id.* ¶ 11; *see also* Rikard Decl., Ex. E, Letter from VA, dated Jan. 11, 2006 at 355–36, ECF No. 37. Rikard perceives that the PTSD has had a "profoundly negative effect" on his relationship with his wife and children and has "affected his" work as well. Rikard Decl. ¶ 13–14.

### 8. *William Christian Nevins and one family member*

On June 25, 1996, William Christian Nevins was working as a Senior Airman in the U.S. Air Force, stationed in Dhahran, Saudi Arabia, and living in Khobar Towers. Decl. of Pl. William Christian Nevins ("Nevins Decl.") (Dec. 10, 2019) ¶ 6, ECF No. 37 (sealed), ECF No. 39 (public version). Nevins was on the fifth floor of Building 131 of Khobar Towers when the bomb exploded. *Id.* ¶ 7. He was "blown off his feet" by the explosion, although he is "not sure how far," and was "hit by flying debris" and glass. *Id.* Nevins was "bleeding" and had a "large piece of glass" stuck in his left knee. *Id.* After Nevins exited the building, he was "overwhelmed" and "afraid there would be another attack." *Id.* ¶ 8. Instead of seeking medical attention, Nevins pulled the glass out of his knee, "helped set up a triage area," and "assisted in treating and moving the casualties." *Id.* ¶ 9. As a result of the attack, Nevins has "suffered both

20

physically and mentally" and has a permanent scar on his left knee. *Id.* ¶ 12. He has been rated as 10% disabled by the VA for "permanent bilateral tinnitus," *id.*, and sought treatment with the VA for PTSD, for which he was rated 30% disabled. *Id.* ¶ 13; *see also* Nevins Decl., Ex. H, Letter from VA, dated Dec. 29, 2016 at 389, ECF No. 37. Nevins perceives that his symptoms of PTSD have created "a large amount of stress" in his relationship with his wife, and the two separated for a time in 2014. Nevins Decl. ¶ 18.

One member of William Christian Nevins's family is also a plaintiff in this lawsuit: his wife, Kristina Nevins, who was his fiancée at the time of the attack. Kristina first learned about the attack when Nevins "called her" and told her about the explosion. Decl. of Kristina Nevins ("Kristina Nevins Decl.") (Dec. 11, 2019) ¶ 7, ECF No. 37 (sealed), ECF No. 39 (public version). She was scared and "kind of in shock" and "watched the news continuously for the next three days to try and stay updated." *Id.* ¶ 9. Nevins's friends kept Kristina "updated on when and how" Nevins was returning home. *Id.* ¶ 10. Kristina perceives that Nevins "has not been the same" since the attack, *id.* ¶ 13, and the bombing has "negatively affected" Kristina's relationship with Nevins. *Id.* ¶ 16. The "breakdown" of their relationship has caused her to "suffer" from feelings of "anxiety and depression." *Id.* ¶ 21.

### 9. *Timothy Michael Schomaker*

On June 25, 1996, Timothy Michael Schomaker was working as a Senior Airman in the U.S. Air Force, stationed in Dhahran, Saudi Arabia, living in the Khobar Towers Complex. Decl. of Pl. Timothy Michael Schomaker ("Schomaker Decl.") (Dec. 13, 2019) ¶ 5, ECF No. 37 (sealed), ECF No. 39 (public version). At the time of the explosion, Schomaker was on the phone in his room at Khobar Towers. *Id.* ¶ 7. The explosion "knocked" him "off balance," causing him to "stumble around the room and slam [his] body into furniture." *Id.* He had ringing in his ears after the explosion and continues to suffer from tinnitus and hearing loss. *Id.*

After the attack, Schomaker helped "evacuate" and "ensure the safety of the Khobar Tower residents," cleaned the blood of fellow Airmen off "walls, floors, and furniture," and "volunteered" to carry "the caskets of the bodies that were transported back to the U.S."  *Id.* ¶ 8. For his "efforts" that day, Schomaker received an Expeditionary Medal Award.  *Id.* ¶ 10; *see also* Schomaker Decl., Ex. E, ECF No. 37.  Schomaker remained in Saudi Arabia for over two months after the attack, was "extremely tense and fearful of another attack," and began to "experience anxiety and depression."  Schomaker Decl. ¶ 9.  Schomaker perceives that the attack "has had a significant effect" on his life.  *Id.* ¶ 12.  He suffers from PTSD and anxiety, for which he is "in therapy" and participates in a "survivors' support group."  *Id.*  The VA has rated him 60% disabled overall, with 50% for PTSD and 10% for tinnitus.  *Id.* ¶ 11; *see also* Schomaker Decl., Ex. F, Letter from VA, dated Jun. 25, 2019 at 425, ECF No. 37.

### 10. *Steven Neal Wilson and one family member*

On June 25, 1996, Steven Neal Wilson was serving as a Senior Airman in the U.S. Air Force, stationed in Dhahran, Saudi Arabia, living in the Khobar Towers Complex.  Decl. of Pl. Steven Neal Wilson ("Wilson Decl.") (Dec. 16, 2019) ¶ 6, ECF No. 37 (sealed), ECF No. 39 (public version).  At the time of the bombing, Wilson was "standing on the balcony of the third floor, which is the top floor of Building 129, smoking a cigarette."  *Id.* ¶ 8.  The force of the explosion "threw" Wilson through the sliding glass doors and across the common living area "approximately 20 feet" and into a wall.  *Id.* ¶ 9.  Wilson was briefly knocked unconscious and when he regained consciousness, he "yelled but got no reply."  *Id.*  As a result of the blast, Wilson had shrapnel wounds to his "head and back," severed flexor tendons in left-hand digits two and three, a traumatic brain injury, and tinnitus and hearing loss.  *Id.* ¶ 10.  Despite his injuries, Wilson assisted with "transporting casualties" and "providing first aid" until his superior officer "forced" him to get into an ambulance because he was "bleeding on the other survivors."

22

*Id.* ¶ 11.  For his "efforts and injuries" that day, Wilson was awarded a Purple Heart.  *Id.* ¶ 14;

*see also* Wilson Decl., Ex. G, ECF No. 37.  When he arrived at the hospital, he "waited in the

cafeteria for a few hours" until a doctor came in and "stuck a pair of scissors" into his open

wound.  Wilson Decl.  ¶ 12.  Wilson lost consciousness and "woke up three days later."  *Id.*  He

was then "transported to Ramstein, Germany" where they "performed surgical repair" of his

hand.  *Id.*  Over the next "couple of months," at a hospital in Colorado, Wilson received "further

treatment and occupational therapy" to "completely relearn how to use" his two injured fingers.

*Id.* ¶ 11–12.  Wilson continues to have difficulty with the fingers in his left hand and "glass

remains embedded" in his skull, visible "as a red knot" because he is bald.  *Id.* ¶ 16.  The VA has

diagnosed Wilson with PTSD, for which he continues to seek treatment.  *Id.* ¶ 18-19.  The VA

has assigned Wilson a combined disability rating of 80%, which includes 10% for tendonitis in

his left wrist, 50% for sleep apnea, and 10% for tinnitus.  *Id.* ¶ 22; *see also* Wilson Decl., Ex. I,

Letter from VA, dated Nov. 18, 2019 at 474, ECF No. 37.

   One member of Wilson's family is also a plaintiff in this lawsuit: his wife at the time of

the attack, Kimberly Michelle Wilson.  Kimberly Michelle Wilson, who is now his ex-wife, first

learned of the attack on Khobar Towers when she received a call at work from Wilson's Air

Force Supervisor.  Decl. of Pl. Kimberly Michelle Wilson ("Kimberly Michelle Wilson Decl.")

(Dec. 20, 2019) ¶ 7, ECF No. 37 (sealed), ECF No. 39 (public version).  While Wilson's

supervisor did not know Wilson's "exact status," he believed "someone from the unit thought

they had heard or seen him" and that Wilson's wife "should not worry."  *Id.* ¶ 7.  After Kimberly

got off the phone, she was "distraught and extremely anxious" — "it was impossible not to be

worried."  *Id.* ¶ 8.  She left work early and did not return until she knew Wilson's "condition"

and "travel arrangements."  *Id.*  After "a day or two," she finally learned that Wilson had

"undergone surgery." *Id.* ¶ 10.  When Wilson returned home, his wife was "extremely relieved," *id.* ¶ 11, but she and Wilson "suffered greatly" because Wilson "did not want to communicate" and Kimberly was "mourning the emotional loss" of her "partner." *Id.* ¶ 15.  After the attack, Wilson's "work performance" was "negatively affected," so Kimberly "[sought] employment opportunities to contribute financially," causing her "a great deal of anxiety." *Id.* ¶ 17.  After the attack, there was "significant strain" on their marriage. *Id.* ¶ 18.  Kimberly and Wilson eventually "divorced on July 28, 2015." *Id.*; *see also* Kimberly Michelle Wilson Decl., Ex. D, Copy of Divorce Decree, dated July 28, 2015 at 488–89, ECF No. 37.

### 11. *Nathan Frederick Baloy*

On June 25, 1996, Nathan Frederick Baloy was working as a Senior Airman in the U.S. Air Force, stationed in Dhahran, Saudi Arabia, and living in the Khobar Towers Complex.  Decl. of Pl. Nathan Frederick Baloy ("Baloy Decl.") (Dec. 19, 2019) ¶ 5, ECF No. 37 (sealed), ECF No. 39 (public version).  At the time of the explosion, Baloy was sleeping on the couch in his suite. *Id.* ¶ 7.  The force of the explosion sent the sliding glass door "flying" off its frame and into Baloy. *Id.* ¶ 8.  The frame "knocked" Baloy unconscious and "impaled" his right knee, while the windows shattered and sent shrapnel into Baloy's left foot and "across" his body. *Id.* When he regained consciousness, Baloy noticed his pants were "drenched in blood" from the "large piece of the door fragment" that was embedded in his leg. *Id.*  When he arrived at the medical clinic, he was informed there was "no Novocain" and "received 15 stitches" above his right knee and "four below without any numbing agent or pain killers." *Id.* ¶ 9.  For the "injuries" Baloy "sustained" that day, he was awarded a Purple Heart. *Id.* ¶ 13; *see also* Baloy Decl., Ex. F, ECF No. 37.  Baloy still experiences "ringing" in his ears and he suffers from tinnitus as a result of the explosion.  Baloy Decl.  ¶ 10.  He also had "severe headaches that lasted for several days" after the attack because of "head trauma" from the bombing. *Id.*  The

24

VA has diagnosed Baloy with symptoms of PTSD including "anxiety, depression, irrational fears and sleep issues." *Id.* ¶ 11. Baloy has "tried to attend therapy" but he becomes "overwhelmed" and "angry" and "ha[s] to leave." *Id.* ¶ 12. He has been rated 70% disabled by the VA for PTSD. *Id.*; *see also* Baloy Decl., Ex. E, Letter from VA, dated Dec. 19, 2019 at 508–09, ECF No. 37.

### 12. *Jackie Swogger and one family member*

On June 5, 1996, Jackie Swogger was working as an Airman in the U.S. Air Force, stationed in Dhahran, Saudi Arabia, and living in Khobar Towers. Decl. of Jackie Swogger ("Swogger Decl.") (Dec. 17, 2019) ¶ 6, ECF No. 37 (sealed), ECF No. 39 (public version). At the time of the explosion, Swogger was sitting with his back "centered in the crack of the double-doors" in his bedroom and was writing a letter to his family. *Id.* ¶ 8. The explosion "blew open" the double doors Swogger was "leaning against" and "launched" him "almost completely out of the window." *Id.* ¶ 9. Swogger was "hanging out of the window" from his "beltline up" and "finally" pulled himself back inside after several attempts to grab something. *Id.* He then "felt immediate pain" in his left shoulder, which he "later learned was fractured." *Id.* ¶ 10. His "ears were ringing," his head was "pounding from head trauma," and his "severely bruised and swollen" right knee "had to be drained of fluid," which resulted in "permanent scarring." *Id.* He also had "cuts and bruises all over" his body from the glass and the impact of being "thrown almost completely out the window." *Id.* Even though he was in "serious pain," Swogger "held off seeking medical treatment" so he could assist with the search efforts. *Id.* ¶ 13–14. Although Swogger was eligible to receive a Purple Heart, he did not because of "bitter comments" he made about "those responsible" for the bombing. *Id.* ¶ 15. Swogger believes it was "three days" before he was allowed to "make a scripted call home" to his father. *Id.* ¶ 16. Swogger remained in Saudi Arabia for "approximately one month" after the bombing, a time when he was

"anxious" and feared "another attack." *Id*. ¶ 18.  Swogger has suffered "debilitating" "physical and emotional" injuries and has been rated as 100% disabled by the VA, *id*. ¶ 22, 20% of which is attributed to chronic knee and shoulder pain, 50% of which is attributed to "night terrors, severe insomnia, and sleep apnea," *id*. ¶ 23, and 50% of which is attributed to PTSD, *id*. ¶ 26; *see also* Swogger Decl., Ex. E, Letter from VA, dated Dec. 6, 2019 at 529, ECF No. 37. Swogger has also had "serious hearing deprivation issues" since the attack and has been rated as 10% disabled by the VA for tinnitus.  Swogger Decl. ¶ 24; *see also* Swogger Decl., Ex. E, Letter from VA, dated Dec. 6, 2019 at 529, ECF No. 37.  Swogger has been "rated unemployable by the VA" due to his "mental health issues," and has only recently sought "therapy" for the PTSD. Swogger Decl. ¶ 27.

One member of Swogger's family is also a plaintiff in this lawsuit: his father, Jackie Douglas Swogger.  Jackie first learned of the bombing while he was watching the news at home. Decl. of Pl. Jackie Douglas Swogger ("Jackie Douglas Swogger Decl.") (Dec. 12, 2019) ¶ 6, ECF No. 37 (sealed), ECF No. 39 (public version).  He "finally" got a call from Swogger "three days after the bombing," after which he watched the news for "more information," but the news "did not calm" his "worries."  *Id*. ¶ 6–7.  "About two weeks later," Swogger informed his father of his injuries and Jackie felt "scared and nervous."  *Id*. ¶ 8.  Jackie has experienced "immense problems and pain" since Swogger was diagnosed with PTSD.  *Id*. ¶ 11-12.  Although his relationship with Swogger has improved since the years immediately following the bombing, Jackie feels that his family's "quality of life has been severely diminished" by the bombing and "the trauma" it caused.  *Id*. ¶ 14.

### 13. *Chad Allen McCullough*

On June 25, 1996, Chad Allen McCullough was working as a fuel specialist for the U.S. Air Force, stationed in Dhahran, Saudi Arabia, and living in the Khobar Tower Complex.  Decl.

of Pl. Chad Allen McCullough ("McCullough Decl.") (Jan. 2, 2020) ¶ 5, ECF No. 37 (sealed),

ECF No. 39 (public version).  At the time of the explosion, McCullough was on "the third floor

of Building 127, walking east towards the elevator, facing a window."  *Id.* ¶ 6.  The explosion

"shattered" the window in front of McCullough and the glass "penetrated" his left shoulder and

the left side of his chest.  *Id.*  McCullough had "abrasions and bruising" from "being knocked

over and from debris" that fell on top of him.  *Id.*  Once he had exited the building, McCullough

assisted with first aid for "countless hours into the morning."  *Id.* ¶ 7.  Over the next few days,

McCullough assisted with "searching through the rubble," volunteered "to be a pallbearer," and

"volunteered to assist the FBI with their investigation by searching through the rubble for

fragments of the truck bomb." *Id.* ¶ 8.  For his "efforts," McCullough received the Armed Forces

Expeditionary Medal.  *Id.* ¶ 9; *see also* McCullough Decl., Ex. C, ECF No. 37.  Since the attack,

McCullough has experienced "ongoing symptoms of PTSD" including "depression, anxiety,"

and "chronic sleep deprivation," and perceives that his PTSD has "negatively affected" his

"marriage and friendships."  McCullough Decl. ¶ 11–12.  McCullough "avoided seeking

treatment or an evaluation by the VA for many years" because "of the manner in which the

military dealt with evaluating and treating" his "psychological injuries following the" bombing,

and he therefore does not have a disability rating.  *Id.* ¶ 16.  McCullough "recently sought

treatment again with the VA" and is "in the process of obtaining a rating" for his "permanent

psychological injuries" that resulted from the attack.  *Id.*  McCullough feels that he is "forever

haunted" by the attack.  *Id.* ¶ 17.

### 14. *LeSandro Edwin Santiago*

On June 25, 1996, LeSandro Edwin Santiago was working as a Senior Airman in the U.S.

Air Force, stationed in Dhahran, Saudi Arabia, and living in the Khobar Towers Complex.  Decl.

of Pl. LeSandro Edwin Santiago ("Santiago Decl.") (Dec. 9, 2019) ¶ 5, ECF No. 37 (sealed),

ECF No. 39 (public version).  Santiago was "inside the fitness center in garage number 12" when the bomb exploded.  *Id.* ¶ 6.  The force of the explosion "threw" him "about six to ten feet across the room."  *Id.*  Santiago sustained "lacerations and bruises" to his body from "flying debris" and a "1.5-inch laceration" to his left wrist that left a scar.  *Id.*  He later discovered that he had sustained "trauma" to his left kidney.  *Id.*  After the attack, Santiago "assisted medical personnel" and also assisted in "setting up a temporary morgue and processing the remains," which he helped with for over 48 hours.  *Id.* ¶ 7-8.  He only "broke down" later when he was watching the news and "it showed each person that was reported deceased."  *Id.* ¶ 8.  Santiago received the Air Force Commendation Medal with Valor.  *Id.*; *see also* Santiago Decl., Ex. E, ECF No. 37.  He developed symptoms of PTSD including "anxiety, panic attacks, and depression."  Santiago Decl. ¶ 9.  Santiago is currently in treatment to "manage" his PTSD symptoms.  *Id.* ¶ 13.  He was also diagnosed with "left renal sclerotic disease" that was "more likely than not caused by the bombing.  *Id.* ¶ 14.  Santiago has been rated 40% by the VA with 30% for PTSD and 10% for hypertension.  *Id.* ¶ 16; *see also* Santiago Decl., Ex. H, Letter from VA, dated Nov. 6, 2019 at 600, ECF No. 37.

### D.   Procedural History

The plaintiffs filed this lawsuit on May 3, 2019.  *See* Compl., ECF No. 1.  As discussed, *infra* in Part III.B, the defendants were properly served under the FSIA.  When the defendants did not appear, the Clerk entered default against the defendants on January 23, 2020.  *See* Clerk's Entry of Default.  The plaintiffs then moved for judicial notice of prior related cases and for default judgment as to liability and damages.  *See* Pls.' Mot. I; Pls.' Mot. II; *see also* Pls. Mem.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 55(b)(2) permits a court to consider entering a default judgment when a party applies for that relief.  *See* FED. R. CIV. P. 55(b)(2).  Nevertheless,

"strong policies favor resolution of disputes on their merits" and, therefore, "'[t]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party.'"  *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)).  Furthermore, "entry of a default judgment is not automatic," *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted), and so the procedural posture of a default does not relieve a federal court of its typical obligations, including its "affirmative obligation" to determine whether it has subject-matter jurisdiction over the action, *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996).  Additionally, "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant."  *Mwani*, 417 F.3d at 6.

When default judgment is sought under the FSIA, a claimant must also "establish[] his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  This requirement "provides foreign sovereigns a special protection akin to that assured the federal government by FED. R. CIV. P. 55([d])."  *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014); *see also* H.R. REP. No. 94-1487, at 26 (1976) (stating that § 1608(e) establishes "the same requirement applicable to default judgments against the U.S. Government under rule 55([d])").  While the "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide," courts must be mindful that Congress enacted § 1605A, FSIA's terrorism exception, and § 1608(e) with the "aim[] to prevent state sponsors of terrorism — entities particularly unlikely to submit to this country's laws — from escaping liability for their sins."  *Han Kim*, 774 F.3d at 1047–48 (quoting 28 U.S.C. § 1608(e)); *see also Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1114 (D.C. Cir. 2019).  With this objective

29

in mind, the D.C. Circuit has instructed that "courts have the authority — indeed, we think, the obligation — to 'adjust evidentiary requirements to . . . differing situations.'"  *Han Kim*, 774 F.3d at 1048 (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)).

Generally, courts in FSIA default actions must draw their "findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence."  *Id.* at 1049 (quoting *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 21 n.1 (D.D.C. 2001)).  Courts take uncontroverted factual allegations that are supported by admissible evidence as true.  *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) ("Courts may rely on uncontroverted factual allegations that are supported by affidavits." (citing *Rimkus*, 750 F. Supp. 2d at 171)); *accord* FED. R. CIV. P. 56(e)(2) (authorizing court to "consider the fact undisputed for purposes of the motion" when adverse party "fails to properly address another party's assertion of fact").

The D.C. Circuit's "review of findings underlying a default judgment in a FSIA case of this sort is 'lenient.'"  *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 356 (D.C. Cir. 2018) (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017)), as "the courts are granted broad discretion to determine what degree and kind of evidence is satisfactory," *Maalouf*, 923 F.3d at 1114 (citing *Han Kim*, 774 F.3d at 1047; *Owens*, 864 F.3d at 785).  In particular, "[i]n a FSIA default proceeding, a factual finding is not deemed clearly erroneous if there is an adequate basis in the record for inferring that the district court . . . was satisfied with the evidence submitted."  *Owens*, 864 F.3d at 785 (second alteration in original) (internal quotation marks omitted).

## III.   DISCUSSION

A default judgment may be entered when (1) the court has subject-matter jurisdiction over the claims, (2) personal jurisdiction is properly exercised over the defendants, (3) the

plaintiffs have presented satisfactory evidence to establish their claims against the defendants, and (4) the plaintiffs have satisfactorily proven that they are entitled to the monetary damages they seek.  These requirements are addressed in order below.

### A.  Subject-Matter Jurisdiction under the FSIA

"The district courts . . . have original jurisdiction" over "any nonjury civil action against a foreign state" seeking "relief *in personam* with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title."  28 U.S.C. § 1330(a).  The plaintiffs seek *in personam* relief.  This Court must decide, therefore, whether the defendants are entitled to immunity under the "state sponsor of terrorism" exception set forth in §1605A.[8]

"[T]he FSIA establishes a general rule granting foreign sovereigns immunity from the jurisdiction of United States courts," *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13 (D.C. Cir. 2015) (citing 18 U.S.C. § 1604), but "that grant of immunity is subject to a number of exceptions," *id.* at 13–14.  The plaintiffs assert jurisdiction based on the FSIA's terrorism exception.  28 U.S.C. § 1605A, *see* FAC ¶ 1.  In relevant part, this exception abrogates a foreign state's immunity in cases where a plaintiff seeks "money damages" for "personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" if "engaged in by an official, employee, or agent of such foreign state," 28 U.S.C. § 1605A(a)(1).  The FSIA defines a "foreign state" to include "a political subdivision of a foreign state or an agency or instrumentality" thereof.  28 U.S.C. § 1603(a).  The exception also requires that "the foreign

---

[8]  This suit falls beyond the ten-year statute of limitations for actions brought under the FSIA's terrorism exception, *see* 28 U.S.C. § 1605A(b), but the "limitation period in § 1605A(b) is not jurisdictional," and the defendants have "forfeited [their] affirmative defense . . . by failing to raise it in" this Court, *Owens*, 864 F.3d at 804; *see also Maalouf*, 923 F.3d at 1115 (holding that a district court may not *sua sponte* raise a forfeited statute of limitations defense under 28 U.S.C. § 1605A(b)).

country was designated a 'state sponsor of terrorism at the time of the act,'" *Mohammadi*, 782

F.3d at 14 (quoting 28 U.S.C. § 1605A(a)(2)(A)(i)(I)), and that, at that time, "the 'claimant or the

victim was' a 'national of the United States,'" *id.* (quoting 28 U.S.C. § 1605A(a)(2)(A)(ii)(I)), or

was a member of the armed forces, 28 U.S.C. § 1605A(a)(2)(A)(ii)(II).[9]

Plaintiffs satisfy each of the applicable elements here.  As stated above, Iran was

designated a state sponsor of terrorism in 1984, twelve years before the 1996 Khobar Towers

bombing.  Both the IRGC and MOIS are "a political subdivision of a foreign state or an agency

or instrumentality" thereof.  28 U.S.C. § 1603(a); *see Rimkus*, 750 F. Supp. 2d at 180 (finding

that the IRGC "constitute[s] [an] integral part[ ] of Iran's political structure, and thus

constitute[s] a foreign state for [FSIA] purposes"); *Blais*, 459 F. Supp. 2d at 53 (stating that

"MOIS and the IRGC are considered to be a division of state of Iran.").  All of the 35 plaintiffs

have averred in sworn declarations that they were United States citizens at the time of the

attack.[10]  Finally, the plaintiffs seek damages "for personal injury . . . that was caused by an . . .

extrajudicial killing" for which the defendants provided "material support or resources."  28

U.S.C. § 1605A(a)(1); *see also Owens*, 864 F.3d at 778 ("[T]he plain meaning of § 1605A(a)

---

[9]     Finally, the provision requires proof that, "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim," 28 U.S.C. § 1605A(a)(2)(A)(iii), but the attack took place in Saudi Arabia, not Iran, so this requirement does not apply.

[10]    *See* Christie Decl. ¶ 3 (attesting to the declarant's United States citizenship); Janet Louise Christie Decl. ¶ 2 (same); Zook Decl. ¶ 3 (same); Bouse Decl. ¶ 2 (same); Douglass Decl. ¶ 2 (same); Russell Decl. ¶ 2 (same); Love Decl. ¶ 2 (same); Jackson Decl. ¶ 3 (same); Sheila Lynn Jackson Decl. ¶ 2 (same); William Richard Jackson Decl. ¶ 2 (same); Timko Decl. ¶ 2 (same); Nagel Decl. ¶ 3 (same); RaeAnn Beth Nagel Decl. ¶ 2 (same); Bernardine Clementine Nagel Decl. ¶ 2 (same); Hunnel Decl. ¶ 2 (same); Gerard Paul Nagel Decl. ¶ 2 (same); Michael John Nagel Decl. ¶ 2 (same); Wilmes Decl. ¶ 2 (same); Robert Charles Nagel Decl. ¶ 2 (same); Patrick Nagel Decl. ¶ 2 (same); Carolyn Ann Nagel Decl. ¶ 2 (same); White Decl. ¶ 3 (same); Georgiana White Decl. ¶ 2 (same); Morse Decl. ¶ 3 (same); Rikard Decl. ¶ 3 (same); Nevins Decl. ¶ 3 (same); Kristina Nevins Decl. ¶ 2 (same); Schomaker Decl. ¶ 3 (same); Wilson Decl. ¶ 3 (same); Kimberly Michelle Wilson Decl. ¶ 2 (same); Baloy Decl. ¶ 3 (same); Swogger Decl. ¶ 3 (same); Jackie Douglas Swogger Decl. ¶ 2 (same); McCullough Decl. ¶ 3 (same); Santiago Decl. ¶ 3 (same).

grants . . . jurisdiction over claims against designated state sponsors of terrorism that materially

support extrajudicial killings committed by nonstate actors.").

To explain, the truck bombing that plaintiffs allege caused their injuries was an

"extrajudicial killing" resulting in the deaths of nineteen American military personnel. *See, e.g.*,

*Rimkus*, 750 F. Supp. 2d at 182 ("The actions of defendants constituted both an extrajudicial

killing and the provision of material support in satisfaction of the first element of liability.");

*Akins*, 332 F. Supp. 3d at 33 (same); *Aceto*, 2020 WL 619925 at *13 (same).  The term

"extrajudicial killing" in the FSIA's terrorism exception has the "meaning given" in "the Torture

Victim Protection Act of 1991," *see* 28 U.S.C. § 1605A(h)(7), which defines the term as "a

deliberated killing not authorized by a previous judgment pronounced by a regularly constituted

court affording all the judicial guarantees which are recognized as indispensable by civilized

peoples," Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992) (codified at 28 U.S.C. § 1350 note

§ 3(a)).

In addition, this Court takes judicial notice of the evidence presented in *Blais* and *Heiser*

*I*, which demonstrates that defendants provided "material support or resources" for this

extrajudicial killing.  It is clear from the evidence in those cases, described above, that

defendants authorized, "organized and sponsored" the Khobar Towers attack.  *Heiser I*, 466 F.

Supp. 2d at 262.  Further, the evidence shows that defendants helped to recruit, train, fund,

supply, and direct Saudi Hezbollah.  This establishes that defendants' actions were "a

'substantial factor' in the sequence of events that led to the plaintiff[s'] injur[ies]" and that the

injuries were "'reasonably foreseeable or anticipated as a natural consequence of' the

defendant's conduct."  *Owens*, 864 F.3d at 206 (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d

Cir. 2013)) (explaining that the jurisdictional standard for causation under the FSIA's terrorism exception" is proximate cause).

Accordingly, under 28 U.S.C. § 1605A, defendants are not immune from this suit, and subject-matter jurisdiction may be properly exercised.  *See* 28 U.S.C. § 1330(a).

## B.    Personal Jurisdiction under the FSIA

"Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of [the FSIA]."  28 U.S.C. § 1330(b).  Here, service was ultimately made under § 1608(a)(4).

Section 1608 first prescribes two methods by which service shall ordinarily be made, *see* 28 U.S.C. § 1608(a)(1)–(2), but these methods were "not available" to plaintiffs in this action, *Holladay v. Islamic Republic of Iran*, 406 F. Supp. 3d 55, 61 (D.D.C. 2019); *see also Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 49 (D.D.C. 2019), as "[t]he defendants have neither made a special arrangement for service with the plaintiffs, nor entered into any international convention governing service," *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78 (D.D.C. 2017).

Thus, the plaintiffs initially attempted service under paragraph (a)(3) of § 1608 by sending a copy of the summons, complaint, and notice of suit, along with a Farsi translation, via the United States Postal Service's Registered Return Receipt First Class International Mailing Services, to each of the defendants, through the Iranian Ministry of Foreign Affairs.  *See* Certificate of Mailing, ECF No. 17.  The USPS deliveries were refused by the recipients, *see* Exs. 1–3, Not. of Failed Service Under 28 U.S.C. § 1608(a)(3), ECF No. 18, so plaintiffs, following § 1608(a)(4), transmitted the summons, complaint, and notice of suit, along with Farsi translations, "through diplomatic channels," *see* 28 U.S.C. § 1608(a)(4) (allowing resort to this method "if service cannot be made within 30 days under paragraph (3)").  By this method,

34

defendants were served.  *See* Return of Service.[11]  This Court has personal jurisdiction over defendants.

### C.    Defendants' Liability

The 14 service-member plaintiffs bring claims for assault and battery, FAC ¶¶ 144–49 (Count II), and intentional infliction of emotional distress ("IIED"), *id.* ¶¶ 150–57 (Count III). The 21 family-member plaintiffs bring claims for intentional infliction of emotional distress, *id.* ¶¶ 158–65 (Count IV), and seek damages for solatium, pain and suffering, and loss of consortium, *id.* ¶¶ 166–70 (Count V).  As is discussed in detail below, all 35 plaintiffs now seek punitive damages.  *See id.* ¶¶ 171–75 (Count VI); Pls.' Mot. for Punitive Damages at 1.  All claims are brought under § 1605A(c), which creates a "[p]rivate right of action . . . for personal injury or death," and currently provides that, "[i]n any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c).

Section 1605A(c) does not give guidance to courts on the substantive bases for liability that determine plaintiffs' entitlement to damages.  Consequently, courts "may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)."  *Fraenkel*, 892 F.3d at 353; *see Estate of Heiser v. Islamic Republic of Iran* (*Heiser II*), 659 F. Supp. 2d 20, 24 (D.D.C. 2009) (applying "general principles of tort law," such as the Restatement (Second) of Torts, to determine liability); *see also Roth*, 78 F. Supp. 3d at 399 (citing *Oveissi II*, 879 F. Supp. 2d at 54); *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 335 (D.D.C. 2014).  Defendants' liability is discussed in detail below, starting with the service-member plaintiffs.

---

[11]    Specifically, on December 3, 2019, the United States Department of State stated in a letter that it had met the requirements for diplomatic service under section 1608(a)(4) by causing delivery of a Summons, Complaint, and Notice of Suit to each defendant through Swiss channels on November 5, 2019.  *See* Return of Service at 1.

1.   *Service-Member Plaintiffs*

All 14 of the service-member plaintiffs — Glenn Tyler Christie, Clayton Omar Zook, Joseph Martin Jackson, Christopher Pius Nagel, Bryant Keith White, Ricky Lee Morse, Scott Eilliot Rikard, William Christian Nevins, Timothy Michael Schomaker, Steven Neal Wilson, Nathan Frederick Baloy, Jackie Swogger, Chad Allen McCullough, and LeSandro Edwin Santiago — bring claims under the theories of assault, battery, and IIED.  As is discussed in the damages section below, these plaintiffs may recover under only one theory, *see e.g.*, *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002) ("[I]t 'goes without saying that the courts can and should preclude double recovery by an individual" (quoting *Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 333 (1980)), but each theory of liability is nevertheless evaluated.

a.   *Assault and Battery*

Battery requires an act "intending to cause a harmful or offensive contact . . . or an imminent apprehension of such a contact," and that such a contact in fact "directly or indirectly results."  RESTATEMENT (SECOND) OF TORTS § 13.  "Harmful contact" causes a "physical impairment of the condition of another's body, or physical pain or illness."  *Id.* § 15; *see also Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 76 (D.D.C. 2010) (defining these terms). In materially supporting the truck bombing, defendants acted with the intent to cause harmful contact with the residents of the Khobar Towers.  *See, e.g.*, *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 102 (D.D.C. 2017) (defining material support for terrorist attacks as acts intending to cause harm).  Each of the 14 service-member plaintiffs who was in the Khobar Towers complex at the time of the bombing avers that some harmful physical contact resulted from the bomb, so defendants are liable to these 14 plaintiffs for battery.[12]

---

[12]     *See* Christie Decl. ¶¶ 8, 14 (cuts and PTSD); Zook Decl. ¶¶ 9, 14 (shoulder injury, PTSD); Nagel Decl. ¶¶ 10, 24 (cuts and PTSD); White Decl. ¶¶ 7, 9, 13 (cuts, glass in foot, PTSD); Morse Decl. ¶¶ 6, 9, 16 (cuts, glass in

Assault occurs where a defendant "acts intending to cause a harmful or offensive contact with the person of the other . . . or an imminent apprehension of such a contact, and . . . the other is thereby put in such imminent apprehension." RESTATEMENT (SECOND) OF TORTS § 21(1). "[A]cts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm," so where plaintiffs averred "that they did, in fact, fear such harm because of the attack," defendants may be held liable for assault. *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 73 (D.D.C. 2010); *see also Valore*, 700 F. Supp. 2d at 76 (same). Imminence is defined as being "so close to striking distance that [one] can reach the other almost at once." RESTATEMENT (SECOND) OF TORTS § 29 cmt. 2. Given that they were all present at Khobar Towers, the 14 service-member plaintiffs were in imminent apprehension of harm and defendants are liable to those plaintiffs for assault.

### b. *Intentional Infliction of Emotional Distress*

Defendants are liable to plaintiffs for intentional infliction of emotional distress if defendants "by extreme and outrageous conduct intentionally or recklessly cause[d] severe emotional distress to" the plaintiffs. RESTATEMENT (SECOND) OF TORTS § 46(1); *see also Heiser II*, 659 F. Supp. 2d at 26. "Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009); *see also Valore*, 700 F. Supp. 2d at 77 (same). Further, all 14 of the service-member plaintiffs have demonstrated, through their sworn declarations and corroborating submissions, that they suffered severe emotional and psychological distress as a result of the attack. Thirteen service members have been formally

---

feet, PTSD); Rikard Decl. ¶¶ 7, 11 (bruising, PTSD); Nevins Decl. ¶¶ 7, 13 (glass in knee, PTSD); Schomaker Decl. ¶¶ 7, 11 (bruising and PTSD); Wilson Decl. ¶¶ 10, 18 (severed tendons in hand, PTSD); Baloy Decl. ¶¶ 8, 11 (debris in leg, PTSD); Swogger Decl. ¶¶ 10, 26 (fractured shoulder, PTSD); McCullough Decl. ¶ 6 (cuts and bruising); Santiago Decl. ¶¶ 6, 9 (cuts, kidney trauma, PTSD).

diagnosed with PTSD.[13]  The declaration of the one other service-member plaintiff, Chad

McCullough, demonstrates his significant emotional distress, both acute and chronic, resulting

from having been a target of the attack.  *See* McCullough Decl. ¶ 10 (describing continuing

symptoms of PTSD).  Defendants are liable to the 14 service members for IIED.

2. *Victims' Family Members*

The remaining plaintiffs seek to collect damages as family members of service members

present in Saudi Arabia for the Khobar Towers bombing.  All 21 of these plaintiffs — Janet

Louise Christie, Sandra Olivia Bouse, Crystal Lynn Love, Gregory Anthony Russell, Janet Lynn

Douglass, Sheila Lynn Jackson, William Richard Jackson, Melissa Dawn Timko, RaeAnn Beth

Nagel, Bernardine Clementine Nagel, Michael John Nagel, Gerard Paul Nagel, Patrick James

Nagel, Robert Charles Nagel, Terese Marie Hunnel, Carolyn Ann Nagel, Mary Margaret

Wilmes, Georgiana White, Kristina Nevins, Kimberly Michelle Wilson, and Jackie Douglas

Swogger — are family members of service-member plaintiffs to this suit.

The family members' theory of liability is IIED.  *See* Compl. ¶¶ 158–65 (Count IV).  The

Restatement permits recovery for those who were not a direct target of a defendant's conduct if

(1) "the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional

harm upon a person [who] is not present" and (2) the claimant is a member of a victim's

immediate family, *Heiser II*, 659 F. Supp. 2d at 26–27 (quoting DAN B. DOBBS, THE LAW OF

TORTS § 307 (2000)), or the functional equivalent of an immediate family member, *see Bettis v.*

*Islamic Republic of Iran*, 315 F.3d 325, 337 (D.C. Cir. 2003) (extending liability under the FISA

for IIED to "members of the victim's household" who were also "viewed as the functional

---

[13]     *See* Christie Decl. ¶14 (PTSD); Zook Decl. ¶ 14 (PTSD); Nagel Decl. ¶ 24 (PTSD); White Decl. ¶ 13
(PTSD); Morse Decl. ¶ 16 (PTSD); Rikard Decl. ¶ 11 (PTSD); Nevins Decl. ¶  13 (PTSD); Schomaker Decl. ¶ 11
(PTSD); Wilson Decl. ¶ 18 (PTSD); Baloy Decl. ¶ 11 (PTSD); Swogger Decl. ¶ 26 (PTSD); Santiago Decl. ¶ 9
(PTSD).

equivalent of immediate family members"); *see also* RESTATEMENT (SECOND) OF TORTS § 46, cmt. l (leaving "open the possibility of situations in which presence . . . may not be required").

Eighteen of the plaintiffs are plainly immediate family members — parents, siblings, spouses, and children — of victims.  *See Fritz*, 324 F. Supp. 3d at 63 (observing that the "strict meaning" of immediate family is "one's spouse, parents, siblings, and children" (quoting *Heiser II*, 659 F. Supp. 2d at 28)).  Three of the plaintiffs — Crystal Lynn Love, Gregory Anthony Russell, and Kristina Nevins — do not fall neatly into these traditional categories.  Half-siblings like Love and Russell "are presumed to recover" as full siblings would, *id.* (quoting *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 52 (D.D.C. 2007)), and the evidence here supports application of that presumption:  Love, Russell, and Zook all share the same biological father. *See* Zook Decl. ¶ 5; Love Decl. ¶ 3; Russell Decl. ¶ 3.  Love and Russell both attest to their close relationships with their half-brother, Zook.  Russell and Love both thought of Zook as a "father figure," Russell Decl. ¶ 7, because their biological father died when they were both "very young," Love Decl. ¶ 8; Russell Decl. ¶ 8.

Additionally, Kristina Nevins, who was William Nevins' fiancée at the time of the attack and is now his wife, was the functional equivalent of a spouse.  The "functional equivalent" requirement in *Bettis* is derived from *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260 (D.D.C. 2002), which "allowed recovery for intentional infliction of emotional distress to a woman who, although not legally married to the victim, had lived with him for over 20 years in a 'bond that was the functional equivalent of marriage.'"  *Bettis*, 315 F.3d at 337 (quoting *Surette*, 231 F. Supp. 2d at 270).  Here, Nevins and Kristina Nevins had been together for "four years" before the attack and had been engaged and living together "about six months or so" before Nevins was deployed, Kristina Nevins Decl. ¶ 6.  They were "planning on getting married once"

Nevins returned home.  *Id.*  They did so on April 19, 1997, less than one year after the attack.
*See* Kristina Nevins Decl., Ex. B, Florida Marriage Record, dated Apr. 19, 1997 at 400, ECF No.
37.  In *Surette*, the relationship between Beverley Surette and the victim, William Buckley, "was
recognized by Buckley's family, his colleagues and his employer," some of whom attested to the
"longstanding, loving, loyal, and trusting relationship" between Buckley and Surette.  231 F.
Supp. at 270.  Here, a close friend attested to the relationship between Nevins and Kristina
Nevins: "Will and Kristina were engaged to be married and living together at the time of the
June 25, 1996" attack.  Kristina Nevins Decl., Ex. C, Witness Statement of Michelle O. Reid at
402, ECF No. 37.

Defendants are liable for IIED to the 21 family-member plaintiffs.  In this case, because
defendants materially supported Saudi Hezbollah, their conduct was "sufficiently outrageous and
intended to inflict severe emotional harm upon a person who is not present," such that a victim's
immediate family members need not have been at the bombing to recover for their emotional
distress.  *Heiser II*, 659 F. Supp. 2d at 27 (quoting DAN B. DOBBS, THE LAW OF TORTS § 307, at
834); *see Schooley*, 2019 WL 2717888, at *73 (concluding the same); *Akins*, 332 F. Supp. 3d at
38 (same).  Finally, the 21 family-member plaintiffs have shown, through their uncontested
declarations, that they did suffer significant emotional consequences from the attack, in the days
spent waiting for news of their loved ones and in the years after the attack.[14]

---

[14]     *See* Janet Louise Christie Decl. ¶¶ 6, 15 (attesting to emotional distress stemming from her experience as a
result of the bombing); Bouse Decl. ¶¶ 8, 21–22 (same); Love Decl. ¶¶ 6, 10–11 (same); Russell Decl. ¶¶ 7–8, 12
(same); Douglass Decl. ¶¶ 7, 12 (same); Sheila Lynn Jackson Decl. ¶¶ 7–9, 15 (same); William Richard Jackson
Decl. ¶¶ 6–7, 11 (same); Timko Decl. ¶¶ 6, 13 (same); RaeAnn Beth Nagel Decl. ¶¶ 8–10 (same); Bernardine
Clementine Nagel Decl. ¶ 7, 18 (same); Michael John Nagel Decl. ¶¶ 6–7, 11 (same); Gerard Paul Nagel Decl. ¶¶
6, 11 (same); Patrick James Nagel Decl. ¶¶ 8, 18 (same); Robert Charles Nagel Decl. ¶¶ 6–8 (same); Hunnel Decl.
¶¶ 7–8, 15 (same); Carolyn Ann Nagel Decl. ¶¶ 6–7 (same); Wilmes Decl. ¶¶ 7, 12, 16 (same); Georgiana White
Decl. ¶¶ 7–8, 20 (same); Kristina Nevins Decl. ¶¶ 7–9, 21 (same); Jackie Douglas Swogger Decl. ¶¶ 6–8, 12 (same).

*        *        *

As outlined above, the service-member plaintiffs and the family-member plaintiffs have established defendants' liability under the federal private right of action against state sponsors of terrorism, 28 U.S.C. § 1605A(c), for the torts of assault, battery, and intentional infliction of emotional distress.

### D.      Prejudgment Interest

Plaintiffs next seek prejudgment interest on their compensatory damages.  "Whether to award such interest is a question that rests within this Court's discretion, subject to equitable considerations."  *Oveissi II*, 879 F. Supp. 2d at 56.  In cases like this one, the general practice has been to award prejudgment interest.  *See, e.g.*, *Kinyua v. Republic of Sudan*, No. 14-cv-2118 (JDB), 2020 WL 2542119 at * 7 (D.D.C. 2020) (finding a prejudgment interest award appropriate for family members of U.S. Embassy worker severely injured in bombing in Nairobi over 20 years ago); *Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 82 (D.D.C. 2014) (awarding prejudgment interest for Embassy bombing).  *But see Oveissi v. Islamic Republic of Iran,* 768 F. Supp. 2d 16, 30 n.12 (D.D.C. 2011) (arguing that compensatory awards under the *Heiser* framework already "represent the appropriate level of compensation, regardless of the timing of the attack").  Consistent with this practice and with the relevant equitable principles, plaintiffs are entitled to "prejudgment interest at the prime rate" on their compensatory damages.  *Owens v. Republic of Sudan*, 71 F. Supp. 3d 252, 261 (D.D.C. 2014); *see also Oldham v. Korean Air Lines Co., Ltd.*, 127 F.3d 43, 54 (D.C. Cir. 1997); *Forman v. Korean Air Lines Co.*, 84 F.3d 446, 450–51 (D.C. Cir. 1996).  An award of prejudgment interest will "place plaintiffs in the same position they would have been in had they received (and invested) their damages awards in" 1996.  *Owens*, 71 F. Supp. 3d at 261; *see also, e.g.*, *Opati*, 60 F. Supp. 3d at 83 (awarding

prejudgment interest "reimburses plaintiffs for the time value of money, treating the awards as if they were awarded promptly and invested by plaintiffs").  Failing to award prejudgment interest would place plaintiffs at a disadvantage relative to plaintiffs in earlier litigation.  *See Estate of Doe v. Islamic Republic of Iran*, 943 F. Supp. 2d 180, 184 n. 1 (D.D.C. 2013).

The appropriate interest rate is calculated using the prime rate for each year.  *See Forman*, 84 F.3d at 450 (holding prejudgment interest should be calculated "at the prime rate for each year between the accident and the entry of judgment").  Using the prime rates for each year since the 1996 Khobar Towers bombing through 2020 results in a multiplier of 3.33, which the Court will apply in calculating the total award.[15]

### E.    Punitive Damages

In addition to compensatory damages and prejudgment interest, plaintiffs seek punitive damages.  *See* FAC ¶¶ 171–75; Mot. for Punitive Damages at 1.  Plaintiffs' claims are brought under § 1605A(c), which creates a "[p]rivate right of action . . . for personal injury or death," and currently provides that, "[i]n any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c).  As originally enacted in 1996, however, the FSIA's terrorism exception "shielded" sovereigns "from the possibility of punitive damages."  *Opati*, 140 S. Ct. at 1605 (citing Antiterrorism and Effective Death Penalty Act of 1996 (codifying state-sponsored terrorism exception at 28 U.S.C. § 1605(a)(7)); § 1606 (generally barring punitive damages in suits proceeding under any of

---

[15]        This multiplier was calculated using the following formula provided in *Owens*: "To calculate the multiplier, the Court multiplied $1.00 by the prime rate in 1999 (8%) and added that amount to $1.00, yielding $1.08.  Then, the Court took that amount and multiplied it by the prime rate in 2000 (9.23%) and added that amount to $1.08, yielding $1.17968.  Continuing this iterative process through 2014 yields a multiplier of 2.26185."  71 F. Supp. 3d at 262 & n.6,7,8.  *Owens* used the Federal Reserve's historical prime rate data, *see id.*, and the same data was used here, *see* Bd. of Governors of the Fed. Reserve Sys. Historical Data, https://www.federalreserve.gov/datadownload/Review.aspx?rel=H15&series=8193c94824192497563a23e3787878e c&lastobs=&from=01/01/1996to=12/31/2020&filetype=csv&label=include&layout=seriescolumn; *see also* Ex. A, Spreadsheet, Pls.' Mot. for Punitive Damages, ECF No. 43-2 (showing the full calculation).

§ 1605's sovereign immunity exceptions)).  In 2008, Congress amended the FSIA's terrorism

exception, *see* National Defense Authorization Act for Fiscal Year 2008 (NDAA), 122 Stat. 338,

first, by moving the terrorism exception from § 1605 to § 1605A, which had the effect of

"freeing claims brought under the terrorism exception from the FSIA's usual bar on punitive

damages."  *Opati*, 140 S. Ct. at 1606.  Second, "Congress created an express federal cause of

action for acts of terror," and that new cause of action — the provision at § 1605A(c) quoted

above — "expressly authorizes punitive damages."  *Id.*

   Soon after these amendments, questions arose about their application to conduct that

occurred prior to the 2008 amendments, like the 1996 Khobar Towers bombing.  When plaintiffs

filed this suit, awards of punitive damages "for conduct occurring prior to the enactment of

§ 1605A," were barred in the D.C. Circuit, which had held in *Owens v. Republic of Sudan*, that

Congress had not clearly authorized such retroactive awards.  864 F.3d at 818.  While plaintiffs

were serving their complaint, though, the Supreme Court decided to review *Owens.  See Opati v.

Republic of Sudan*, 139 S. Ct. 2771 (2019).  In May 2020, when plaintiffs' motions to take

judicial notice and for default judgment were pending, the Supreme Court ruled, in *Opati v.

Republic of Sudan*, that Congress clearly authorized plaintiffs suing under § 1605A(c) to seek

punitive damages for pre-2008 conduct.  140 S. Ct. at 1608.  After *Opati*, then, plaintiffs, who

are proceeding under § 1605A(c), may seek punitive damages.  *See Ewan v. Islamic Republic of

Iran*, No. 17-cv-1628 (JDB), 2020 WL 3081939, at *10 (D.D.C. June 10, 2020) (concluding that

plaintiffs suing for injuries from 1983 bombing were entitled to seek punitive damages after

*Opati*).[16]  For the reasons stated below and *infra* Part III.F.5, plaintiffs will be awarded punitive

damages equal to compensatory damages.

---

[16]  While the Supreme Court was considering *Opati*, plaintiffs withdrew their request for punitive damages as
part of an effort to receive an expedited ruling.  *See* Notice of Voluntary Withdrawal of Punitive and Economic

"[P]unitives are aimed not at compensation but principally at retribution and deterring harmful conduct." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 492 (2008); *see also Opati*, 140 S. Ct. at 1609 ("[P]unitive damages aren't merely a form a compensation but a form of punishment."). In line with these aims, in assessing punitive damages under the FSIA's terrorism exception, one approach used in this district is weighing four factors derived from general principles of tort law: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Oveissi II*, 879 F. Supp. 2d at 56 (quoting *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 30 (D.D.C. 2008)); *see* RESTATEMENT (SECOND) OF TORTS § 908 ("In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant."). Here, all four factors weigh in favor of awarding punitive damages: defendants aided Hezbollah in carrying out a horrific, violent attack that killed nineteen people and injured hundreds more; plaintiffs suffered physical injuries and psychological trauma as a result; there is a need to deter future terrorist attacks; and defendants, as state actors, can be presumed to possess significant wealth. *See Abedini v. Islamic Republic of Iran*, 422 F. Supp. 3d 118, 141 (D.D.C. 2019) (stating that these factors are used "[t]o determine whether punitive damages under the FSIA are warranted").

Application of these factors has not led to a single approach for calculating the amount of punitive damages, however. At least four methods have emerged.[17]

---

Damages Demands, ECF No. 34. After the favorable ruling in *Opati*, plaintiffs filed a Motion to Reinstate Punitive Damages, *see* Pls.' Mot. for Punitive Damages, which is granted.

[17]    A fifth method is inapplicable here. Where punitive damages have already been awarded for an incident, the punitive damages in subsequent cases related to that incident are calculated using the ratio of compensatory to punitive damages awarded in the first case. *See Murphy*, 740 F. Supp. 2d at 82 (developing this method); *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 17 (D.D.C. 2012) (adopting the same method).

First, *Flatow v. Islamic Republic of Iran*, awarded "punitive damages in the amount of three times . . . Iran's annual expenditure for terrorist activities."  999 F. Supp. 1, 34 (D.D.C. 1998); *see also Acosta*, 574 F. Supp. 2d at 30 (adopting this approach); *Valore*, 700 F. Supp. 2d at 88 (adopting this approach but with a multiplier of five).  Asserting that Congress's "purpose" in enacting the terrorism exception was "to deter acts of terrorism," *Flatow* looked to an expert witness to determine "the minimum amount" that would affect Iran's conduct.  999 F. Supp. at 34.  The expert landed on "a factor of three times its annual expenditure for terrorist activities" as "the minimum amount which would affect" Iran's "conduct," adding "that a factor of up to ten times its annual expenditure for terrorism must be considered to constitute a serious deterrent to future terrorist activities aimed at United States nationals."  *Id.*  A subsequent case "adopt[ed] five as a multiplier," and awarded $1 billion in punitive damages, in an effort "to send the strongest possible message that Iran's support of terrorism against citizens of the United States absolutely will not be tolerated by the courts of this nation."  *Valore*, 700 F. Supp. 2d at 89.

More recently, the *Flatow* method has been rejected because of the unreliability and "staleness of the" available evidence about Iran's expenditures.  *See, e.g.*, *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 167 (D.D.C. 2017) (noting that cases presenting evidence about Iran's expenditures "were decided over 15 years ago and the record in this case contains no such evidence"); *Cohen v. Islamic Republic of Iran (Cohen II),* 268 F. Supp. 3d 19, 28 (D.D.C. 2017) ("Additionally, determining Iran's annual expenditures is imprecise because there is a lack of credible evidence supporting the numerical estimates and when the funding occurred."); *Opati*, 60 F. Supp. 3d at 81 ("[T]here is not enough evidence in the record on defendants' expenditures during the relevant time period.").  This method's premise has also been questioned

due to "the lack of any evidence that high awards have successfully deterred" Iran.  *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 26 (D.D.C. 2016).

Second, "[r]ecently several decisions from this Court have calculated the total compensatory damages awarded a victim," under the FSIA "and then multiplied that award 'by a factor between one and five,'" *Fritz*, 324 F. Supp. 3d at 65 (quoting *Cohen II*, 268 F. Supp. 3d at 28).  *Gill v. Islamic Republic of Iran*, for instance, multiplied the compensatory award for "a shooting attack in Israel" by three.  249 F. Supp. 3d at 91, 106.  *Cohen II* applied "a multiple of two" to the compensatory award for a bus bombing in Jerusalem.  268 F. Supp. 3d at 28.  In these cases, the *Flatow* method was rejected for the reasons above, as well as because the method produces excessive awards, especially in cases involving injuries but no deaths.  *See Gill*, 249 F. Supp. 3d at 105 ("The approach of using Iran's annual expenditures on terrorist activities, 'which may result in awards of billions of dollars, has been used in the case of exceptionally deadly attacks, such as the 1983 bombing of the Marine barracks in Beirut, which killed 241 American military servicemen.'" (quoting *Braun*, 228 F. Supp. 3d at 87)).  Plaintiffs favor this method, requesting "punitive damages . . . in an amount equal to twice the amount of compensatory damages."  Pls.' Mot. for Punitive Damages at 8.

Third, "a flat $300 million" for punitive damages has been awarded in some cases.  *Abedini*, 422 F. Supp. 3d at 141 (noting this approach).  For example, *Bodoff v. Islamic Republic of Iran* awarded that amount after "[c]onsidering similar cases."  907 F. Supp. 2d 93, 106 (D.D.C. 2012) (citing, *inter alia*, *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 75 (D.D.C. 2008); *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 86 (D.D.C. 2011)); *see also Oveissi II*, 879 F. Supp. 2d at 55–59 (awarding $300 million "in light of prior case law.").  *Bodoff* emphasized "the Supreme Court's instruction that a punitive damages award

be 'reasonably predictable in its severity . . . so that [a] . . . bad man can look ahead with some ability to know what the stakes are in choosing one course of action or another.'"  *Bodoff*, 907 F. Supp. 2d at 106 (*Exxon Shipping Co. v. Baker*, 554 U.S. 471, 502 (2008)).  This method, however, trades discretion for predictability, and has recently been consistently rejected.  *See Abedini,* 422 F. Supp. 3d at 142 ("This method limits a judge's discretion to tailor a punitive award appropriate to the magnitude of the underlying injury."); *see also Flanagan*, 87 F. Supp. 3d at 124; *Hekmati*, 278 F. Supp. 3d at 166–67; *Moradi*, 77 F. Supp. 3d at 73.

Fourth, courts have awarded punitive damages equal to compensatory damages.  *See Abedini,* 422 F. Supp. 3d at 142; *Hekmati*, 278 F. Supp. 3d at 166–67; *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 73 (D.D.C. 2015).  For the reasons stated *infra* Part III.F.5, this method will be adopted here.

## F.     Damages

Turning to the allowable damages, the plaintiffs seek to recover economic, pain and suffering, and solatium damages.  *See* FAC ¶¶ 133–70 (Counts I–V).  Plaintiffs also seek to recover punitive damages.  *See* FAC ¶¶ 171–75; Pls.' Mot. for Punitive Damages at 1.  The damage award to which each plaintiff is entitled is described below.

### 1.     *Legal Standard for Damages under Section 1605A(c)*

In actions brought under the FSIA's terrorism exception, foreign states may be liable for money damages, including "economic damages, solatium, pain and suffering and punitive damages."  28 U.S.C. § 1605A(c).  To recover, the plaintiffs "must prove that the consequences of the foreign state's conduct were reasonably certain (*i.e.*, more likely than not) to occur, and must prove the amount of damages by a reasonable estimate."  *Roth*, 78 F. Supp. 3d at 402 (internal quotation marks omitted); *see also Fraenkel*, 892 F.3d at 353 (stating the same).  Courts may look to expert testimony and prior awards in determining whether the amount of damages

has been proven by a reasonable estimate. *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008). The D.C. Circuit "review[s] the District Court's FSIA damages awards for abuse of discretion." *Fraenkel*, 892 F.3d at 356.

The evidence presented in *Blais* and *Heiser I*, of which this Court has taken judicial notice and reviewed above, has satisfactorily shown that the plaintiffs' injuries were reasonably certain and were the intended consequences of the defendants' material support of Saudi Hezbollah. *See Schooley*, 2019 WL 2717888, at *74 (concluding the same); *Akins*, 332 F. Supp. 3d at 39 (same). Having concluded this, whether plaintiffs have shown the amount of economic, pain and suffering, and solatium damages by a reasonable estimate will be considered next.

### 2. *Economic Losses and Medical Expenses*

The 14 service-member plaintiffs seek to recover for "medical expenses" and "economic losses." FAC ¶ 140; *see also id* ¶ 143. This demand is unaccompanied by any documentation of medical bills or payments or by any evidence of lost wages or other economic injury, and so plaintiffs have failed to prove the amount of economic or medical expenses damages by a reasonable estimate. *See Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 71 (D.D.C. 2015) (concluding the same where plaintiff had estimated his economic loss without documentation); *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 41 (D.D.C. 2016) (denying economic damages where plaintiffs did not provide documents "lending credence" to their claims of lost income); *Akins*, 332 F. Supp. 3d at 39–40 (denying economic losses for failure to support claims with sufficient evidence); *Aceto*, 2020 WL 619925 at *18 (denying economic losses and medical expenses where demands "unaccompanied by any documentation"). "Unlike damages for pain and suffering, lost earnings" and incurred medical expenses "are not hard to quantify, and the Court will not excuse plaintiffs' failure to support the claim for lost earnings" and medical

expenses "with competent evidence."  *Moradi*, 77 F. Supp. 3d at 71.  Plaintiffs' claims for economic losses and medical expenses are denied.

### 3. *Pain and Suffering*

As discussed, defendants are liable to the 14 service-member plaintiffs for battery, assault, and intentional infliction of emotional distress, but the bar on multiple recoveries allows plaintiffs to recover only under one theory, for the single underlying harm.  *See, e.g.*, *Valore*, 700 F. Supp. 2d at 77 ("The Court notes that these plaintiffs who have claimed assault, battery, and IIED may recover under only one of any such theories, as multiple recovery is prohibited."). Within this single-recovery framework, the "baseline assumption" applied in previous cases under the FSIA's terrorism exception is that "persons suffering injuries in terrorist attacks are entitled to $5 million in damages."  *Kaplan*, 213 F. Supp. 3d at 35 (quoting *Davis*, 882 F. Supp. 2d at 12).  The baseline may be adjusted either upward or downward.  An upward departure would be warranted "in the presence of 'severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic . . . or were mistaken for dead.'"  *Id.* at 35–36 (quoting *Valore*, 700 F. Supp. 2d at 84).  A downward departure would be warranted "in the face of 'minor shrapnel injuries or minor injury from small-arms fire.'"  *Id.* at 36 (quoting *Valore*, 700 F. Supp. 2d at 84).

Pain and suffering damages are by their nature difficult to quantify.  In *Schooley*, this Court relied in part on an "objective metric" — the VA disability rating — to "determin[e] the relative degree of injury suffered by each service-member plaintiff."  *Schooley*, 2019 WL 2717888, at *74.  That rating is the "agency's official determination regarding the extent of disabling injury sustained by service members in connection with military service."  *Id.* (internal quotation marks omitted).  As *Schooley* explained, "[t]he VA disability rating, which includes both mental and physical injuries in a single number, facilitates an approach to awarding

49

damages that is generally agnostic to the mental or physical nature of the injury and further provides" an effective way of comparing injuries to ensure that similar injuries yield similar awards. *Id.*; *cf. Khaliq v. Republic of Sudan*, 33 F. Supp. 3d 29, 33 (D.D.C. 2014) ("When calculating damages amounts, 'the Court must take pains to ensure that individuals with similar injuries receive similar awards.'" (quoting *Peterson*, 515 F. Supp. 2d at 54)). *Schooley*'s basic rubric is adopted in this case for the service-member plaintiffs with relevant VA disability ratings. *See Aceto*, 2020 WL 619925 at *18 (using *Schooley*'s "basic rubric" of VA disability ratings to calculate damages amounts). Thus, service-member plaintiffs rated by the VA up to 30% disabled receive a baseline award of $5,000,000; plaintiffs rated 40–60% disabled by the VA will receive an upward departure, for a total award of $6,000,000; and service-member plaintiffs rated 70–100% disabled by the VA will receive a further upward departure, for a total of $7,000,000. *Schooley*, 2019 WL 2717888, at *75. The remaining service-member plaintiffs will be awarded damages based on the descriptive and documentary evidence presented. *See id.* (adopting the same approach); *see also Akins*, 332 F. Supp. 3d at 40–41 (using this approach); *Aceto*, 2020 WL 619925 at *18 (using this approach).

Seven plaintiffs — Glenn Tyler Christie, Clayton Omar Zook, Joseph Martin Jackson, Christopher Pius Nagel, Bryant Keith White, Nathan Frederick Baloy, and Jackie Swogger — can recover in the 70–100% disabled category. Several of these plaintiffs' entire disability ratings are attributable to the bombing, and those plaintiffs can recover $7,000,000 based simply on their disability ratings. Christie's disability rating is 70%, *see* Christie Decl. ¶ 18; Christie Decl., Ex. D, Letter from VA, dated Dec. 17, 2018 at 14, and he will receive an award of $7,000,000. Zook's disability rating is 90%, *see* Zook Decl. ¶ 14; Zook Decl., Ex. E, Letter from VA, dated Mar. 13, 2019 at 49, and he will receive an award of $7,000,000. Jackson's disability

rating is 90%, *see* Jackson Decl. ¶ 12–13; Jackson Decl., Ex. D, Letter from VA, dated Mar. 19, 2019 at 115, and he will receive an award of $7,000,000.  Baloy's disability rating is 70%, *see* Baloy Decl. ¶ 12; Baloy Decl., Ex. E, Letter from VA, dated Dec. 19, 2019 at 508–09, and he will receive an award of $7,000,000.  For several of these plaintiffs, only a portion of the disability rating is attributable to the bombing, and those plaintiffs can recover for that portion. Of Nagel's 100% disability rating, 70% is attributable to PTSD and 10% is attributable to tinnitus, Nagel Decl., Ex. H, Letter from VA, dated Feb. 13, 2019 at 170, but the remaining 20% is attributable to injuries that Nagel does not aver were caused by the Khobar Towers attack and for which he therefore cannot recover.  Thus, Nagel can recover for 80% of his VA disability rating and will receive an award of $7,000,000.  Similarly, the VA has given White a 100% disability rating, White Decl. ¶ 22; White Decl., Ex. H, Letter from VA, dated May 1, 2018 at 296, 70% of which is attributable to PTSD, *see* White Decl. ¶ 22; White Decl., Ex. I, List of VA Rated Disabilities at 298.  The remaining 30% is attributable to other injuries that White does not aver were caused by the Khobar Towers attack and for which he therefore cannot recover.  Thus, White can recover for 70% of his VA disability rating and will receive an award of $7,000,000. Finally, of Swogger's 100% disability rating, 50% is attributable to PTSD, *see* Swogger Decl. ¶ 26; Swogger Decl., Ex. E, Letter from VA, dated Dec. 6, 2019 at 529, 20% is attributable to "chronic knee and shoulder pain" and 20% of which is attributable to "a painful scar," *see* Swogger Decl. ¶ 23; Swogger Decl., Ex. E, Letter from VA, dated Dec. 6, 2019 at 529.  Swogger attributes both the chronic knee and shoulder pain and painful scar to his "physical injuries from the Attack."  Swogger Decl. ¶ 23.  Thus, Swogger can recover for 90% of his VA disability rating and will receive an award of $7,000,000.

Four plaintiffs — Ricky Lee Morse, Scott Elliot Rikard, William Christian Nevins, and Timothy Michael Schomaker — can recover in the 40–60% disabled category.  Of Morse's 60% disability rating, 50% is attributable to PTSD.  *See* Morse Decl. ¶ 16; Morse Decl., Ex. I, Letter from VA, dated Oct. 1, 2019 at 340.  The remaining 10% is attributable to other injuries that Morse does not aver were caused by the Khobar Towers attack and for which he therefore cannot recover.  Thus, Morse can recover for 50% of his VA disability rating and will receive an award of $6,000,000.  Similarly, the VA has given Rikard an 80% disability rating, Rikard Decl. ¶ 11; Rikard Decl., Ex. E, Letter from VA, dated Jan. 11, 2006 at 355–36, 30% of which is attributable to PTSD and 10% of which is attributable to "bilateral tinnitus" resulting from the bombing, Rikard Decl. ¶ 11.  The remaining 40% is attributable to other injuries that Rikard does not aver were caused by the Khobar Towers attack and for which he therefore cannot recover.  Thus, Rikard can recover for 40% of his VA disability rating and will receive an award of $6,000,000. Finally, Nevins has been rated 60% disabled by the VA, 30% of which is attributable to PTSD and 10% of which is attributable to tinnitus.  *See* Nevins Decl. ¶ 13; Nevins Decl., Ex. H, Letter from VA, dated Dec. 29, 2019 at 389.  The remaining 20% is attributable to other injuries that Nevins does not aver were caused by the Khobar Towers attack and for which he therefore cannot recover.  Thus, Nevins can recover for 40% of his VA disability rating and will receive an award of $6,000,000.

One plaintiff, LeSandro Edwin Santiago, can recover in the up-to-30% disabled category. Of Santiago's 40% disability rating, 30% is attributable to PTSD.  Santiago Decl. ¶ 16; Santiago Decl., Ex. H, Letter from VA, dated Nov. 6, 2019 at 600.  The remaining 10% is attributable to injuries Santiago does not aver were caused by the Khobar Towers attack and for which he

therefore cannot recover.  Thus, Santiago can recover for 30% of his VA disability rating and will receive an award of $5,000,000.

Review of the affidavits and supporting evidence submitted by one service-member plaintiff — Steven Neal Wilson — demonstrates that Wilson is entitled to an award of $6,000,000 for the wounds he received in the bombing and the psychological symptoms he has suffered since.  *See* Wilson Decl. ¶ 10, 18 (describing shrapnel wounds, injury to left hand, and symptoms of PTSD).[18]  Of Wilson's 80% disability rating, only 20% total is attributable to injuries he sustained from the Khobar Towers Attack, *see* Wilson Decl. ¶ 22; Wilson Decl., Ex. I, Letter from VA, dated Nov. 18, 2019 at 474, and based on this rating, Wilson would receive only $5,000,000 in damages.  The documentary evidence, however, supports the finding that Wilson's injuries are similar to injuries of those receiving higher awards in this suit, so his award will be supplemented.  *See* Wilson Decl. ¶ 12–13 (describing surgery and months of occupational therapy for hand injury); Wilson Decl. ¶ 16 (describing continuing problems with hand); Wilson Decl. ¶ 18 (describing symptoms of PTSD).

Finally, review of the affidavits and supporting evidence submitted by the remaining service-member plaintiff demonstrates that one plaintiff — Chad Allen McCullough — is entitled to an award of $3,000,000 for the cuts and bruising he received in the bombing and the psychological symptoms he has suffered since.  *See* McCullough Decl. ¶¶ 6, 11 (describing cuts

---

[18]  Although Wilson has been rated 80% disabled by the VA, the submitted evidence does not support a finding that the disabilities underlying this rating are attributable to the bombing, and so the disability rating is not used to calculate Wilson's damages award.  While 10% of Wilson's disability rating is attributable to tendonitis in his left wrist, and 10% is attributable to tinnitus, the remaining 50% is attributable to "obstructive sleep apnea."  Wilson Decl. ¶ 22; Wilson Decl., Ex. I, Letter from VA, dated Nov. 18, 2019 at 474.  The declaration and attachments do not show what injuries underlie these determinations.  *See* Wilson Decl.; *see also* Wilson Decl., Ex. I, Letter from VA, dated Nov. 18, 2019 at 474, ECF No. 37.  Further, Wilson's declaration states that he has been diagnosed with PTSD by the VA because of the attack.  *See* Wilson Decl. ¶ 18.  His declaration also states that he had several surgeries and "underwent occupational therapy" for several months for the injury to his left hand.  Wilson Decl. ¶ 18.  Neither his PTSD nor his hand injury appear to be reflected in his disability rating.  *See* Wilson Decl., Ex. I, Letter from VA, dated Nov. 18, 2019 at 474.

to shoulder and chest and symptoms of PTSD).  McCullough suffered the sort of "'minor shrapnel injuries or minor injury from small-arms fire,'" *Kaplan*, 213 F. Supp. 3d at 36 (quoting *Valore*, 700 F. Supp. 2d at 84), which, under this court's FSIA cases, receive an award of $3,000,000, *see, e.g.*, *Schooley*, 2019 WL 2717888, at *75 (awarding $3,000,000 to plaintiffs with similar, "comparatively minor" injuries); *Akins*, 332 F. Supp. 3d at 41 (awarding $2,500,000 to victims who sustained cuts from flying glass and psychological injury).

Accordingly, Glenn Tyler Christie, Clayton Omar Zook, Joseph Martin Jackson, Christopher Pius Nagel, Bryant Keith White, Nathan Frederick Baloy, and Jackie Swogger will receive awards of $7,000,000 each; Ricky Lee Morse, Scott Elliot Rikard, William Christian Nevins, Timothy Michael Schomaker, and Steven Neal Wilson will receive awards of $6,000,000 each; LeSandro Edwin Santiago will receive an award of $5,000,000; and Chad Allen McCullough will receive an award of $3,000,000.

### 4.    *Solatium*

The 21 family-member plaintiffs seek solatium damages to compensate for the emotional distress they experienced as family members of service-member victims.  *See* FAC ¶ 152. "Solatium is traditionally a compensatory damage which belongs to the individual heir personally for injury to the feelings and loss of decedent's comfort and society," *Fraenkel*, 892 F.3d at 356 (quoting *Flatow*, 999 F. Supp. at 29), but solatium damages have also been awarded to compensate for the emotional distress of the family members of surviving victims, *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 39 (D.D.C. 2012) (explaining that "in the context of distress resulting from injury to loved ones — rather than death — courts have applied a framework where awards are valued at half of the awards to family members of the deceased." (internal quotation marks omitted)); *see also Valore*, 700 F. Supp. 2d at 85 ("Relatives of surviving servicemen received awards valued at half of the awards to family members of the

deceased.").  "Under the FSIA, a claim for solatium is nearly indistinguishable from a claim for IIED."  *Flanagan*, 87 F. Supp. 3d at 115; *see also Fraenkel*, 892 F.3d at 357.  Damages recoverable on the family members' claims of IIED thus will be discussed as claims for solatium damages.

"Mental anguish, bereavement and grief resulting from" an immediate family member's death or injury "constitutes the preponderant element of a claim for solatium."  *Fraenkel*, 892 F.3d at 356–57 (alteration adopted) (quoting *Flatow*, 999 F. Supp. at 30).  In determining the appropriate amount to compensate victims' family members for emotional distress, "the Court may look to prior decisions awarding damages . . . for solatium."  *Acosta*, 574 F. Supp. 2d at 29.

Commonly accepted in this Court is *Heiser I*'s standardized framework for solatium damages.  *Heiser I*, 466 F. Supp. 2d at 269; *see Roth*, 78 F. Supp. 3d at 403 (noting the "framework has been adopted by other courts as an appropriate measure of solatium damages for the family members of victims of state-sponsored terror" (citing *Valore*, 700 F. Supp. 2d at 85)).  Although the *Heiser* framework is not mandatory, *see Fraenkel*, 892 F.3d at 361 ("There is no statutory basis for concluding that district courts *must* award solatium damages in the amounts that *Heiser* found commonly granted.").  It is adopted here for consistency, *see also Akins*, 332 F. Supp. 3d at 43 (adopting the *Heiser* framework for awarding solatium damages); *Schooley*, 2019 WL 2717888, at *77 (same); *Aceto*, 2020 WL 619925 at *20–21 (adopting the *Heiser* framework for awarding solatium damages).

The *Heiser* framework, as a baseline, awards spouses of deceased victims $8,000,0000, parents and children of deceased victims $5,000,000, and siblings of deceased victims $2,500,000.  *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 15 (D.D.C. 2010).  "[F]amilies of victims who have died are typically awarded greater damages than families of

victims who remain alive," *Heiser I*, 466 F. Supp. 2d at 269 (quoting *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 75 (D.D.C. 2006)), and so the courts have awarded family members of surviving victims approximately half the baseline awards for family members of the deceased, *see Wultz*, 864 F. Supp. 2d at 39; *Valore*, 700 F. Supp. 2d at 85.  Here, then, the applicable baseline solatium awards are $4,000,000 to spouses of surviving victims and $2,500,000 to parents of surviving victims, *see Wultz*, 864 F. Supp. 2d at 39; "[c]hildren of a surviving victim receive $1.5 million on average," *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 28 (D.D.C. 2014), and siblings of surviving victims receive $1,250,000, *see Valore*, 700 F.Supp.2d at 85.

These numbers serve only as an anchor from which the Court should deviate to compensate for specific circumstances.  *See Fraenkel*, 892 F.3d at 362 ("While past solatium awards from comparable cases are appropriate sources of guidance for district courts, different plaintiffs (even under FSIA) will prove different facts that may well (and should) result in different damage awards." (internal quotation marks omitted)).  "Decisions to deviate from the starting points provided by the *Heiser* framework are committed to the discretion of the particular court in each case . . ." *Oveissi*, 768 F. Supp. 2d at 26; *see also Fraenkel*, 892 F.3d at 351 ("District Court judges have discretion . . . to grant solatium awards based on the particular facts of each case, subject to abuse-of-discretion review for errors of law, clearly erroneous factual findings, and faulty reasoning.").  The damages awards for plaintiff-spouses are addressed first, followed by parents and children, and then siblings.

### a. Spouses

Four of the family-member plaintiffs were spouses, or the functional equivalent of spouses, of service-member plaintiffs at the time of the bombing: Sandra Olivia Bouse, Georgiana White, Kristina Nevins, and Kimberly Michelle Wilson.  Each spouse has described

fear for her spouse's physical well-being in the immediate aftermath of the bombing and the toll that the bombing has taken since on their sense of safety, on their spouses, and on their marriages.  *See* Bouse Decl. ¶¶ 7–8, 15; Georgiana White Decl. ¶¶ 7-10, 16, 20; Kristina Nevins Decl. ¶¶ 9, 16, 21; Kimberly Michelle Wilson Decl. ¶¶ 8, 15, 17–18.

The *Heiser* framework awards spouses of surviving victims $4,000,000.  Here, Sandra Olivia Bouse, Georgiana White, Kristina Nevins, and Kimberly Michelle Wilson will receive an award of $4,000,000 each.

### b.  Parents

Six of the immediate–family member plaintiffs will receive awards as parents of service members who were stationed at the Khobar Towers at the time of the bombing:  Janet Louise Christie, Janet Lynn Douglass, Sheila Lynn Jackson, William Richard Jackson, Bernardine Clementine Nagel, and Jackie Douglas Swogger.  These mothers and fathers have attested to their panic upon learning about the attack and to the continued distress of witnessing their children deal with the psychological after-effects of the attack.[19]  These harms are consistent with those suffered by many parents of victims of terrorism.  *See Valencia*, 774 F. Supp. 2d at 16.

The parents of the injured service members are each entitled to a baseline award of $2,500,000.  *See Akins*, 332 F. Supp. 3d at 44 (awarding $2,500,000 to the parents of injured service members).  Here, Janet Louise Christie, Janet Lynn Douglass, Sheila Lynn Jackson, William Richard Jackson, Bernardine Clementine Nagel, and Jackie Douglas Swogger will receive an award of $2,500,000 each.

---

[19]     Janet Louise Christie Decl. ¶¶ 6–7, 15; Janet Lynn Douglass Decl. ¶¶ 7–10; Sheila Lynn Jackson Decl. ¶¶ 6–9, 15; William Richard Jackson Decl. ¶¶ 6–7. 10–11; Bernardine Clementine Nagel Decl. ¶¶ 6–7, 18; Jackie Douglas Swogger Decl. ¶¶ 6–8, 14.

### c.   Children

Although RaeAnn Beth Nagel, the only plaintiff who is a child of a service-member plaintiff injured in the bombing, was too young at the time of the bombing to comprehend that her father had been in danger, *see* RaeAnn Beth Nagel Decl. ¶ 4 (stating that she was three years old on June 25, 1996), this lessened awareness does not lessen the distress Nagel experienced growing up with a father suffering from psychological symptoms from the attack, *see id.* ¶¶ 6–10 (describing these effects on their relationship).  She also attributes difficulties in their relationship with her service-member father at least in part to the psychological mark the bombing left.  *See* RaeAnn Beth Nagel Decl. ¶ 10.

As stated, "[c]hildren of a surviving victim receive $1.5 million on average" under the *Heiser* framework.  *Spencer*, 71 F. Supp. 3d at 28.  RaeAnn Beth Nagel, whose father received an award of $7,000,000, will receive an award of $1,500,000.

### d.   Siblings

Ten of the 21 family-member plaintiffs are siblings or half-siblings of service-member plaintiffs: Crystal Lynn Love, Gregory Anthony Russell, Melissa Dawn Timko, Michael John Nagel, Gerard Paul Nagel, Patrick James Nagel, Robert Charles Nagel, Terese Marie Hunnel, Carolyn Ann Nagel, and Mary Margaret Wilmes.  Each has described distress upon learning about the bombing and has suffered from the ongoing effects of the attack on their respective siblings and families.[20]  These harms are consistent with those suffered by many siblings of victims of terrorism.  *See Valencia*, 774 F. Supp. 2d at 16.  These plaintiffs' service-member siblings — Clayton Omar Zook, Joseph Martin Jackson, and Christopher Pius Nagel — were each awarded $7,000,000, so no downward departure for proportionality is required.  Within the

---

[20]   *See* Love Decl. ¶¶ 6, 10–11; Russell Decl. ¶¶ 7–8, 12 (same); Timko Decl. ¶¶ 6, 13; Michael John Nagel Decl. ¶¶ 6–7, 11; Gerard Paul Nagel Decl. ¶¶ 6, 11; Patrick James Nagel Decl. ¶¶ 8, 18; Robert Charles Nagel Decl. ¶¶ 6–8; Hunnel Decl. ¶¶ 7–8, 15; Carolyn Ann Nagel Decl. ¶¶ 6–7; Wilmes Decl. ¶¶ 7, 12, 16.

*Heiser* framework, these siblings of injured service members are each entitled to an award of $1,250,000.  *See Akins*, 332 F. Supp. 3d at 45 (awarding a baseline amount of $1,250,000 to siblings of injured service members).

*       *       *

In sum, plaintiffs will be awarded a total of $132,000,000 in compensatory damages.

### 5.       *Punitive Damages*

All 35 plaintiffs also seek to recover punitive damages.  *See* FAC ¶¶ 171–75; Mot. for Punitive Damages at 1.  Punitive damages equal to compensatory damages will be awarded.

This conclusion is informed not only by the already identified flaws in the existing methods described above, *see supra* Part III.E, but also by the Supreme Court's guidance on punitive damages.  To be sure, much of that guidance is rooted in the Due Process Clause, and "foreign states" and their agents "are not 'persons' protected by the Fifth Amendment['s]" Due Process Clause.  *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002); *see also TMR Energy Ltd. v. St. Prop. Fund of Ukraine*, 411 F.3d 296, 301 (D.C. Cir. 2005) (holding that where a foreign state "exert[s] sufficient control over [an entity] to make it an agent of the State, then there is no reason to extend to [that entity] a constitutional right that is denied to the sovereign itself"); *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 619 (1992) ("[a]ssuming, without deciding, that a foreign state is a 'person' for purposes of the Due Process Clause"); *Haim*, 784 F. Supp. 2d at 14 ("Due Process principles play no role in limiting punitive damages in terrorism-related FSIA suits.").[21]  Nevertheless, the Supreme Court's guidance is "instructive, insofar as" due process principles "embody general concerns for

---

[21]       These "due process cases . . . have all involved awards subject in the first instance to state law," and have thus interpreted the Fourteenth Amendment, *Exxon Shipping Co.*, 554 U.S. at 502, but any gloss on the Fifth Amendment's Due Process Clause, which is applicable here, would likely be the same, *see Kunz v. DeFelice*, 538 F.3d 667, 679 (7th Cir. 2008) (applying the Fourteenth Amendment principles to an award of punitive damages in a case governed by the Fifth Amendment).

fairness and consistency." *Flanagan*, 87 F. Supp. 3d at 125 n.37; *see also Exxon Shipping Co.*, 554 U.S. at 502 (importing these principles into maritime law). *But see Beer v. Islamic Republic of Iran*, 789 F. Supp. 2d 14, 26 (D.D.C. 2011) (holding that none of the Supreme Court's guidance on punitive damages applies in FSIA terrorism-exception cases and reaffirming the *Flatow* method).

The Supreme Court has laid out three "guideposts" for "reviewing punitive damages" awards: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)). In addition, in *Philip Morris USA v. Williams*, the Supreme Court announced that "the Constitution's Due Process Clause forbids . . . use [of] a punitive damages award to punish a defendant for injury that it inflicts upon nonparties or those whom they directly represent, *i.e.*, injury that it inflicts upon those who are, essentially, strangers to the litigation." 549 U.S. 346, 353 (2007). "Despite these" and other "limitations, punitive damages overall are higher and more frequent in the United States than they are anywhere else," the Supreme Court has observed. *Exxon Shipping Co.*, 554 U.S. at 496.

This guidance brings into immediate view additional problems with the *Flatow* and flat-award methods. The flat-award method, though purporting to respect the guidepost of treating comparable cases comparably, has in practice elevated superficial similarities over meaningful ones. Furthermore, the flat-award method in practice skims over analysis of the plaintiffs' precise harms. *Bodoff*, for example, was a suit brought by the estate, and by surviving family

members, of a man killed in a bombing of a passenger bus, and it awarded $300 million based on comparisons to cases involving the beheading of two civilians, an assassination of a rabbi on the streets of New York City, the hijacking of Egypt Air Flight 648, and a bombing at a restaurant in Tel Aviv.  907 F. Supp. 2d at 106.  More troublingly, the *Flatow* method, in keying punitive damages to Iran's spending, abandons a focus on case-specific evidence altogether, in favor of a singular focus on deterrence.

The compensatory-multiplier approach and the method adopted here both hew to the harm defendants caused plaintiffs by "anchor[ing] punitive damages to compensatory damages." *Cohen II*, 268 F. Supp. at 28.  The Supreme Court's guidance, however, indicates that the compensatory-multiplier approach favored by plaintiffs would yield an excessive award here. Recall that plaintiffs request an award of two times compensatory damages, *see* Pls.' Mot. for Punitive Damages at 8, amounting to a punitive damages award of $264 million.  A punitive award of one times compensatory damages — $132 million — is more appropriate.

Certain features of this case do suggest that a large award is appropriate:  The defendants' conduct was incredibly reprehensible — "the result of intentional malice," not "mere accident." *State Farm*, 538 U.S. at 419; *see also Beer*, 789 F. Supp. 2d at 25 ("Terrorism, along with atrocities such as genocide, occupies a unique place in the pantheon of human conduct as an activity devoid of value that observes no respect for life and no hint of compassion.").  In addition, the Khobar Towers bombing caused the death of nineteen people and physical injuries to hundreds more.  *See Phillip Morris*, 549 U.S. at 355 (holding that evidence like this "of actual harm to nonparties can help to show that the conduct that harmed the plaintiff also posed a substantial risk of harm" to others, "and so was particularly reprehensible").  "[P]hysical assault

or trauma" is the most serious type of harm that can a defendant can do to a plaintiff, and the type of harm most deserving of punitive damages.  *State Farm*, 538 U.S. at 426.

That said, other features of this case suggest that an award of punitive damages equal to compensatory damages would be a sufficient response to defendants' conduct.  For one, care should be taken not to use the punitive damages verdict "to punish a defendant directly on account of harms it is alleged to have visited on" the other victims of the bombing, who are "nonparties."  *Phillip Morris*, 549 U.S. at 355.  Any punitive damages award here should thus be proportional to the harms done to plaintiffs in this case, who suffered serious but not fatal injuries.  *See State Farm*, 538 U.S. at 426 ("[C]ourts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered.").  For another, plaintiffs are already receiving substantial compensatory awards, and "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of" an appropriate punitive award.  *Exxon Shipping Co.*, 554 U.S. at 501 (quoting 538 U.S. at 425).  "The compensatory damages for the injury suffered here, moreover," are "based on a component which" would be "duplicated in the punitive award."  *State Farm*, 538 U.S. at 426.  Specifically, "the compensatory damages include an amount for emotional distress, such as humiliation or indignation caused by the defendant's act," and, as such "there is no clear line of demarcation between punishment and compensation" — the award of compensatory damages "includes elements of both."  RESTATEMENT (SECOND) OF TORTS § 908, cmt, c (1977).  Where these elements are present — serious but not the most serious harm and potentially overlapping compensatory and punitive awards — the Supreme Court has urged that an award of punitive damages equal to compensatory damages is appropriate.  *See Exxon Shipping Co.*, 554 U.S. at 513–15 (holding

that a 1:1 ratio of compensatory to punitive damages is the upper-limit in maritime cases, where the conduct is not likely to be the most serious); *see also State Farm*, 538 U.S. at 429 ("An application of the . . . guideposts to the facts of this case, especially in light of the substantial compensatory damages awarded (a portion of which contained a punitive element), likely would justify a punitive damages award at or near the amount of compensatory damages"). Such a ratio of compensatory to punitive awards, the Supreme Court has observed, is also likely "to protect against the possibility (and the disruptive cost to the legal system) of awards that are unpredictable and unnecessary, either for deterrence or for measured retribution." *Exxon Shipping Co.*, 554 U.S. at 513.

One final justification for large punitive damages awards plays a prominent role in FSIA terrorism cases and merits addressing — deterrence. This Court joins others in noting "the lack of any evidence that high awards have successfully deterred" Iran. *Bluth*, 203 F. Supp. 3d at 26. Over a decade ago, in 2009, Iran had "10 billion in . . . outstanding court judgments" in FSIA cases. *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 37 (D.D.C. 2009). That amount has surely ballooned over the last decade. Adding hundreds of millions of dollars to that amount in this case is not likely to have a meaningful deterrent effect. Indeed, given "that the prospects for recovery upon judgments entered in these cases are extremely remote," large awards of punitive damages in cases like this one "may . . . serve only to expose" the political branches "to an unprecedented burden in [their] management of United States foreign policy towards Iran." *Id.* at 37–38; *see also* Comment, *Exceptional Judgments: Revising the Terrorism Exception to the Foreign Sovereign Immunities Act*, 127 YALE L.J. 1890, 1900 (2018) ("[T]he outstanding judgments threaten to frustrate Iran's reintegration into the global economic community.").

Thus, plaintiffs are entitled to a punitive damages award of $132,000,000 to be apportioned among plaintiffs according to their compensatory damages. *Onsongo v. Republic of Sudan*, 60 F. Supp. 3d 144, 153 (D.D.C. 2014); *see also See Valore*, 700 F. Supp. 2d at 90 (apportioning in the same fashion).

## IV.    CONCLUSION

The plaintiffs' motion for default judgment is granted. Defendants are liable for the pain and suffering inflicted on the 14 service-member plaintiffs and for the emotional distress inflicted on the 21 family-member plaintiffs.

The plaintiffs are awarded monetary damages in the following amounts:

- Service-member plaintiffs Glenn Tyler Christie, Clayton Omar Zook, Joseph Martin Jackson, Christopher Pius Nagel, Bryant Keith White, Nathan Frederick Baloy, and Jackie Swogger are each entitled to $7,000,000 in pain and suffering damages and $7,000,000 in punitive damages, both of which are multiplied by the prime interest rate factor of 3.33%;

- Service-member plaintiffs Ricky Lee Morse, Scott Elliot Rikard, William Christian Nevins, Timothy Michael Schomaker, and Steven Neal Wilson are each entitled to $6,000,000 in pain and suffering damages and $6,000,000 in punitive damages, both of which are multiplied by the prime interest rate factor of 3.33%;

- Service-member plaintiff LeSandro Edwin Santiago is entitled to $5,000,000 in pain and suffering damages and $5,000,000 in punitive damages, both of which are multiplied by the prime interest rate factor of 3.33%;

- Service-member plaintiff Chad Allen McCullough is entitled to $3,000,000 in pain and suffering damages and $3,000,000 in punitive damages, both of which are multiplied by the prime interest rate factor of 3.33%.

- Plaintiff-spouses Sandra Olivia Bouse, Georgiana White, Kristina Nevins, and Kimberly Michelle Wilson are each entitled to $4,000,000 in solatium damages and $4,000,000 in punitive damages, both of which are multiplied by the prime interest rate factor of 3.33%;

- Plaintiff-parents Janet Louise Christie, Janet Lynn Douglass, Sheila Lynn Jackson, William Richard Jackson, Bernardine Clementine Nagel, and Jackie Douglas Swogger are each entitled to an award of $2,500,000 in solatium damages and $2,500,000 in punitive damages, both of which are multiplied by the prime interest rate factor of 3.33%;

- Plaintiff-child RaeAnn Beth Nagel is entitled to $1,500,000 in solatium damages and $1,500,000 in punitive damages, both of which are multiplied by the prime interest rate factor of 3.33%;

- Plaintiff-siblings and half-siblings Crystal Lynn Love, Gregory Anthony Russell, Melissa Dawn Timko, Michael John Nagel, Gerard Paul Nagel, Patrick James Nagel, Robert Charles Nagel, Terese Marie Hunnel, Carolyn Ann Nagel, and Mary Margaret Wilmes are each entitled to $1,250,000 in solatium damages and $1,250,000 in punitive damages, both of which are multiplied by the prime interest rate factor of 3.33%.

Thus, the total damages award is $879,120,000.

An appropriate Order accompanies this Memorandum Opinion.

Date: July 2, 2020

_____
BERYL A. HOWELL
Chief Judge